

13 CIV 4037

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BROADCAST MUSIC, INC.,

Petitioner,

v.

PANDORA MEDIA, INC.,

Respondent.

Related to *United States v. Broadcast Music, Inc.*, 64 Civ. 3787 (LLS)

13 Civ. _____ (LLS)

**PETITION OF BROADCAST MUSIC, INC., FOR THE DETERMINATION OF REASONABLE LICENSE FEES**

## INTRODUCTION

1. Petitioner Broadcast Music, Inc. ("BMI") seeks a determination of reasonable license fees (and terms) for a blanket license that covers all BMI-affiliated musical compositions performed by the internet music streaming service (the "Service") of Pandora Media Inc. ("Pandora"). BMI seeks this determination pursuant to Article XIV(A) of the Final Judgment, *United States v. Broadcast Music, Inc.,* 1966 Trade Cas. (CCH) ¶ 71,941 (S.D.N.Y. 1966), as amended by 1996-1 Trade Cas. (CCH) ¶ 71,378 (S.D.N.Y. 1994) (the "BMI Consent Decree," attached hereto as Exhibit 1). The license at issue will cover Pandora's performance of BMI-affiliated musical compositions that are accessible via (a) Pandora's website and (b) on a through-to-the-audience basis, third party platforms with which Pandora has a contractual economic relationship for the period January 1, 2013 – December 31, 2014.

2. The fee determination for the license at issue also shall include appropriate adjustments to account for the withdrawal from BMI by certain BMI-affiliated publishers of the right to license their digital public performing rights to Pandora and other digital music services

(as discussed more fully below), as well as fee adjustments to account for direct licensing should Pandora seek an adjustable fee blanket license.

       3.      Pursuant to the Order of Judge Stanton, dated April 25, 2001 in *United States v. Broadcast Music, Inc.*, Civ. 64-3787, BMI brings this proceeding by separate petition and notes that this proceeding is related to 64 Civ. 3787.

       4.      In brief, BMI has proposed an increase in Pandora's fees consistent with market rates to reflect the explosive growth of the internet music streaming marketplace, and the changes in the publishing landscape brought about by withdrawal of rights by publishers who are not satisfied with the depressed level of current public performing rights fees. Pandora for its part commenced a rate proceeding against ASCAP to actually lower its current fees. We expect Pandora to claim that it is no different than commercial broadcast radio. This contention is wrong.

## THE PARTIES

       5.      BMI is a music performing right licensing organization, with its headquarters at 7 World Trade Center, 250 Greenwich Street, New York, New York 10007. BMI is a New York corporation that operates on a not-for-profit basis, licensing the public performing right in approximately 7.5 million musical works on behalf of over 600,000 affiliated composers, songwriters, and music publishers to a wide variety of music users.

       6.      Pandora is the market leader in the internet streaming music business in the United States, with its headquarters at 2101 Webster Street, Oakland, California 94612. Pandora is a California corporation, providing the Service on more than 1,000 "integrations," *i.e.,* the various platforms that enable access to Pandora's Service, such as cell phones, tablets, and cars. Pandora delivers the Service to an audience in two ways: (i) a free service that allows

listeners to access Pandora's music, comedy catalogs, and personalized playlist-generating system without payment, but includes advertising, which generates revenue for Pandora; and (ii) Pandora One, a paid service which, in exchange for a subscription fee from the listener, provides users with access to Pandora's music, comedy catalogs, personalized playlist-generating system without external advertising.

7.     Pandora's Service offers almost exclusively musical performances 24 hours per day, 7 days per week to over 200 million listeners, who account for *approximately 1.5 billion listening hours per month*. Pandora does not play one song at a time, as do old-fashioned terrestrial radio stations. By 10 a.m. every morning, Pandora has already performed 200 million songs, as compared with the hundreds of songs played by an average radio station per day. In the year ending January 31, 2013, Pandora streamed *14.01 billion hours of music, performing hundreds of thousands of unique copyrighted works in the BMI repertoire*.

## JURISDICTION

8.     Jurisdiction is proper in this Court pursuant to this Court's rate-setting authority under Article XIV of the BMI Consent Decree. *United States v. Broadcast Music, Inc.* 1966 Trade Cas. (CCH) ¶ 71,941 (S.D.N.Y 1966), as amended by 1996-1 Trade Cas. (CCH) ¶ 71,378 (S.D.N.Y. 1994).

9.     Pursuant to Article XIV(A) of the BMI Consent Decree, the Court has jurisdiction over the instant petition because: (i) Pandora made a written application for a reasonable license fee pursuant to Article XIV of the BMI Consent Decree; (ii) BMI advised Pandora of the fee BMI deemed reasonable for the license requested; (iii) more than 90 days have passed since BMI advised Pandora of its advised fee; and (iv) Pandora has neither agreed to the fee advised by BMI nor made a filing in this Court seeking determination of a reasonable

license fee.  Accordingly, BMI seeks this Court's determination of a reasonable final license fee with respect to Pandora's Service, under Article XIV of the BMI Consent Decree.

10.    Venue is proper in this district as a result of the express consent of Pandora in applying for a license pursuant to the BMI Consent Decree.

## THE NEW AND EXPANDING INTERNET MUSIC STREAMING MARKET

11.    In the last decade, the public's interest in listening to streaming music via the internet has exploded.  Although traditional broadcast radio continues to be the primary source of access to music in the United States, digital music services on the internet have experienced exponential growth in subscribers, revenues, and music usage.  As for the near future, a recent study suggests that monthly internet music streaming listeners in the United States will rise dramatically over the next four years, from 132.6 million in 2012 to 176.5 million in 2016.  That will mean that by 2016, nearly 54% of Americans and more than 67% of internet users will be listening to personalized internet music streaming services like Pandora, or a similar online service.

12.    Internet music streaming services like Pandora are rapidly increasing their share of the music listening experience.  According to a recent survey, internet music streaming services and internet on-demand services have displaced compact discs as the second-most popular way to listen to music, behind the traditional AM/FM broadcast radio format.

13.    Services like Pandora are successfully expanding and extending the reach and popularity of internet music streaming services, in large part because it can be accessed on multiple devices, including smartphones.  The internet music streaming services provide new listening opportunities anywhere that internet connectivity exists.

14.     Mobile devices have become a key driver of the consumption of internet streamed music.  Listening to music on the internet via mobile devices now accounts for approximately half of listening hours for internet streaming music services.  Listeners simply download (install) applications ("apps") on their mobile devices like iPhones, iPads, Androids, and other tablet devices.  Even with respect to conventional radio listening, fully 70% of that listening in the United States takes place outside of the home, including in vehicles.  As of May 2013, Pandora was among the most downloaded free iPhone apps of all time, second only to Facebook.

15.     Advertising spending on internet music streaming services is also expected to increase dramatically in the near term.  In the United States, total advertising revenue is estimated to reach $970 million in 2013 and grow to $1.31 billion by 2016.

## PANDORA IS THE MARKET LEADER IN THE INTERNET STREAMING MUSIC MARKET

16.     In addition to the unprecedented volume of music played by Pandora (described above), Pandora performs a massive catalog consisting of over 1,000,000 songs from over 100,000 artists, spanning over 500 genres and sub-genres.  The breadth of music played by Pandora is staggering compared to broadcast radio stations, making a blanket license even more valuable.  Indeed, many of the 1,000,000 songs in Pandora's catalog get no terrestrial radio airplay.

17.     In addition to offering a variety of genre-based stations, Pandora allows users to create their own customized stations by choosing a song or artist to start a station.  Based on the user-selection, Pandora then plays similar music that it believes the listener will enjoy.

18.     This functionality is powered by Pandora's proprietary technology known as the "Music Genome Project."  The Project works as follows:  when a song becomes part of

Pandora's catalog, its music analysts examine up to 450 attributes of the song, including objectively observable metrics such as tone and tempo, as well as subjective characteristics, such as lyrics and emotional intensity.

19.     The combination of Pandora's huge user base with a massive catalog and customizable stations greatly increases the breadth and depth of unique musical performances played on Pandora's Service.  In 2012, Pandora averaged approximately 670,000 unique tracks per quarter.

20.     Adding to Pandora's reach is its stated strategy to make the Service available "wherever internet connectivity exists."  To date, Pandora is now available on over 1,000 platforms, such as automobiles, automotive aftermarket devices, and consumer electronic devices including a variety of mobile devices and tablets.

21.     Although the dominant market leader, Pandora faces competition from other internet music streaming services, like Spotify.  Similar to Pandora, Spotify is a subscription-based, music streaming service which provides content from a range of major and independent record labels.  Spotify has over 6 million paying subscribers, over 24 million active users, and a catalog of over 20 million songs.

22.     Among other features, Spotify offers Spotify Radio, a service substantially similar to Pandora's Service.  Like the Service, Spotify Radio gives a user the ability to browse and search for music by song, artist, album, or genre, and allows a user to create their own customizable stations based on a user's selection of an artist, genre, or decade.

23.     Apple Inc. ("Apple"), recently announced that this fall it will launch an internet streaming music service called iTunes Radio, designed to compete with Pandora.  Once released, iTunes Radio is expected to closely resemble Pandora's Service.  Similar to Pandora,

iTunes Radio will offer a free internet music streaming service, which will feature audio and banner advertisements. iTunes Radio will also stream a selection of customizable stations based on users' preferences, as well as each user's iTunes buying history and iCloud account.

24.     Music Choice also provides a similar service as Pandora, but for digital cable TV, mobile phones, and cable modem subscribers. Among other things, Music Choice offers nearly fifty music channels to televisions via cable and satellite. Similar to the Service, these audio music channels provide continuous and uninterrupted music streaming content, across many different genres. Music Choice offers a service enhancement which allows subscribers to customize channels based on format, genre, and similar criteria.

## INTERNET MUSIC STREAMING EXPONENTIALLY EXPANDED THE CONSUMPTION OF COPYRIGHTED MUSIC, LEADING PUBLISHERS TO CREATE A NEW MARKET FOR MUSIC PERFORMING RIGHTS

25.     As internet music streaming services have dramatically expanded their use of music, performing millions of unique copyrighted works at a time, 24 hours per day, 7 days per week, for hundreds of millions of users, publishers (and record labels) became frustrated with the unreasonably low fees paid by services like Pandora to the performing rights organizations ("PROs"), including BMI.

26.     In the pre-Internet era, songwriters, composers, and publishers benefitted from the promotion they received when their song was played on a terrestrial broadcast radio station. Terrestrial airplay increased album sales, leading to higher overall compensation to the songwriters, composers and publishers. But this is no longer the case. Compact disc and album sales have continuously eroded over the past decade, and mechanical royalties paid to music publishers from record sales have been diminishing despite the explosive growth in use and consumption of music.

27.     In light of these changes, publishers (and record labels) set out to collect appropriate fees that truly capture all of the value of the copyrighted works they possess. The publishers recognized that the fees that were being paid for the performing right to PROs (like BMI), particularly in comparison to the fair market value rates paid by Pandora for the sound recording public performance right to SoundExchange (a non-profit organization that collects statutory royalties on behalf of record labels and artists, for digital transmissions), did not reflect the true value of their copyrighted musical works.

28.     First, in 2012, EMI Music Publishing ("EMI") withdrew its catalog from the ASCAP and BMI repertoires with respect to specified digital uses, including those on Pandora's Service effective January 1, 2013. By doing so, EMI secured for itself the right to negotiate fees for the digital performances of their works with services like Pandora license, and to collect truly market-driven fees.

29.     Soon thereafter, Sony/ATV Music Publishing ("Sony") similarly withdrew from ASCAP and BMI the right for the PROs to license the Sony catalog with respect to specified digital uses, including those on Pandora's Service. By doing so, Sony also secured for itself the right to negotiate license fees for the digital performances of its works with services like Pandora, and to collect truly market-driven fees.

30.     Pandora negotiated separate licenses with EMI and Sony for the digital use of their copyrighted musical works. The negotiations between Pandora and EMI, and between Pandora and Sony, were arm's-length negotiations that resulted in agreements between a willing buyer and a willing seller. Upon information and belief, the agreement reached between Pandora and Sony in 2013 represents a 25% increase in fees over the rates Pandora paid to BMI for 2012.

31.     In advance of the iTunes Radio launch, Apple began negotiating direct, parallel agreements with both publishers and record labels, for its new music streaming service, iTunes Radio. (Pendola, Rocco, How Apple's iRadio Could Pose a Problem For Pandora, *The Street*, June 3, 2013 at 1, http://www.thestreet.com/story/11940174/1/how-apples-iradio-could-pose-a-problem-for-pandora.html.)

32.     In fact, Apple negotiated with Warner for performing rights from its publishing arm (and sound recording rights from its record label) for iTunes Radio, even though Warner had not withdrawn its rights from BMI or ASCAP.

33.     Reports indicate that Apple will pay the Warner publishing arm its pro rata share of a rate of 10% of iTunes Radio's advertising revenue. (Christman, Ed, Sony/ATV Signs with Apple iRadio, Launch Imminent, *BillboardBiz*, June 7, 2013 at 1, http://www.billboard.com/biz/articles/news/digital-and-mobile/1566280/sonyatv-signs-with-apple-iradio-launch-imminent.)

34.     Apple also has successfully brokered a deal with Sony at the same rate. (*Id.*) While Apple is currently finalizing negotiations with Universal Music Publishing Group ("Universal"), it is expected that this deal will also mimic the terms of the Warner and Sony deals. (*Id.*)

## PANDORA'S MUSIC STREAMING SERVICE IS NOT WITHIN THE SCOPE OF THE BMI RADIO STATION BLANKET/PER PROGRAM LICENSE AGREEMENT

35.     In January 2012, Judge Dolinger entered an order approving a license between ASCAP and the Radio Music Licensing Committee ("RMLC"), the entity that represents over 10,000 terrestrial radio stations in the United States, for the period from January 1, 2010 to December 31, 2016 (the "ASCAP Radio Station License"). At that time, BMI and the RMLC were also in the midst of a rate court litigation over the RMLC's petition seeking a

drastic fee reduction to respond to the economic downturn that RMLC claimed afflicted the radio industry in 2008 to 2009.

36.    The execution of the ASCAP Radio Station License created what all parties recognized would be considered by the Court as the most relevant benchmark for the license at issue in the BMI-RMLC litigation.

37.    Soon after Judge Dolinger approved the ASCAP Radio Station License, BMI and the RMLC entered into settlement discussions to resolve their rate court litigation.  The RMLC pushed for a quick deal with BMI, and took the position that BMI would have to provide a license with essentially the same terms as the ASCAP deal.

38.    BMI's principal goal in negotiating with the RMLC was to secure the important source of royalties from the thousands of terrestrial radio stations that would be covered by the Radio Station License against RMLC's unreasonable reduction claims.

39.    In August 2012, this Court approved an industry-wide settlement between the RMLC and BMI covering the seven-year license period January 1, 2010 through December 31, 2016 (the "BMI Radio Station License").

40.    The BMI Radio Station License provides for a blanket license rate of 1.7% of each licensee's gross revenues for all broadcast and new media offerings.  For terrestrial broadcasts, licensees received a 15% deduction on the fee, while licensees received a deduction of 25% for new media offerings.

41.    Although the RMLC-BMI negotiations did not focus on these rates as they were presented to BMI as part of the already concluded package of the ASCAP Radio Station License, BMI understood that new media offerings would have a 25% deduction, instead of the

15% deduction, to account for the fact that many of the terrestrial stations' website revenue was not specifically attributable to music and thus should receive a higher deduction.

42.    License fees from new media transmissions are immaterial relative to the overall fees paid by RMLC stations for their terrestrial broadcasts.

43.    "New Media Transmissions" are defined in the BMI Radio Station License as "any performance transmitted via the Internet, wireless data networks, or any other similar transmission facilities, where a commercial relationship exists between such performance and Licensee's Radio Broadcasting.  By way of example, a commercial relationship exists when: (1) there is in-common branding and marketing between Licensee's New Media Transmissions and Licensee's Radio Broadcasting; and/or (2) there are bundled sales of advertising availabilities and/or sponsorship across Licensee's Radio Broadcasting and Licensee's New Media Transmissions."

44.    Because of the significant fees paid by terrestrial radio stations for their terrestrial broadcasts, BMI was willing to accept a lower rate for RMLC stations' new media transmissions.  Terrestrial radio stations pay on average $150 million per year to BMI, with only a small fraction of those fees coming from new media transmissions by those stations.

## DESPITE ITS POSITION AS MARKET LEADER IN A GROWING INDUSTRY, PANDORA WANTS TO PAY BMI LOWER FEES THAN IT HAS IN THE PAST

45.    Pandora has embarked on a significant campaign to lower its royalty fees. Rather than changing its business model to charge higher ad rates or subscription fees, Pandora has lobbied Congress to change the law in order to reduce its royalty payments to performers and record labels.  In a hearing before Congress in late 2012, Pandora CEO Joseph Kennedy bemoaned Pandora's "astonishingly high royalty burden," claiming that "the current rate-setting structure is a clear case of discrimination against the Internet and innovative services."

46.   In an open and brazen effort to artificially drive down its license fees, on June 11, 2013, Pandora announced that it had acquired KXMZ-FM, a terrestrial radio station broadcasting out of Rapid City, South Dakota for the expressly stated purpose of "qualify[ing] for the same RMLC license under the same terms as our competitors."

47.   From July 18, 2005 through December 31, 2012, BMI licensed Pandora's use of BMI-affiliated musical compositions pursuant to its standard form, "BMI Web Site Music Performance Agreement" (the "2005 Agreement"), with the understanding that the syndication of Pandora through third parties required payment of additional fees. BMI's original Internet Web Site blanket license agreement, created in 1995, covers a wide array of disparate types of web sites, and does not reflect the intensive music use of the modern digital music services.

48.   By letter dated October 25, 2012, Pandora terminated the 2005 Agreement as of December 31, 2012.

49.   By letter dated December 5, 2012, Pandora applied for a license from BMI pursuant to BMI's Consent Decree, commencing January 1, 2013. The final fees established by this Court therefore will be retroactive to January 2013, with credit for any fees provided and paid under an interim fee agreement to be reached between the parties.

50.   Pandora's letter did not detail the nature of Pandora's service to be covered by the request, or the scope of the license sought.

51.   In response, by letter dated March 4, 2013, BMI quoted an annual blanket license fee for the right to publicly perform BMI-affiliated musical compositions in the United States on Pandora's Service that is accessible via (a) Pandora's website and (b), on a through-to-the-audience basis, third party platforms with which Pandora has a contractual economic relationship for the period January 1, 2013 – December 31, 2014. Pandora rejected BMI's offer.

52.     BMI and Pandora have negotiated interim license fees to be paid by Pandora for the period commencing January 1, 2013 until such time that either the parties negotiate in good faith, or this Court issues an order setting the terms and fees of a final license agreement.  BMI and Pandora are working on a formula to adjust for the withdrawal of digital rights to certain music catalogs from BMI's repertoire.

53.     Since January 2013, BMI and Pandora also have been negotiating an agreement on final fees and terms.  To date, the parties have been unable to reach agreement.

54.     Pandora contends that its purchase of KXMZ-FM, a station in the 255th largest radio market in the United States, in a city with a population of 70,000, is sufficient to transform Pandora's online music streaming service, into a "New Media Transmission" by a terrestrial broadcast radio station, as that term is defined in the BMI Radio Station License.

55.     Pandora has since withdrawn its rate court application to BMI for the period after June 5, 2013 – the date of its purchase of KXMZ-FM.

56.     Pandora's stunt makes a mockery of performing rights licenses and the rate court process.  The BMI Radio Station License governs terrestrial radio station broadcasts. It does not cover performances by a primarily internet-based music streaming service that happens to own a single radio station in a city with a total population that is less than 0.045% of Pandora's online membership.

57.     Consistent with the logical limitation of the scope of the BMI Radio Station License, the license is expressly limited to covering only those New Media Transmissions by radio stations with a "commercial relationship" with the terrestrial radio stations.

## WHEN SETTING A REASONABLE LICENSE FEE, COURTS DETERMINE FAIR MARKET VALUE BY REFERENCE TO BENCHMARK AGREEMENTS

58.     In deciding whether a proposed fee is reasonable, a rate court attempts to make a determination of the fair market value of a license, or the price that a willing buyer and a willing seller would agree to in an arm's-length transaction.

59.     In so doing, rate courts start from the premise that license agreements entered into by parties in comparable circumstances may provide guidance in setting a reasonable fee. This benchmark methodology is suggested by Article VIII(A) of the BMI Consent Decree itself, which prohibits disparate treatment of similarly-situated licensees.

60.     The rate quoted by BMI to Pandora is reasonable in light of the several free market licenses negotiated directly between withdrawn publishers including: (i) the license agreement recently negotiated between Sony and Pandora; (ii) the license agreement between EMI and Pandora; (iii) any other agreements between a publisher which has withdrawn its digital rights from BMI's catalog that may be negotiated with Pandora prior to the finalization of the license at issue; and (iv) the agreements between Apple and publishers, including Sony, Warner, and Universal.

61.     The rate quoted by BMI is also reasonable in comparison to the prevailing rates in licenses between BMI and comparable music services including: (i) the agreement entered into between BMI and Spotify, dated August 11, 2013; and (ii) the residential music service agreement entered into between BMI and Music Choice, dated January 6, 2006.

62.     The ASCAP rate court has already found the rate quoted by BMI to Pandora reasonable in setting license fees between ASCAP and MobiTV, Inc. ("Mobi") for the years 2003 through 2011.

### THE PUBLISHER DIRECT LICENSES ARE THE
### FIRST FREE MARKET VALUE DEALS
### FOR PERFORMING RIGHTS

63.   The Sony license agreement was a watershed event in the music licensing industry.  For the first time in over fifty years, a direct license for the music performing right was negotiated without the artificial constraint of the BMI Consent Decree.  Publishers Sony and EMI were able to negotiate contracts with Pandora while holding all of the statutory protections of the copyright laws, including the right to refuse to allow Pandora to publicly perform songs in their catalogs, and the right to sue for infringement in the event that Pandora impermissibly performed any such songs, even if unknowingly.  The resulting license fees confirm that an increase is necessary to the prevailing market rate for the public performing right and protections granted by the blanket license offered by BMI.

64.   Publishers and composers have always had the right to directly license their works.  In the past, however, BMI continued to have the non-exclusive right to license those music users negotiating a direct license with the publisher or composer, and the obligation, under the BMI Consent Decree, to license any music user upon demand.  As a result, a music user could abandon direct negotiations with a publisher or composer if the rates proposed were too high, *i.e.* higher than the BMI blanket license rate.  Accordingly, every direct license was subject to a cap at the rate of the PRO fees.  This gave music users tremendous negotiating power and bargaining leverage vis-à-vis publishers.  And it artificially drove down the fair market value of the public performing right held by publishers.

65.   Contrary to Pandora's allegations in the ASCAP proceeding, Sony did not put a "gun to the head" of Pandora.  In fact, Sony merely exercised the statutory right Congress

granted them to license their copyrighted works at a market price. Pandora programs its own content and is free to discontinue the use of Sony music if it did not like the price.

66.     Publishers like Sony and EMI therefore have, for the first time, established the true free market value for a performing rights rate, unconstrained by the existence of this rate court. The Sony agreement with Pandora is a true free market benchmark for the performance of copyrighted musical works.

67.     It has been reported that additional music publishers, including Universal, will withdraw from ASCAP and BMI and negotiate contracts with digital music users like Pandora for limited digital uses. (Ed Christman, Universal Music Publishing Plots Exit From ASCAP, BMI, *BillbardBiz*, February 1, 2013 at 1, http://www.billboard.com/biz/articles/news/publishing/1537554/universal-music-publishing-plots-exit-from-ascap-bmi.) Those licenses will similarly represent the uncapped, market value rates.

68.     Apple's licenses with Warner, Sony, and Universal will serve as additional free market benchmarks that can be used to estimate the free market value of a BMI license, particularly because Apple approached Warner before it had even withdrawn any rights from BMI.

69.     Publishers also expect the currently negotiated rates with Apple to increase after iTunes Radio establishes itself, and expect Pandora to match these recently negotiated deals with Apple. (Christman, Ed, Sony/ATV Signs with Apple iRadio, Launch Imminent, *BillboardBiz*, June 7, 2013 at 1, http://www.billboard.com/biz/articles/news/digital-and-mobile/1566280/sonyatv-signs-with-apple-iradio-launch-imminent.)

## BMI'S LICENSES WITH OTHER MUSIC SERVICE PROVIDERS PROVE THAT THE RATE PROPOSED TO PANDORA IS EMINENTLY REASONABLE

70.     BMI currently has agreements with Spotify and Music Choice.  Not only do both services – Spotify Radio and Music Choice – have features or provide services that are similar to, or the same as, Pandora's Service, but all three have a license agreement with BMI which includes rates and terms that are the same as, *or higher than*, BMI's proposal to Pandora.

### *The BMI-Spotify License*

71.     The agreement between Spotify and BMI, dated August 11, 2011, supports the reasonableness of BMI's proposed rate to Pandora.  The fee quoted to Pandora is reasonable in light of the rate in the BMI-Spotify license.

### *The BMI-Music Choice License*

72.     The license agreement between BMI and Music Choice, dated January 6, 2006, further supports the reasonableness of BMI's offer to Pandora.

73.     The rate agreed to between BMI and Music Choice is commensurate with the rate that BMI quoted to Pandora in its March 4, 2013 offer letter.

74.     BMI anticipates that in the coming months, it will reach one or more agreements with internet streaming music services other than Spotify and Music Choice.  Those agreements will also include rates that are the same as, or higher than, BMI's proposal to Pandora.

## THE RATE SET IN THE ASCAP-MOBI CASE ALSO SUPPORTS THE REASONABLENESS OF BMI'S PROPOSAL

75.     Mobi is a middleman between cable television networks that create programming and wireless carriers to which consumers subscribe to obtain wireless services on

their mobile devices.  Among other things, Mobi offers a product called MobiRadio, which provides a selection of all-audio, commercial-free digital music channels.

76.    In November 2003, Mobi applied to ASCAP for a license.  Failing to reach agreement over an appropriate rate, ASCAP applied to the rate court in May 2008 for a reasonable fee retroactive to the date of Mobi's written request for a license.  In May 2010, a decision was rendered in that case, setting a reasonable license fee for a "through to the audience" license for Mobi for the years 2003 to 2011.

77.    In setting a reasonable rate for Mobi's all-audio offerings provided through MobiRadio, the Court considered BMI's agreement with Music Choice, and set a rate equal to the rate established between BMI and Music Choice.

78.    Thus, the ASCAP rate court has found such rate reasonable for a licensee that offers a streaming music product, and such fee is commensurate with BMI's offer to Pandora.

## RELIEF REQUESTED

WHEREFORE, BMI respectfully requests that the Court enter an Order:

A.    Confirming as reasonable the rates and terms requested by BMI for a license covering performances of music in the BMI repertoire by Pandora as reasonable and directing Pandora to pay such license fees, effective as of January 1, 2013 and continuing through December 31, 2014.

B.    for such other and further relief as this Court deems just and proper.

Dated: New York, New York
      June 13, 2013

                         MILBANK, TWEED, HADLEY & MCCLOY LLP

                         By _____

                              Linda Dakin-Grimm
                              Atara Miller
                              Rachel Penski-Fissell

                         One Chase Manhattan Plaza
                         New York, New York 10007
                         (212) 530-5039

                                        -and-

                         Stuart Rosen
                         Joseph J. DiMona
                         Hope Lloyd
                         7 World Trade Center
                         250 Greenwich Street
                         New York, New York 10007

                         *Attorneys for Petitioner Broadcast Music, Inc.*

**Exhibit 1**

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,   }

          Plaintiff,  }

      v.            }             Civil No.
}             64-Civ-3787

BROADCAST MUSIC, INC. and  }

RKO GENERAL, INC.,      }

          Defendants.}

## FINAL JUDGMENT

Plaintiff, United States of America, having filed its complaint herein on December 10, 1964, and defendant having filed its answer denying the substantive allegations of such complaint, and the parties by their respective attorneys having consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law herein and without this Final Judgment constituting evidence or an admission by either party with respect to any such issue:

Now, THEREFORE, before the taking of any testimony and without trial or adjudication of any issue of fact or law herein, and upon the consent of the parties hereto, it is hereby

ORDERED, ADJUDGED and DECREED as follows:

### I.

This Court has jurisdiction of the subject matter of this action and of the parties hereto. The complaint states claims for relief against the defendant under Sections 1 and 2 of the Act of Congress of July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies," commonly known as the Sherman Act, as amended.

### II.

As used in this Final Judgment:

(A) "Defendant" means the defendant Broadcast Music, Inc., a New York Corporation;

(B) "Programming period" means a fifteen minute period of broadcasting commencing on the hour and at fifteen, thirty and

forty-five minutes past the hour without regard to whether such period contains one or more programs or announcements.

(C) "Defendant's repertory" means those compositions, the right of public performance of which defendant has or hereafter shall have the right to license or sublicense.

### III.

The provisions of this Final Judgment shall apply to defendant and to each of its subsidiaries, successors, assigns, officers, directors, servants, employees and agents, and to all persons in active concert or participation with defendant who receive actual notice of this Final Judgment by personal service or otherwise. None of the provisions of this Final Judgment shall apply outside the United States of America, its territories, and possessions.

### IV.

Defendant is enjoined and restrained from:

(A) Failing to grant permission, on the written request of all writers and publishers of a musical composition including the copyright proprietor thereof, allowing such persons to issue to a music user making direct performances to the public a non-exclusive license permitting the making of specified performances of such musical composition by such music user directly to the public, provided that the defendant shall not be required to make payment with respect to performances so licensed.

(B) Engaging in the commercial publication or recording of music or in the commercial distribution of sheet music or recordings.

### V.

(A) Defendant shall not refuse to enter into a contract providing for the licensing by defendant of performance rights with any writer who shall have had at least one copyrighted musical composition of his writing commercially published or recorded, or with any publisher of music actively engaged in the music publishing business whose musical publications have been commercially published or recorded and publicly promoted and distributed for at least one year, and who assumes the financial risk involved in the normal publication of musical works; provided, however, that defendant shall have the right to refuse to enter into any such contract with any writer or publisher who does not satisfy reasonable standards of literacy and integrity if the defendant is willing to submit to arbitration in the County, City

and State of New York the reasonableness and applicability of such standards, under the rules then prevailing of the American Arbitration Association, with any writer or publisher with whom defendant has refused so to contract.

(B) Defendant shall not enter into any contract with a writer or publisher requiring such writer or publisher to grant to defendant performing rights for a period in excess of five years, provided, however, that defendant may continue to license, as if under the contract, all musical compositions in which the defendant has performing rights at the date of termination of any such contract until all advances made by defendant to such writers and publishers shall have been earned or repaid.

(C) Upon the termination, at any time hereafter, of any contract with a writer or publisher relating to the licensing of the right publicly to perform any musical composition, defendant shall continue to pay for performances of the musical compositions of such writer or publisher licensed by defendant upon the basis of the current performance rates generally paid by defendant to writers and publishers for similar performances of similar compositions for so long as such performing rights are not otherwise licensed.

## VI.

(A)  Defendant shall not acquire rights of public performance in any musical compositions from any publisher under a contract which requires the officers, directors, owners or employees of such publisher to refrain from publishing or promoting musical works licensed through another performing rights organization, provided that nothing contained in this paragraph shall prevent defendant from entering into a contract with a publishing entity which requires such entity not to license any performance rights through any other performing rights organization during the term of the contract, and requiring that any works licensed by such officers, directors, owners or employees through another performing rights organization be licensed by a separate publishing entity which does not have a name identical with or similar to the name of any publishing entity with which defendant has contracted.

(B)  Defendant shall not enter into any agreement for the acquisition or the licensing of performing rights which requires the recording or public performance of any stated amount or percentage of music, the performing rights in which are licensed or are to be licensed by defendant.

- 3 -

## VII.

(A) Defendant shall make available at reasonable intervals, to all writers and publishers who have granted performance rights to it, a complete statement of the performance payment rates (to writers, those applicable to writers, and to publishers, those applicable to publishers), currently utilized by it for all classifications of performances and musical compositions.

(B) Defendant will not offer or agree to make payments in advance for a stated period for future performing rights which are not either repayable or to be earned by means of future performance to any writer or publisher who, at the time of such offer or agreement, is a member of or under direct contract for the licensing of such performing rights with any other United States performing rights licensing organization, provided that this restriction shall not apply (1) in the case of any such writer or publisher who at any time prior to said offer or agreement had licensed performing rights through defendant or (2) in the case of any such writer or publisher who is a member of or directly affiliated with any other United States performing rights licensing organization which makes offers or makes payments similar to those forbidden in this subparagraph to writers or publishers then under contract to defendant.

(C) Defendant shall include in all contracts which it tenders to writers, publishers and music users relating to the licensing of performance rights a clause requiring the parties to submit to arbitration in the City, County and State of New York under the then prevailing rules of the American Arbitration Association, all disputes of any kind, nature or description in connection with the terms and conditions of such contracts or arising out of the performance thereof or based upon an alleged breach thereof, except that in all contracts tendered by defendant to music users, the clause requiring the parties to submit to arbitration will exclude disputes that are cognizable by the Court pursuant to Article XIV hereof.

## VIII.

(A) Defendant shall not enter into, recognize as valid or perform any performing rights license agreement which shall result in discriminating in rates or terms between licensees similarly situated; provided, however, that differentials based upon applicable business factors which justify different rates or terms shall not be considered discrimination within the meaning of this section; and provided further that nothing contained in this section shall prevent changes in rates or terms from time to time by reason of changing conditions affecting the market for or marketability of performing rights.

- 4 -

(B) Defendant shall, upon the request of any unlicensed broadcaster, license the rights publicly to perform its repertory by broadcasting on either a per program or per programming period basis, at defendant's option.  The fee for this license shall relate only to programs (including announcements), or to programming periods, during which a licensed composition is performed.  The fee shall be expressed, at defendant's option, either (1) in dollars, (2) as a percentage of the revenue which the broadcaster received for the use of its broadcasting facilities or (3) in the case of sustaining programs or programming periods, as a percentage of the applicable card rate had the program or programming period been commercially sponsored.  In the event defendant offers to license broadcasters on bases in addition to a per program or per programming period basis, defendant shall act in good faith so that there shall be a relationship between such per program or such per programming period basis and such other bases, justifiable by applicable business factors including availability, so that there will be no frustration of the purpose of this section to afford broadcasters alternative bases of license compensation.

## IX.

(A) Defendant shall not license the public performance of any musical composition or compositions except on a basis whereby, insofar as network broadcasting by a regularly constituted network so requesting is concerned, the issuance of a single license, authorizing and fixing a single license fee for such performance by network broadcasting, shall permit the simultaneous broadcasting of such performance by all stations on the network which shall broadcast such performance, without requiring separate licenses for such several stations for such performance.

(B) With respect to any musical composition in defendant's catalogue of musical compositions licensed for broadcasting and which is or shall be lawfully recorded for performance on specified commercially sponsored programs on an electrical transcription or on other specially prepared recordation intended for broadcasting purposes, defendant shall not refuse to offer to license the public performance by designated broadcasting stations of such compositions by a single license to any manufacturer, producer or distributor of such transcription or recordation or to any advertiser or advertising agency on whose behalf such transcription or recordation shall have been made who may request such license, which single license shall authorize the broadcasting of the recorded composition by means of such transcription or recordation by all stations enumerated by the licensee, on terms and conditions fixed by defendant, without requiring separate licenses for such enumerated stations.

(C) Defendant shall not, in connection with any offer to license by it the public performance of musical compositions by

- 5 -

music users other than broadcasters, refuse to offer a license at a price or prices to be fixed by defendant with the consent of the copyright proprietor for the performance of such specific (i.e., per piece) musical compositions, the use of which shall be requested by the prospective licensee.

## X.

(A) Defendant shall not assert or exercise any right or power to restrict from public performance by any licensee of defendant any copyrighted musical composition in order to exact additional consideration for the performance thereof, or for the purpose of permitting the fixing or regulating of fees for the recording or transcribing of such composition; provided, however, that nothing in this paragraph shall prevent defendant from restricting performances of a musical composition in order reasonably to protect the work against indiscriminate performances or the value of the public performance rights therein or to protect the dramatic performing rights therein, or, as may be reasonably necessary in connection with any claim or litigation involving the performance rights in any such composition.

(B) Defendant, during the term of any license agreements with any class of licensees, shall not make any voluntary reductions in the fees payable under any such agreements, provided, however, that nothing herein shall prevent defendant from lowering any fees or rates to any or all classes of licensees in response to changing conditions affecting the value or marketability of its catalogue to such class or classes, or where necessary to meet competition.

## XI.

For the purpose of securing or determining compliance with this Final Judgment, and for no other purpose, duly authorized representatives of the Department of Justice shall, on written request of the Attorney General or the Assistant Attorney General in charge of the Antitrust Division. and on reasonable notice to defendant made to its principal office, be permitted, subject to any legally recognized privilege:

(A) Access, during office hours of such defendant, to all books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or under the control of defendant relating to any matters contained in this Final Judgment;

(B) Subject to the reasonable convenience of defendant and without restraint or interference from it, to interview officers or employees of defendant, who may have counsel present regarding any such matters.

Upon written request of the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division, defendant shall submit such reports in writing with respect to the matters contained in this Final Judgment as may from time to time be necessary to the enforcement of this Final Judgment.

No information obtained by the means permitted in this Section XI shall be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of the Executive Branch of the Plaintiff, except in the course of legal proceedings in which the United States is a party for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

XII.

All of the provisions of this Final Judgment shall become effective on the entry thereof, except as to paragraph C of Article VII, which shall not become effective until 90 days after the date of entry of this Final Judgment.

XIII.

Jurisdiction is retained by this Court for the purpose of enabling either of the parties to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the modification of any of the provisions thereof, for the enforcement of compliance therewith and for the punishment of violations thereof.

To best preserve the independent conduct of defendant's music licensing activities, the jurisdiction retained by this Court over this Final Judgment shall be exercised by a Judge of this Court other than one to whom has been assigned any action in which a judgment has been entered retaining jurisdiction over any music performing rights licensing organization (e.g. ASCAP) other than defendant. No reference or assignment of any issue or matter under this Final Judgment shall be made to a Magistrate Judge or Master to whom has been referred or assigned any pending issue or matter in which any music performing rights licensing organization other than defendant as to which this Court has entered judgment retaining jurisdiction, (e.g. ASCAP) is a party.

XIV.

(A) Subject to all provisions of this Final Judgment, defendant shall, within ninety (90) days of its receipt of a written application from an applicant for a license for the right

- 7 -

of public performance of any, some or all of the compositions in defendant's repertory, advise the applicant in writing of the fee which it deems reasonable for the license requested. If the parties are unable to agree upon a reasonable fee within sixty (60) days from the date when defendant advises the applicant of the fee which it deems reasonable, the applicant may forthwith apply to this Court for the determination of a reasonable fee and defendant shall, upon receipt of notice of the filing of such application, promptly give notice thereof to the Assistant Attorney General in charge of the Antitrust Division. If the parties are unable to agree upon a reasonable fee within ninety (90) days from the date when defendant advises the applicant of the fee which it deems reasonable and no such filing by applicant for the determination of a reasonable fee for the license requested is pending, then defendant may forthwith apply to this Court for the determination of a reasonable fee and defendant shall promptly give notice of its filing of such application to the Assistant Attorney General in charge of the Antitrust Division. In any such proceeding, defendant shall have the burden of proof to establish the reasonableness of the fee requested by it. Should defendant not establish that the fee requested by it is a reasonable one, then the Court shall determine a reasonable fee based upon all the evidence. Pending the completion of any such negotiations or proceedings, the applicant shall have the right to use any, some or all of the compositions in defendant's repertory to which its application pertains, without payment of any fee or other compensation, but subject to the provisions of Subsection (B) hereof, and to the final order or judgment entered by this Court in such proceeding;

(B)   When an applicant has the right to perform any compositions in defendant's repertory pending the completion of any negotiations or proceedings provided for in Subsection (A) hereof, either the applicant or defendant may apply to this Court to fix an interim fee pending final determination of what constitutes a reasonable fee. It is the purpose of this provision that an interim fee be determined promptly, and without prejudice as to the final determination of what constitutes a reasonable fee. It is further intended that interim fee proceedings be completed within 120 days of the date when application is made to fix an interim fee, subject to extension at the request of defendant or the applicant only in the interest of justice for good cause shown. If the Court fixes such interim fee, defendant shall then issue and the applicant shall accept a license providing for the payment of a fee at such interim rate from the date the applicant requested a license. If the applicant fails to accept such license or fails to pay the interim fee in accordance therewith, such failure shall be ground for the dismissal of its application. Where an interim license has been issued pursuant to this Subsection (B), the reasonable fee finally determined by this Court shall be retroactive to the date the applicant requested a license;

- 8 -

(C) When a reasonable fee has been finally determined by this Court, defendant shall be required to offer a license at a comparable fee to all other applicants similarly situated who shall thereafter request a license of defendant, but any license agreement which has been executed without any Court determination between defendant and another applicant similarly situated prior to such determination by the Court shall not be deemed to be in any way affected or altered by such determination for the term of such license agreement;

(D) Nothing in this Article XIV shall prevent any applicant from attacking in the aforesaid proceedings or in any other controversy the validity of the copyright of any of the compositions in defendant's repertory nor shall this Judgment be construed as importing any validity or value to any of said copyrights.

AND IT IS FURTHER ORDERED, ADJUDGED and DECREED that with respect to any music user heretofore licensed by defendant the license agreement of which expressly provides for determination by this Court of reasonable license fees or other terms for any period covered by such license, either defendant or such music user may apply to this Court for such determination provided that such license agreement provision has not otherwise expired.

Dated: New York, N. Y.
December 29, 1966

EDWARD C. McLEAN
United States District Judge

JUDGMENT ENTERED DECEMBER 29, 1966

JOHN J. OLEAR, JR.
     Clerk

Dated: New York, New York
        November 18, 1994

Robert P. Patterson, Jr.
U.S.D.J.

- 9 -