# KING & SPALDING

King & Spalding LLP
101 Second Street
Suite 2300
San Francisco, CA 94105
Tel: +1 415 318 1200
Fax: +1 415 318 1300
www.kslaw.com

Kenneth Steinthal
Partner
Direct Dial: +1 415 318 1211
Direct Fax: +1 415 318 1300
ksteinthal@kslaw.com



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/23/13

December 20, 2013

**MEMO ENDORSED**

VIA ECF

Hon. Louis L. Stanton, United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:   *Broadcast Music, Inc. v. Pandora Media, Inc.*, No. 13-CIV-4037 (LLS)

Dear Judge Stanton:

We respectfully but urgently request that this Court reconsider its endorsed memorandum issued earlier today. *See* ECF No. 80. That endorsed memorandum appears to contradict the portion of the Court's earlier endorsed memorandum (ECF No. 78) that held "that presently-existing Article XIV/interim licenses are included in, and protected by, the final paragraph of the December 18, 2013 order" (in which Your Honor held that "[n]othing in this opinion affects the rights of licensees to continue to perform the withdrawn compositions under presently-existing licenses"). In this regard, the language in the Court's most recent endorsed order appears to have created countless infringers overnight based on the fact that they do not "hold previously-executed licenses." This cannot be what the Court intended.

The BMI and Sony positions misapprehend the source of Pandora's Article XIV license. Pandora applied for a blanket license on December 5, 2012, before the date the Court held that Sony-EMI (unwittingly) took its compositions out of the BMI repertory for all purposes. On the date of Pandora's Article XIV application ("Application"), BMI indisputably had the right—and pursuant to Article XIV(A) was required—to grant Pandora the blanket license to which Pandora's application pertained. As this Court posited on November 25, the "application which is being discussed in article 14—and thus what has been applied for—is treated as granted *until the adjudicated procedures are over*[.]" Conf. Tr. at 6 (Nov. 25, 2013) (emphasis added). Article XIV(A) authorizes Pandora's performances throughout the rate-setting process whether or not an interim fee is paid. *See* Art. XIV(A) ("Pending the completion of any such negotiations or proceedings, the applicant shall have the right to use any, some or all of the compositions in [BMI]'s repertory to which its application pertains, *without payment of any fee or other compensation*.") (emphasis added). As the source of such authorization, Article XIV confers a compulsory license to Pandora upon application. *Cf. Gibbons v. Ogden*, 22 U.S. 1, 213 (1824)

Denied
Louis L.
Stanton
12/21/13

("The word 'license' means permission, or authority, and a license to do any particular thing, is a permission or authority to do that thing; and if granted by a person having power to grant it, transfers to the grantee the right to do whatever it purports to authorize."). That should end the inquiry.

BMI's position in its letter today is directly at odds with the one it made to this Court when advocating the inclusion of a compulsory licensing requirement and a rate court provision in its consent decree. Its Memorandum in Support of the 1994 Decree Modification explained that "[t]he modification contemplates that a would-be licensee would *automatically obtain a BMI license* by requesting one." BMI Memo. in Supp. of Decree Modification at 23-24 (June 27, 1994) (emphasis added). Further, BMI advocated that "[i]nstead of temporary restraining orders, orders to show cause, motions for emergency stays pending appeal, races to the courthouse, forum shopping in parallel lawsuits, and the like, the parties and the Court will be able to proceed in an orderly manner while the music user is assured that it is not committing copyright infringement and BMI is assured of interim license fees subject to a later readjustment." *Id.* at 33 (emphasis added). BMI's letter today presents precisely the scenario Article XIV was designed to avoid, where BMI seeks to deprive Pandora of such assurances while Sony-EMI has already made overt infringement threats. *See* Exhibit A.

The agreement between Pandora and BMI regarding interim fees given so much focus by BMI is not the source of Pandora's pre-existing license to perform BMI music; the operation of Article XIV(A) in connection with Pandora's Application is the source of that authorization. Even the document attached by BMI in support of its letter expressly states that it is designed to "confirm the Parties' understanding regarding interim fees to be paid and music use reporting to be furnished by Pandora for the Pandora service under the Application" beginning January 1, 2013, when Pandora's payment and other obligations under its first BMI license ended. Indeed, it confirms BMI's understanding that "[t]he Interim Fees payable herein shall be for the same scope of license as contained in [Pandora's existing BMI] Agreement"—which included Sony-EMI's catalogs—and, even to the extent Pandora seeks a license "for a broader scope of activities under the Application," the agreement confirms that "Pandora shall be licensed under the Application for such activities pending an agreement between the Parties or a BMI Rate Court order setting final license fees." This agreement hardly should operate to trump the license conferred by Article XIV(A).

While it is true that Pandora's interim fee payments to BMI have been adjusted to account for Pandora's direct licenses with Sony and EMI in 2013, in no way does that limit the scope of Pandora's Application, which pursuant to Article XIV(A) dictates the repertory subject to Pandora's license. The case law is clear that although payments to PROs are sometimes reduced to account for directly licensed compositions, that does not exclude those compositions from the scope of the repertoire subject to the blanket license. It just prevents double payments for the performances of those compositions. *See Broad. Music, Inc. v. DMX*, 583 F.3d 32, 29 (2d Cir. 2012) ("An AFBL is essentially a blanket fee reduced to account for music directly licensed from music publishers and owners *that also appear with in the PRO's repertoire*.") (emphasis added).

Article XIV(B) is a mechanism for setting interim fees, nothing more. It begins "*[w]hen* an applicant has the right to perform any compositions in defendant's repertory pending the completion of any negotiations or proceedings provided for in Subsection (A) hereof," not *if*. BMI Decree art. XIV(B) (emphasis added). The fact that interim fees are retroactively adjustable based on the adjudicated reasonable final fee does not disturb the scope of Pandora's Article XIV(A) license pending the Court's determination.

Whereas both Sony-EMI's and BMI's letters misinterpret Article XIV(A), BMI's letter seeking clarification is a bald-faced effort to force Pandora into what BMI presumes will be an over-priced license agreement with Sony-EMI that it will seek to use as a benchmark in this proceeding. BMI should not be permitted to leverage its 2013 decree violation in this fashion. Further, the Court's most recent endorsement could effectively allow Sony-EMI (and others) to engage in the form of withdrawal that the Court found the BMI decree prohibited—a partial withdrawal limited to Pandora and certain other new media entities that would not affect BMI's ability to continue to collect license fees from vast numbers of already licensed entities holding previously-executed licenses (interim or otherwise). Pandora respectfully requests that the Court clarify that it did not intend to create countless infringers overnight based on the fact that they do not "hold previously-executed licenses." Consistent with that clarification, Pandora requests that the Court also clarify that the license automatically conferred by Article XIV(A) pending a determination by the Court on Pandora's Application is not affected by any subsequent withdrawals.

Respectfully submitted,

*/s/ Kenneth Steinthal*
Kenneth L. Steinthal

cc:   All Counsel