**MILBANK, TWEED, HADLEY & McCLOY LLP**

**ONE CHASE MANHATTAN PLAZA**
**NEW YORK, NY 10005**

212-530-5000
FAX: 212-530-5219

**LOS ANGELES**
213-892-4000
FAX: 213-629-5063

**WASHINGTON, D.C.**
202-835-7500
FAX: 202-835-7586

**LONDON**
44-20-7615-3000
FAX: 44-20-7615-3100

**FRANKFURT**
49-(0)69-71914-3400
FAX: 49-(0)69-71914-3500

**MUNICH**
49-89-25559-3600
FAX: 49-89-25559-3700

Scott A. Edelman
PARTNER
DIRECT DIAL NUMBER
212-530-5149
E-MAIL: SEdelman@milbank.com

**BEIJING**
8610-5969-2700
FAX: 8610-5969-2707

**HONG KONG**
852-2971-4888
FAX: 852-2840-0792

**SINGAPORE**
65-6428-2400
FAX: 65-6428-2500

**TOKYO**
813-5410-2801
FAX: 813-5410-2891

**SÃO PAULO**
55-11-3927-7700
FAX: 55-11-3927-7777

October 21, 2014

**VIA ECF**

Honorable Louis L. Stanton
Southern District of New York
500 Pearl Street
New York, NY 10007

Re: *Broadcast Music, Inc. v. Pandora Media, Inc.*, 13 Civ. 4037 (LLS)

Dear Judge Stanton,

We write on behalf of Broadcast Music, Inc. ("BMI") in response to the letter from Pandora Media, Inc. ("Pandora"), requesting leave to move for partial summary judgment that it is licensed to perform all the works in BMI's repertory through at least December 31, 2016. (Letter from K. Steinthal to Judge Stanton, dated Oct. 14, 2014 (the "Pandora's October 2014 Letter").) Pandora spends some time explaining the nature of its proposed motion, but nowhere does Pandora acknowledge that the relief it is seeking is precisely the same relief that it requested last December. Your Honor denied that relief, and also denied Pandora's motion for reconsideration of that denial. Pandora's proposed "summary judgment motion" is nothing more than a motion for a second reconsideration of its denied motion for reconsideration of its initial motion for summary judgment.

Although fashioned as a motion for summary judgment, Pandora is not seeking a determination on any claim or defense at issue at trial. Rather, it is asking for an advisory ruling that it currently has a license with BMI that will shield it from the effects of any withdrawal from BMI of the right to license a publisher's catalog. (Pandora's October 2014 Letter at 1 ("Pandora intends to move for summary judgment that it is licensed to perform all the works in BMI's

repertory . . . ."); *id.* at 2 ("[T]he works of all the major publishers are 'in' the BMI repertory today.").)[1]

In the context of a rate setting proceeding, there is no efficiency in having legal issues teased out and decided piecemeal. Even assuming that Pandora had not previously made the same motion unsuccessfully in 2013, given the proximity of trial in this rate court proceeding, Pandora's application for summary judgment would be inappropriate.

Pandora's real concern is that the publishers will exercise their right—a right affirmed by this Court (*see* Op. & Order at 14, Dec. 18, 2013 (ECF No. 74) (the "December 18 Order"))—to withdraw their entire catalogs from BMI at the end of this year, thereby requiring Pandora to enter into direct licenses with those publishers. In another year end scramble to avoid direct licensing, Pandora seeks to bring this motion almost exactly one year after it sought virtually identical relief from this Court. (*See* Letter from K. Steinthal to Judge Stanton, dated Oct. 11, 2013 (ECF No. 13).) Neither the Court nor BMI should be required to expend time and resources on another round of summary judgment briefing on an issue already decided by this Court. This Court's December 18, 2013 decision is the law of the case.[2]

**This Court has already denied the relief requested by Pandora.**

On November 1, 2013, Pandora moved for summary judgment arguing that "despite the fact that certain music publishers have by agreement with BMI withdrawn from BMI the right license their composition to so-called 'New Media Services' such as Pandora," BMI was required to license all such compositions to Pandora. (December 18 Order at 2.) On December 18, 2013, this Court held that "the publishers are privileged to license, or not license, the performance of their compositions as they see fit." (*Id.* at 10.) The Court, however, held that BMI lacked the power to license any compositions that were the subject of a publisher withdrawal "to any applicant, ***including Pandora***." (*Id.* at 14.) In response to BMI's concern that the Court's then-proposed ruling, if applied retroactively, would upset market expectations

---

1 Pandora also uses the term, "license in effect," arguing that "it matters precisely when a licensee is deemed to have a license, as PRO repertoires no longer remain essentially intact during the time from a licensee's application to when a rate is finally determined." (*Id.*) (*See* Pandora's October 2014 Letter at 2.) The "license in effect" is a term that is contained in BMI's affiliation agreements with publishers providing that termination of affiliation is subject to any existing BMI licenses that were then in effect.

2 *Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003) (internal quotations omitted) (limiting a district courts' reconsideration of earlier decisions under Federal Rule of Civil Procedure 54(b) by "treating those decisions as law of the case, which gives a district court discretion to revisit earlier rulings in the same case, subject to the caveat that where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again"); *see also M.O.C.H.A. Soc'y, Inc. v. City of Buffalo*, 689 F.3d 263, 283 (2d Cir. 2012) (Plaintiff precluded by the law-of-the-case doctrine from re-litigating issues previously decided).

embodied in existing licenses (BMI's Memo. of Law in Opp. to Pandora's Motion for Partial Summary Judgment, dated Dec. 6, 2013, at 32 (ECF No. 51)), the Court specified that its ruling under the BMI Consent Decree did not impair "the right of licensees to continue to perform the withdrawn compositions under presently-existing licenses." (December 18 Order at 14.)

In a series of rulings—triggered by Pandora's request for clarification that its current request now mimics—that followed the December 18 Order, this Court made clear that Pandora does not have a license that allows it to perform withdrawn works. Specifically, Your Honor held that because the interim agreement that BMI and Pandora negotiated and agreed to expressly contemplated the possibility of publisher withdrawals, and included a fee reduction commensurate with such withdrawals, Pandora did not have "the right publicly to perform withdrawn compositions." (Memo. Endorsement, dated Dec. 23, 2013 ("December 23 Endorsement") (ECF No. 86).) Contrary to Pandora's suggestion, BMI now does not contend that Pandora "has no interim license at all." (Pandora's October 2014 Letter at 3.) Rather, BMI contends that Pandora does not have an interim license *that shields it from the effects of publisher withdrawals*. As this Court recognized in its December 23 Endorsement, Pandora's interim license contemplates publisher withdrawals and provided a credit to Pandora to account for such withdrawn works. That agreement also expressly contemplated future withdrawals, providing that:

> [I]n the event that *additional* music publishers withdraw from BMI the right to license their musical works to Pandora, the Parties agree to negotiate in good faith to adjust the Interim Fees payable commensurate with such publisher withdrawal, provided, however, that if the Parties are not able to arrive at a negotiated adjustment to the Interim Fees within 60 days from the commencement of such negotiations, then either Party may terminated this letter agreement upon written notice to the other Party . . . [and] apply to the BMI court for determination of new interim and/or final license fees pursuant to Section XIV of the BMI Consent Decree.

(BMI-Pandora Interim Agreement, ¶ 4 (emphasis added), attached hereto as Exhibit A.)

Pandora sought reconsideration of the Court's decision that Pandora's license did not protect it from publisher withdrawals. (Letter from K. Steinthal to Judge Stanton, dated Dec. 20, 2013 (ECF No. 81).) Your Honor ***denied*** Pandora's request for reconsideration. (Memo. Endorsement, dated Dec. 23, 2013 (ECF No. 87).)

Pandora's current motion would upend this Court's prior determinations that (1) publishers "are privileged to license, or not license, . . . as they see fit," and (2) that Pandora's interim license does not give it the right to perform withdrawn works.

**Pandora repeats the same arguments previously decided by the Court.**

In Pandora's October 14 Letter, Pandora raises nearly identical arguments to those decided last year:

| **Issue** | **Pandora's December 20, 2013 letter** | **Pandora's October 2014 letter** | **Ruling** |
|---|---|---|---|
| Impact of Article XIV | "Article XIV confers a compulsory license to Pandora upon application."<br><br>(Letter from K. Steinthal to Judge Stanton at 1, dated Dec. 20, 2013 (ECF No. 81).) | BMI's Consent Decree "guarantees a license."<br><br>(Pandora's October 2014 Letter at 2.) | "An application for a license. . . is not a license itself."<br><br>(Memo. Endorsement, Dec. 20, 2013 (ECF No. 80).) |
| Impact of Article XIV(B) | Consent Decree was a "mechanism for setting interim fees, nothing more." (*Id*. at 3.) | The only purpose of the rate court "is to set a rate for the license to which the user indisputably has a right." (*Id*. at 2.) | December 18 Order (addressing the terms of BMI's license with Pandora). |
| Impact of Court's December 18, 2013 decision | Pandora bemoans that the Court's decision effectively would permit partial withdrawals and force Pandora into marketplace agreements with publishers that could be used as benchmarks in this proceeding. (*Id*. at 3.) | Pandora bemoans that "the scope of Pandora's BMI license can be vitiated between now and the end of these proceedings." (*Id*. at 2.) | "Based upon the [interim license's] recognition of the publishers' withdrawal . . . neither that agreement nor the December 19 and 20, 2013 Orders give Pandora the right publicly to perform withdrawn compositions." (Memo. Endorsement, Dec. 23, 2013 (ECF No. 86).)<br><br>"The blanket license ultimately granted will not include the right to play compositions denied to Pandora. Therefore, the 'reasonable fee' . . . will be . . . necessarily insufficient to compensate BMI for the applicant's performance of those compositions during the |

| | | | |
|---|---|---|---|
| | | | interim." (Memo Endorsement, Dec. 20, 2013 (ECF No. 80).) |

**The factual situation today is the same as it was in December 2013.**

The facts that exist today are no different than the facts that existed on December 19, 2013: (1) publishers have the right to withdraw permission to license their works from BMI (subject only to whatever agreement that BMI and the publishers might reach); (2) if a publisher does withdraw, BMI cannot issue new licenses to those works to *any* user *including* Pandora; and (3) the Pandora-BMI interim license fee adjusts to reflect withdrawn and directly licensed works, including works withdrawn during the interim period. Pandora's interim license did not shield it from withdrawals in December 2013, and does not shield it from withdrawals today.

**Pandora is trying to use this Court as a weapon to limit the copyright rights of publishers and to avoid direct licensing in the free marketplace.**

The proposed motion is part of an overarching campaign by Pandora to avoid having this Court consider Pandora's direct licenses with Sony and Universal as benchmarks of market value for performing rights on Pandora. As this Court is aware, Pandora entered into two rounds of direct license agreements with publishers, first in late 2012 and mid-2013 (the "Round One Direct Licenses"), and additional direct licenses with publishers in late 2013, following the December 18 Order (the "Round Two Direct Licenses").[3] Pandora's expert has argued vociferously in his reports that the Round One and Two Direct Licenses are not appropriate benchmarks.

Specifically, Pandora's expert has argued that the Sony and Universal agreements in both the 2012 and 2013 rounds were entered into under suspect circumstances that put undue pressure on Pandora. In 2013, the time pressure was created artificially by Pandora's summary judgment motion, which could have been brought at any time after BMI filed its Petition, but which was strategically scheduled for as late as possible. Pandora seeks to replicate history and keep its expert's arguments alive with respect to any new direct licenses that may be negotiated this year. Pandora submitted its letter to the Court almost one year to the day after last year's letter (and 10 months after it entered into the Round Two Direct Licenses), and no doubt will ask for expedited briefing and a decision before year end. Pandora should not be allowed to use this Court as a weapon to avoid having to negotiate direct licenses.[4]

---

3 *See* Letter from L. Dakin-Grimm to Judge Stanton at 3, dated May 19, 2014 (ECF No. 100).

4 Pandora's attempt to avoid negotiating market rates with publishers is evidenced most clearly by its complaint that it must choose between a higher BMI rate and larger repertoire (*i.e.*, with BMI licensing the publishers' catalogs) or a lower BMI rate and a more limited repertoire (*i.e.,* with the publishers withdrawn). (Pandora's October 14 Letter at 3 n.2.) Pandora's complaint only makes sense if one

**Pandora's "alternative" request for a "new" interim license is simply another attempt to seek protection from withdrawal.**

Pandora's request for alternative relief is nonsensical and thus can only be understood as another attempt to obtain a ruling from this Court that Pandora is protected from future publisher withdrawals.

Pandora and BMI have an interim license with a fee that adjusts to account for withdrawn works.[5] Pandora has performed under that agreement—paying BMI interim fees with a deduction off of the headline rate for withdrawn works and direct licenses. Although BMI and Pandora have not engaged in further negotiations regarding an appropriate credit, Pandora has independently adjusted the fees payable to BMI each period to reflect withdrawn and/or directly licensed catalogs.[6] BMI has not disputed the interim fees paid by Pandora so there is no need for an interim fee proceeding at this time.

**Expert discovery has proceeded on the assumption that any final fee will adjust to account for withdrawn catalogs.**

Contrary to Pandora's assertion that the economic experts have assumed in their analyses a fixed repertoire with only an adjustable fee blanket license to account for direct licenses, Pandora's own expert suggests a credit for withdrawn publisher catalogs, even if there is no direct license. (Expert Report of Keith Waehrer ¶ 177, dated Aug. 22, 2014.) Similarly, BMI's expert proposed a fee formula that accounts for direct licenses as well as any future withdrawals. (Expert Rebuttal Report of Pierre Cremieux, dated Oct. 3, 2014, Appx. A.) Such credits will protect Pandora from any subsequent withdrawals. If publisher withdrawals occur before Pandora receives a final license, the Court will not have to "start from scratch." Indeed, it will need only to determine whether BMI's already proposed adjustment formula is reasonable.

---

assumes that the rates that it negotiates with publishers will yield higher rates than whatever this Court would set in a rate court proceeding.

[5] Pandora's suggestion that it has a new "need . . . to have a written interim license in place before the end of the year" cannot be reconciled with the sworn statement by its former CEO that "Pandora and BMI agreed on interim license fees for the period effective January 1, 2013" and he had "executed this agreement on behalf of Pandora." (ECF No. 24 ¶ 9.) The only reason that Pandora now wants the Court to declare that Pandora has a different "interim license" is based on its desire for a ruling that an interim license would protect it from the effects of any future publisher withdrawal.

[6] BMI has not challenged the credits taken by Pandora because of the proximity to trial where final fees will be set and all interim payments adjusted.

**The term of Pandora's license can be decided at trial. It would be a waste of this Court's and the parties' resources to have separate summary judgment regarding the term alone.**

Pandora's proposed motion also seeks a declaration from this Court that the term of the license at issue in this proceeding shall last through the end of 2017. BMI, however, has countered Pandora's proposal with a license term that extends only through 2016.

BMI is not required to provide a license through 2017, as Pandora suggests. (Pandora's October 14 Letter at 1.) Under Pandora's argument, an applicant could seek a license for 50 years, and BMI would be required to provide such a license as long as the fees were reasonable. The Consent Decree, however, contemplates that the rate court would set both fees and terms. (*See* December 18 Order at 1.) Moreover, it would be unfair to require that BMI provide a license of any term that an applicant request. This is particularly so for new media entities like Pandora, the business of which is rapidly evolving. For instance, in the last year alone, Pandora's listening hours in the second quarter of 2014 alone experienced a *30% increase* from the same period last year. BMI therefore asserts its license for Pandora should last only through the end of 2016. If Pandora believes a license of a different length is more appropriate, then it should be required to prove as much at trial.

* * *

In conclusion, this Court should deny Pandora's request to file a motion for partial summary judgment because it is law of the case that Pandora is not protected from publisher withdrawals.

Respectfully Submitted,

/s/ Scott A. Edelman
Scott A. Edelman

cc: All Counsel