# MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP

ONE CHASE MANHATTAN PLAZA

NEW YORK, NY 10005

212-530-5000

FAX: 212-530-5219

Atara Miller
PARTNER
DIRECT DIAL NUMBER
212-530-5124
E-MAIL: AMiller@milbank.com

**REDACTED FOR CONFIDENTIAL INFORMATION**

LOS ANGELES
213-892-4000
FAX: 213-629-5063

WASHINGTON, D.C.
202-835-7500
FAX: 202-835-7586

LONDON
44-20-7615-3000
FAX: 44-20-7615-3100

FRANKFURT
49-(0)69-71914-3400
FAX: 49-(0)69-71914-3500

MUNICH
49-89-25559-3600
FAX: 49-89-25559-3700

BEIJING
8610-5969-2700
FAX: 8610-5969-2707

HONG KONG
852-2971-4888
FAX: 852-2840-0792

SINGAPORE
65-6428-2400
FAX: 65-6428-2500

TOKYO
813-5410-2801
FAX: 813-5410-2891

SÃO PAULO
55-11-3927-7700
FAX: 55-11-3927-7777

November 19, 2014

**VIA ECF**

Honorable Louis L. Stanton
Southern District of New York
500 Pearl Street
New York, NY 10007

  Re: *Broadcast Music, Inc. v. Pandora Media, Inc.*, 13 Civ. 4037 (LLS)

Dear Judge Stanton:

  We write on behalf of Broadcast Music, Inc. ("BMI") to request that at the conference scheduled for November 21, the Court consider BMI's request for a pre-motion conference to modify the Stipulation and Amended Protective Order, as set forth in BMI's letter to the Court, dated October 2, 2014 (ECF No. 110), and in response to the letter from Pandora Media, Inc. ("Pandora"), specifying the relief it seeks through its proposed partial summary judgment motion. (Letter from K. Steinthal to Judge Stanton, dated Nov. 5, 2014 (the "Nov. 5 Letter").) Pandora's letter seeks an Order from this Court: (i) "that its final BMI license has the status of a 'license-in-effect,'" *i.e.* that "any subsequent publisher withdrawals cannot affect the scope of the BMI repertory subject to Pandora's license"; (ii) that, "as of the close of fact discovery and BMI's disclosure of its fee proposal, Pandora's license at issue in this proceeding operates as a license-in-effect"; and (iii) that BMI is required to grant it a license that extends through December 31, 2017. (*Id.* at 1.)

  BMI does not dispute that a final license issued from this Court would be treated as a license-in-effect ("LIE") to the extent that BMI's agreements with its publishers provide for

Milbank, Tweed, Hadley & McCloy LLP

Hon. Louis L. Stanton
November 19, 2014
Page 2

such treatment.  Pandora's request, nevertheless, should be denied because it has no valid legal basis for seeking the sweeping relief requested by its proposed summary judgment motion at this time because:  (i) there are disputed issues of fact—including on which discovery could have been taken, but was not—as to whether any final BMI license will have the effect of locking in the entire BMI repertoire for the proposed term of such license; (ii) Pandora's request to lock in BMI's repertoire as of the close of fact discovery before this Court has had the opportunity to review and adjudicate all relevant issues of fact has no legal basis whatsoever, and the need for it is obviated by the fact that no publisher currently has indicated that it intends to withdraw in advance of the trial; and (iii) there are disputed issues of fact as to the proper term of Pandora's license, which are appropriately resolved at trial.

Pandora brings its motion in an effort to force publishers to license their music to Pandora via PROs at rates that Pandora hopes will be to its benefit for as long as possible.  In seeking its relief, Pandora attempts to paint BMI and its publisher affiliates as unscrupulous, and the withdrawals as illegal maneuvering.  The facts that will be established at trial, however, do not support Pandora's allegations.  The publishers took the unprecedented step to withdraw digital rights from BMI in 2012 and 2013 because they were dissatisfied with the low percentage-of-revenue rates that Pandora and other digital music services paid to the PROs.  Aware of the publishers' dissatisfaction and the Department of Justice's consideration of changes to BMI's Consent Decree that could allow publishers to withdraw digital rights from BMI,[1] Pandora seeks to lock in every BMI publisher and undercut the immediate impact of any consent decree modification.

I. **There are disputed issues of fact regarding whether BMI will have the right to license all works for the duration of a final post-trial license with Pandora.**

   A. **Pandora's arguments raise factual issues on which discovery was not taken and ignore facts that are in the record.**

Pandora seeks a license that "locks in the current BMI repertory as part of the license (in addition to any compositions added to the BMI repertory during the term of the license)." (*Id.* at 3, 4.)  Although Pandora uses the term "withdrawal" throughout its letter, Pandora's motion seeks to protect it not only from any BMI-publisher's *withdrawal* (as that term was used in the Digital Rights Withdrawal Addenda), but also from the ordinary course

---

[1] In light of the publisher withdrawals, and the decisions by this Court and Judge Cote in the ASCAP case regarding such withdrawals, the Department of Justice (the "DOJ") currently is considering modifying BMI's and ASCAP's consent decrees to, among other things, permit digital rights withdrawals.  (*See* http://www.justice.gov/atr/cases/ascap-bmi-decree-review.html, last accessed Nov. 20, 2014.)

2

Milbank, Tweed, Hadley & McCloy LLP

Hon. Louis L. Stanton
November 19, 2014
Page 3

*termination* of a publisher affiliation agreement.[2]  Contrary to Pandora's assertion, no final licensee has ever received such broad protection from BMI.

As the basis for locking in *every* publisher for the term of the Agreement, Pandora relies on four sources:

1. The provision in BMI's most recent form publisher affiliation agreement that provides that the termination of the affiliation agreement shall be "subject to any rights or obligations existing between BMI and its licensees under licenses then in effect" such that BMI "shall have the right to continue to license all of Publisher's Works . . . with respect to which such licenses that exist as of the date of termination, until such licenses expire." (*Id.* at 4 (citing Aug. 2000 Form Affiliation Agreement ¶ 9(B), (the "Aug. 2000 Form Agreement"), attached hereto as Exhibit K).);

2. The provision in the Digital Rights Addenda (and BMI's guidelines related thereto) that states that a withdrawing publisher's repertoire "shall continue to be licensed by BMI under any License-in-Effect, solely for the remaining term of such Licenses-in-Effect . . . ." (*Id.* at 5 (citing DRW Addenda ¶ 6, attached hereto as Exhibits L-N).);

3. Certain provisions in BMG's, Universal's, and Sony's Suspension Agreements; and

4. BMI's past practices.[3]

As detailed below, those sources do not support the conclusion that Pandora is entitled to a license that protects it from any publisher withdrawal or termination. It is obviously in BMI's interest to expand the scope of its licensing authority as much as possible, within the limitations

---

[2] A termination is different from withdrawal. Terminations are effectuated in a manner that is consistent with publishers' affiliation agreements, and terminates a publisher's affiliation with BMI for the catalog that is the subject of the agreement. Withdrawals, however, were given effect pursuant to Digital Rights Withdrawal Addenda ("DRW Addendum") to such publishers' affiliation agreements. Under those Addenda, publishers remain affiliated with BMI but withdraw from BMI the right to license the performing right in their works for certain purposes. Consistent with this Court's December 18, 2013 Order, the effect of such withdrawals would be that BMI no longer had the right to license the performing right to withdrawn works to any music user.

[3] Pandora's repeated intimation that the LIE concept is somehow derived from BMI's Consent Decree (*see, e.g.,* Nov. 5 Ltr. at 2, 3, 5-6) is without any basis. BMI's Consent Decree contains no mention of LIEs. The concept appears only in BMI's private contracts with its affiliates. (*See* Ex. K, Aug. 2000 Form Agreement ¶ 9.B.) Pandora cannot dictate, modify, or enforce the terms of those agreements.

3

Milbank, Tweed, Hadley & McCloy LLP

Hon. Louis L. Stanton
November 19, 2014
Page 4

of the Consent Decree. BMI, however, is constrained by the limits imposed by the copyright holder.

### i. Pandora has not demonstrated that all of BMI's publisher affiliates have agreed to a license-in-effect exception.

Citing BMI's most recent form affiliation agreement, created in 2000, Pandora makes the factual leap that BMI's form agreements "*undoubtedly* apply to the *majority* of BMI's affiliates," and thus Pandora's final license with BMI should be protected from "*any withdrawals* that occur after entry of the Court's rate determination." (Nov. 5 Ltr. at 4, 2 (emphases added).) Such speculation is insufficient to support summary judgment. *Ramirez v. Riverbay Corp.*, No. 13 CIV. 2367 JGK, 2014 WL 3800489, at *8 (S.D.N.Y. Aug. 1, 2014) (holding that "[w]ithout any direct support," the "conclusory testimony proffered by the plaintiff herself is not enough to grant summary judgment" in plaintiff's favor).

First, Pandora is wrong on the facts. BMI produced form agreements dating from 1969 through 2000. (Form Affiliation Agreements, attached hereto as Exhibits A-K.) Only one form agreement—the most recent one—contains a LIE provision. All of the form agreements produced by BMI provide that they will continue "for additional periods of five (5) years unless terminated by either party at the end of such initial period." (*see id.*) Due to this auto-renewal provision, there is no basis on which to assume that all publishers are affiliated under the terms of the current form license.[4] Indeed, Pandora only argues that the new form likely applies to a "majority" of BMI's affiliates. Thus, even if true, this fact cannot support an order that would bind all publishers and all catalogs.[5]

### ii. Pandora misrepresents the nature and effect of the LIE provision in the affiliation agreements.

Pandora argues that the LIE provision makes final licenses "not subject to subsequent publisher resignations/withdrawals during the term of said licenses." (Nov. 5 Ltr. at 9.) This argument ignores the language of the LIE provision itself, which makes clear that it is subject to the "rights and obligations existing between BMI and its licensees." (Ex. K, Aug. 2000 Form Agreement ¶ 9(B).) The LIE provision does not say that the publishers' works are automatically locked into BMI's repertoire for the term of any existing license. Instead, the LIE provision gives BMI the *right*, but does not *require*, BMI to continue to license a publisher's catalog post-termination. Indeed, each form affiliation agreement produced by BMI includes a

---

[4]     Large publishers with multiple catalogs will generally have multiple affiliation agreements with BMI at any given time. It is likely that some older catalogs are covered by affiliation agreements that do not contain an LIE provision.

[5]     ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Milbank, Tweed, Hadley & McCloy LLP

Hon. Louis L. Stanton
November 19, 2014
Page 5

provision stating that BMI is not required to continue to license works subsequent to a termination. (Exs. A-K, Form Affiliation Agreements ¶ 7(A).) BMI can structure its license agreements in myriad ways, including such that terminated or withdrawn catalogs are not included in its license through the end of the term, and to include a fee adjustment (if appropriate) for any material diminution in its repertoire during the license period.

The affiliation agreements thus cannot support Pandora's request for a license that protects it "from being subject to diminished BMI repertoire access by virtue of publisher resignations/withdrawals occurring after BMI's licenses take effect." (*Id.* at 4.)

### iii. The DRW Addenda do not support Pandora's request for a final license that locks in BMI's repertoire.

The inclusion of a LIE provision in BMI's digital rights withdrawal guidelines and DRW Addenda is not helpful to Pandora either. Only three publishers actually withdrew from BMI after executing a DRW Addendum: Sony,[6] Universal, and BMG. (*See* Exs. L-N, DRW Addenda.) Those publishers, however, executed Suspension Agreements that expressly "suspend the application and operation of the Digital Rights Withdrawal Agreements . . . ." (*See* Sony Suspension Agreement ¶ 3, attached hereto as Exhibit O.)[7] Even if the DRW Addenda were in effect, the vast majority of publishers have not executed the Addendum, and thus its LIE provision cannot support Pandora's request to lock in *every* publisher for the term of its license with BMI.

### iv. The Suspension Agreements do not support Pandora's request for a final license that locks in BMI's repertoire.

The Suspension Agreements also do not support Pandora's motion.



---

[6]   Sony executed a Digital Rights Withdrawal Addendum on behalf of itself and U.S. E.M.I. Music Publishing Companies. (*See* E.M.I. DRW Addendum, attached hereto as Exhibit EE.)

[7]

Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP

Hon. Louis L. Stanton
November 19, 2014
Page 6

███████████████████████████████████████████

█████████████████████████████████████ and BMI have since entered into an extension of this Agreement, modifying the above language so that it now extends through 2015. (*See* Suspension Extension Agreement, attached hereto as Exhibit R.) ███████████████████████████████████████████████████████████████

Pandora concedes that under this provision, BMI "is contractually prohibited from *voluntarily* agreeing to a LIE with certain licensees," but argues that the use of the word "voluntarily" expressly allows this Court to require all of BMI's publishers to license to Pandora. (Nov. 5 Ltr. at 7.) It is a broad leap to suggest that the publishers, in limiting BMI's voluntary licensing activities ████████████████████████ intended to provide that the Court could so bind them. As Sony's Peter Brodsky made clear, in the deposition testimony cited by Pandora, ████████████████████████████████ Sony was "looking to be made whole or partially whole if our catalog of songs ended up in a license beyond the period for which we thought it should be. . . ." (Nov. 5 Ltr. at 7 (citing Brodsky deposition).) The uncontroverted evidence shows that the publishers did not want their catalogs to be bound beyond a termination or withdrawal.

### v. BMI's past practice does not support Pandora's request for a final license that locks in BMI's repertoire.

Pandora is wrong that "BMI and its affiliates have consistently operated with the understanding that, once BMI licenses a licensee, that license locks in the current BMI repertory as part of the license (in addition to any compositions added to the BMI repertory during the term of the license)." (Nov. 5 Ltr. at 3.)[10] Again, although it could have taken such discovery during the permitted time period, Pandora took no discovery on this issue and has no basis for its bald assertion.

---

[8]     Music Service, New Media Service, and New Media Transmissions are defined by reference to the Digital Rights Withdrawal Addendum between BMI and Universal. (*See* Ex. M, Digital Rights Withdrawal Addendum between Universal Music Publishing Group and BMI, dated Sept. 14, 2013.)

[9]     ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ .

[10]    Pandora's suggestion that the RMLC agreement locked in BMI's repertoire (*id.* at 8) is simply incorrect. BMI represented only that the digital rights withdrawals, which were contemplated at that time, did not impact the RMLC license because the scope of rights granted to RMLC stations was outside the scope of the withdrawn rights. (*Id.*)

6

Milbank, Tweed, Hadley & McCloy LLP

Hon. Louis L. Stanton
November 19, 2014
Page 7

           If discovery had been taken, Pandora would have learned that before the recent wave of withdrawals BMI had no reason to enforce its rights under the LIE provision. Historically, if an affiliate terminated its affiliation with BMI, it switched to one of the other PROs. There was a general presumption in the industry that over the term of any given license a PRO gained roughly as much catalog as it lost. From the perspective of the music user, such shifts were inconsequential as the fees paid in the aggregate to the PROs did not change over the term of a license. The shifts in repertoire, and any corresponding change in market share, would be accounted for in the next negotiation.[11]

           *   *   *

           In sum, Pandora's request for permission to move for summary judgment is based on assertions that have no basis in the factual record of this case, and should be denied. Factual issues preclude a determination on summary judgment that the scope of the repertoire covered by BMI's license will not diminish during the term of the license.

### B. Pandora's purported equitable arguments do not provide a basis for summary judgment.

           Pandora claims that its eventual final license with BMI must be given LIE status because its expert's analysis would have to be redone to account for publisher withdrawals. (*Id.* at 9.) Pandora's argument, however, is supported only by the self-serving statements of its own expert, which were plainly manufactured for this very motion. In his initial report, Dr. Waehrer proposed an adjustment for "[w]ithdrawn compositions that are not licensed by Pandora." (Expert Report of Keith Waehrer ¶¶ 177, 184, Aug. 22, 2014, attached hereto as Exhibit S.) In that report, Waehrer never stated that this adjustment only took into account *past* withdrawals and was inapplicable to any future withdrawals. Only in his rebuttal report—filed one business day before Pandora previewed this motion to the Court[12]—did Dr. Waehrer first claim that he "reserve[s] the right to revisit [his] analysis" in the event of withdrawals prior to trial. (Expert Rebuttal Report of Keith Waehrer n. 2, Oct. 3, 2014, attached hereto as Exhibit T.) Likewise, Dr. Waehrer's testimony at his deposition (Nov. 5 Ltr. at 9) that he assumed that BMI's repertory would be locked in after a final license was issued is not credible. Even if it were true, such

---

[11]    Indeed, at present, it would be a challenge for BMI's internal systems to track works, affiliation, and performances in a manner that could account for continued licensing of works wholly owned by withdrawing publishers for LIEs at the time of a particular affiliate termination.

[12]    *See* Letter from J. Wetzel to Judge Stanton, Oct. 6, 2014 (ECF No. 111) ("Pandora plans to submit a letter to the Court requesting a pre-motion conference to address two separate issues once it has completed the meet-and-confer process with BMI.").

Milbank, Tweed, Hadley & McCloy LLP

Hon. Louis L. Stanton
November 19, 2014
Page 8

assumption was not reasonable given the uncertainty in the marketplace and the risk of withdrawals.[13]

        Similarly, Pandora's argument that the analysis of BMI's expert Dr. Pierre Cremieux does not address "eliminating Pandora's license-in-effect" (*id.* at 10) is misleading. Dr. Cremieux's rate formula proposal does account for potential future withdrawals in conjunction with the formula for an "adjustable fee blanket license" demanded by Pandora. (Because his analysis assumed that future publisher withdrawals were possible, BMI hereby reserves its rights to modify his analysis if the Court holds that Pandora's license protects it from any subsequent publisher withdrawals.) Pandora's criticisms of Dr. Cremieux's analysis (*id.* at 10) plainly are a matter for trial, and not a basis for summary judgment.

        Even if revised expert analyses were required, the license at issue in this case covers at least two retroactive years (2013-2014). All of the expert work that has been done is critical for setting an appropriate rate for those years, even if additional analyses would have to be done in the event of future withdrawals. ████████████████████████████ ████████████████████████████████████████████ has agreed not to withdraw in 2015 and ████ will have to give BMI at least 90 days' notice (and it has yet to provide such notice to date) of its termination of the Suspension Agreement.[15] For the remainder of the term of Pandora's license—whether it is 2016 or 2017—the parties can easily address a subsequent publisher withdrawal in the event that one occurs by either (a) an adjustment formula (like the one proposed by Dr. Cremieux) that would account for the impact of any future withdrawals and/or (b) agreeing to a rehearing in the event that there is a material diminution of BMI's repertoire. Evaluating the impact of a material diminution in BMI's repertoire during the term of the license on the value of the blanket license, and an appropriate adjustment to account for such a diminution, are plainly matters to be considered and decided as part of the trial. They are not appropriate for summary judgment.

---

[13]    Pandora's claim that it is a "complete surprise" that BMI would not agree that a final license locks in BMI's repertoire is equally not credible. (*Id.* at 10.) ████████████████████████████ ████████████████████████████████████████████████████████████████████████ Even so, Pandora knew that its entitlement to LIE protection was questionable as it raised the issue with BMI in October.

[14]    ████████████████████████████████████████████████████████████████████████

[15]    ████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

8

Hon. Louis L. Stanton
November 19, 2014
Page 9

### C. Pandora's incendiary allegations should be disregarded.

Much of Pandora's letter is plainly intended for a different audience than this Court. A surprising amount of press coverage and inquiries,[16] unsolicited by BMI, make clear that Pandora uses its submissions to this Court to try the case in the press and the court of public opinion. Although untrue and irrelevant to any issue before the Court, BMI feels compelled to respond to just two of Pandora's most egregious allegations.

Pandora accuses BMI of "arguably" breaching its fiduciary duties to its smaller publisher affiliates. (Nov. 5 Ltr. at 12.)[17] Pandora reasons that if BMI does not embrace Pandora's argument, it will be "bending to the will of larger publishers at the expense of its smaller affiliates." (Nov. 5 Ltr. at 12.) BMI takes very seriously any allegations that it is not treating all of its affiliates fairly. BMI cannot change the scope of rights that its affiliates have given to BMI and thus is duty bound to comply with any limitations that exist in its contractual arrangements with its affiliates, no matter the impact of those limitations.

Similarly, Pandora's argument that Sony and Universal are "the driving forces behind BMI's massive legal expenditures in this action" has no factual support and simply is another myth created by Pandora. (*Id.* at 11.) BMI has requested an increase in its fees because it believes that such an increase is reasonable at this time. Pandora, on the other hand, has chosen to contest such increase even though it would cost Pandora less than 1% of additional revenue per year.

### II. Pandora's request for protection from withdrawal as of the close of discovery is without support and is premature.

Pandora cites the fact that costly discovery has closed as the basis for an order "that, as of the close of fact discovery and BMI's disclosure of its fee proposal, Pandora's license

---

[16] Matthew Blake at the *Daily Journal* wrote counsel to BMI purporting to describe Pandora's November 5 letter. (*See* Email from Matthew Blake to Atara Miller, Nov. 12, 2014, attached hereto as Exhibit U.) Likewise, a reporter attended the last court conference on October 22, 2014, although the date and time of the conference never were publicly disclosed. Pandora's citation of a *Hollywood Reporter* article as purported evidence that "to some observers," BMI and the publisher were "side-stepping" this Court's order (Nov. 5 Ltr. at 2) is particularly disingenuous. Pandora should not be permitted to argue that its own statements to the press—as Pandora is plainly the "observer" referred to in the article—constitute third-party observer "evidence" in this case.

[17] As a matter of law, BMI does not have a fiduciary relationship with its affiliates. BMI's form affiliation agreement expressly states that "[p]ublisher acknowledges that the relationship between BMI and Publisher which is created by this agreement is one of ordinary contracting parties and is not intended to be a fiduciary relationship with respect to any of the rights or obligations thereunder." (Ex. K, Aug. 2000 Form Agreement ¶ 24.) BMI nevertheless endeavors to treat all of its affiliates with the utmost good faith.

Milbank, Tweed, Hadley & McCloy LLP

Hon. Louis L. Stanton
November 19, 2014
Page 10

at issue in this proceeding operates as a license-in-effect." (*Id.* at 1.) Pandora no longer claims that it has an interim license or an application that entitles it to such protection.[18] Pandora also does not cite any agreement or document that supports a finding that licensees are entitled to protection from withdrawal at the end of discovery. Nor does Pandora point to any practice or "industry standard" that suggests that BMI, or its affiliated publishers, have ever understood the LIE exception to apply to anything other than a final license.

In fact, the evidence suggests the contrary. BMI's guidelines for digital rights withdrawal[19] that Pandora cites plainly states that a publisher's catalog would be "covered under BMI's existing license agreement with" a customer "for the remainder of the term" if the publisher effected a digital rights withdrawal after BMI entered into "a *final* license." (*Id.* at 5 (citing BMI's guidelines) (emphasis added).) Moreover, the LIE exception in the most recent form affiliation agreement applies only to licensees who have received *final* licenses during the term of the affiliation agreement. Interim licenses are, by definition, subject to negotiation and finalization. At the time that a final license is fixed by either agreement or the Court, the license can account for any changes in repertoire that occurs during the interim period. Indeed, in BMI's case against the local television industry, it made music share adjustments to account for changes in BMI's repertoire and the licensees' use of works in the BMI repertoire for most years in the interim period. (*See* Expert Witness Statement of Pierre Cremieux Appx. I, dated May 25, 2012, attached hereto as Exhibit V.)

In the absence of any factual or legal basis for LIE protection as of the close of discovery, Pandora turns to "equity," presenting a litany of hypotheticals that *might* happen if the Court does not rule in its favor. (Nov. 5 Ltr. at 13-14.) Pandora's concerns are wholly speculative. As BMI advised Pandora, and as Pandora advised the Court, "[t]here is no imminent publisher withdrawal at the end of 2014." (Ltr. from K. Steinthal to Judge Stanton, dated Oct. 31, 2014 (ECF No. 111).) Pandora's claim that the expert analyses may need to be adjusted to account for the impact of withdrawal by a major publisher is equally unfounded. In the unlikely event that a withdrawal occurs before the parties enter into a final license, the Court will be able to address such withdrawal most appropriately at that time. As BMI knows from past experience, the Court is capable of addressing any circumstances that impact on trial if and when such facts arise.[20]

---

[18]    Pandora thus only argues that it is "entitled" to a license and that BMI "will grant a license" to Pandora. (*Id.* at 12.)

[19]    As noted above, these guidelines presently are not applicable because all withdrawing publishers have suspended their withdrawals from BMI.

[20]    In BMI's case against the local television industry, the Television Music License Committee struck an eleventh-hour deal with ASCAP, requiring a wholesale re-do of all expert analyses after pre-trial materials had been submitted. (Order, *WPIX, Inc. v. Broad. Music, Inc.*, No. 09 Civ. 10366 (Oct. 23, 2012).) The Court carefully considered the issues and permitted limited additional discovery and a revision of pre-trial submissions. (*Id.*)

Milbank, Tweed, Hadley & McCloy LLP

Hon. Louis L. Stanton
November 19, 2014
Page 11

BMI therefore requests that the Court deny Pandora's request to file summary judgment for an order directing BMI to license all works in its repertory as of the close of discovery because Pandora has no legal basis for such request and the issue is premature. If the factual circumstances change such that the issue becomes ripe, the Court can address the impact of such withdrawal at that time.

### III. The appropriate duration of Pandora's license is a question of fact that should be decided at trial.

Pandora is not entitled to a pre-determination that its license with BMI will extend through December 31, 2017 as a matter of law. Pandora argues that BMI (and the Court) is obligated to accept any terms that Pandora requests in its license application, and that the Court's jurisdiction is limited to setting rates, not terms. (*See* Nov. 5 Ltr. at 13 ("[T]he text of the BMI Decree entitles Pandora to 'the license [it] requested.'").) Pandora is wrong.

This Court routinely sets both rates ***and terms*** of BMI's licenses with music users. *See, e.g., Broad. Music, Inc. v. DMX, Inc.*, 726 F. Supp. 2d 355, 355, 367 (S.D.N.Y. 2010) (noting that BMI "petition[ed] for a determination of reasonable fees and terms for an . . . AFBL" and denying DMX's request to include bowling centers in the scope of the license at issue). Pandora itself asked this Court to set the terms of its license with BMI when it filed a motion for summary judgment last year seeking "an order that any BMI publisher 'withdrawals' . . . do not affect the scope of the BMI repertory subject to Pandora's BMI consent decree license." (Memo. in Support of Pandora's Motion for Partial Summary Judgment, Nov. 1, 2013, ECF No. 23).)[21] Like any other license term, the duration of the license at issue is appropriately before the Court as a term that must be set at trial. No licensee should be able to dictate to BMI that it must grant it a license for 50 years, or even 10 years, by bootstrapping a mere application into a pre-trial determination that locks in BMI's repertoire. For the same reason, Pandora should not be permitted to a license through 2017 simply because it requested such a term.[22]

---

[21] Indeed, Pandora's argument that the rate court can set only rates, and not the terms of its license (Nov. 5 Ltr. at 13), cannot be reconciled with its own argument in its letter that this Court "has the authority to grant" Pandora a license that protects it from all future withdrawals "under the BMI consent decree" because any such order would be "[l]ike any order of this Court determining rates or terms of a BMI license." (*Id.* at 3.)

[22] Pandora's argument that the scenario of a 50-year license request is inapposite (Nov. 5 Ltr. at 13 n. 10) is irrelevant to the question of whether Pandora has a legal right to dictate the term of its license. The same legal principles apply equally to Pandora as to a licensee seeking a 50-year term, and a holding in favor of Pandora's proposed motion would pave the way for the submission of license requests of excessive duration by applicants eager to avoid at all costs the negotiation of licenses with publishers in the unregulated free market.

Milbank, Tweed, Hadley & McCloy LLP

Hon. Louis L. Stanton
November 19, 2014
Page 12

The question of whether it is appropriate to grant Pandora a license through 2017 is an issue of fact for the trial. BMI is prepared to present evidence that will show that due to the rapidly changing nature of the marketplace for online music transmissions, and the uncertainty of Pandora's business, a license through 2016 is most appropriate. That the internet radio business—including Pandora—is evolving is evident from the events of the last week alone:

- On November 3, Taylor Swift—one of the world's most popular artists—announced that she was removing all of her music from Pandora's competitor Spotify. (B. Sisario, *Taylor Swift Announces World Tour and Pulls Her Music From Spotify*, NY Times, Nov. 3, 2014, attached hereto as Exhibit W.) She explained to Time magazine that she pulled her music from the service because "[e]verybody's complaining about how music sales are shrinking, but nobody's changing the way they're doing things. They keep running towards streaming, which is, for the most part, what has been shrinking the numbers of paid album sales." (J. Dickey, *Taylor Swift on* 1989, *Spotify, Her Next Tour, and Female Role Models*, Time, Nov. 13, 2014, attached hereto as Exhibit X.)

- On November 12, Irving Azoff, on behalf of his company, Global Music Rights, which represents 42 clients with over 20,000 copyrighted works including John Lennon, Smokey Robinson, and George and Ira Gershwin, announced that he is prepared to take his client's music off YouTube Music Key, a digital subscription service that "will compete with Spotify and Pandora." (E. Gardner, *Irving Azoff Threatens to Yank 20,000 Songs From YouTube*, Hollywood Reporter, Nov. 12, 2014, attached hereto as Exhibit Y.)

- On November 13, the *Wall Street Journal* reported that some music executives "worry such . . . personalized radio services [like Pandora, iHeartRadio, and Apple's iTunes Radio] may be blinding some consumers to the advantages of paid subscription services. To correct the problem, [one label executive] said, record labels must tweak both the types of features and the amount of content that they allow their technology partners to offer free . . . ." (H. Karp, *Era of Free Digital Music Wanes*, The Wall Street Journal, Nov. 13, 2014, attached hereto as Exhibit Z.)

These facts demonstrate that Pandora's business model and the industry in which it operates are likely to continue to change. Moreover, these are not the only relevant facts. If the DOJ determines that partial withdrawals are a positive development, and the Consent Decree should be modified to allow them, then it would be incongruous to lock the publishers into a longer term license. In addition, there have been legislative efforts that would allow this Court to expressly consider royalties paid to record labels in this proceeding. Pandora and the record labels currently are litigating before the Copyright Royalty Board over the appropriate rate for sound recording rates that Pandora will pay to the record labels for the period from 2016-2020. These developments may further change the landscape materially before 2017.

Hon. Louis L. Stanton
November 19, 2014
Page 13

In addition, Pandora's claim that "BMI routinely enters agreements with terms of 5 years or more" (Nov. 5 Ltr. at 13) is demonstrably false in the context of new media. All of BMI's recent agreements with new media services have been short-term agreements. (*See, e.g.*, ▮▮▮ (three-year term); ▮▮▮ (three-year term); ▮▮▮ (one-year term with automatic renewal); ▮▮▮ (one-year term with automatic renewal).) Pandora has cited to no contrary example.

To lock BMI—and its affiliates—into a rate for a longer period of time would be unfair. In fact, limiting the license to 2016 is even more important if this Court holds that Pandora has an LIE that protects it from *any* future publisher withdrawals because it would lock in every BMI publisher—who may want to react to the evolving marketplace—for a longer term. BMI will prove at trial that its offer of a four-year term from January 1, 2013 through December 31, 2016 is reasonable, and Pandora can respond to these arguments at trial, rather than seek a preemptory and premature ruling via its summary judgment motion.

\*     \*     \*

In conclusion, this Court should deny Pandora's request to file a motion for partial summary judgment.

Very truly yours,

s/ Atara Miller
Atara Miller

cc:   All Counsel