# KING & SPALDING

King & Spalding LLP
101 Second Street
Suite 2300
San Francisco, CA 94105
Tel: +1 415 318 1200
Fax: +1 415 318 1300
www.kslaw.com

Kenneth Steinthal
Partner
Direct Dial: +1 415 318 1211
Direct Fax: +1 415 318 1300
ksteinthal@kslaw.com

November 5, 2014

**VIA HAND DELIVERY**

Hon. Louis L. Stanton, United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Dear Judge Stanton:

    Following from the conference before Your Honor on October 22, 2014, Pandora submits this letter (i) clarifying the relief it seeks via the motion for partial summary judgment it has requested leave to file, and (ii) discussing the Court's authority to grant the requested relief. Given the sensitive nature of the subject matter, much of which discusses documents produced under the applicable Protective Order, Pandora requests that Your Honor order this letter to be filed under seal.

    Consistent with decades of past practice and the various agreements between BMI's publisher affiliates and BMI, Pandora principally seeks an order confirming that its final BMI license has the status of a "license-in-effect." That is, Pandora seeks an order declaring that any subsequent publisher withdrawals cannot affect the scope of the BMI repertory subject to Pandora's license. Second, given the advanced stage of these proceedings and the apparent volatility of BMI and its affiliates' relationships, Pandora seeks an order that, as of the close of fact discovery and BMI's disclosure of its fee proposal, Pandora's license at issue in this proceeding operates as a license-in-effect through December 31, 2017 (or at a minimum through the end of 2016) at a rate to be determined at trial. No party disputes Pandora's entitlement to a BMI license. Both Pandora and BMI have proposed rates for a blanket license that would entitle Pandora to perform all works in the BMI repertory through at least 2016.

    On the day that Pandora was originally scheduled to file this letter, BMI informed Pandora that there is no longer an impending publisher withdrawal at the end of 2014 for two reasons: (1) [redacted] and (2) the previously undisclosed fact that Sony/ATV and EMI Music Publishing (collectively Sony-EMI) had not given the requisite notice of their

1

intention to terminate their "Suspension Agreement."[1] As a result, there no longer appears to be a pressing need for resolution before January 1, 2015. This Court's pre-trial intervention remains necessary, however, to resolve Pandora's principal claim: that Pandora's final license after the Court's rate determination is a license-in-effect—i.e., not subject to any withdrawals that occur after entry of the Court's rate determination. Without such an order, Pandora's BMI license would differ from every license ever emanating from this rate court in that the publishers could withdraw *en masse* at any time during the term of Pandora's license, even after trial. Such an unprecedented final license status not only would leave Pandora with a materially less-valuable blanket license than every other licensee who has come before the Court, but depending on the scope of any subsequent withdrawals it also would threaten to render these proceedings a farce.

BMI's disclosure of new information to Pandora on Friday regarding its relationships with UMPG and Sony-EMI confirms the need for a determination that Pandora's BMI license has the status of a license in-effect-now. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. As for Sony-EMI, Pandora is puzzled that neither BMI nor Sony-EMI saw fit to mention the impossibility of a Sony-EMI withdrawal before January 1, 2015, in connection with the pre-motion conference. Sony remains circumspect about its plans.[2] In all events, the potential for a Sony-EMI withdrawal before the Court sets a rate for Pandora's BMI license remains real. BMI's email of October 31, 2014, confirmed only that Sony-EMI had not given notice of their intention to withdraw as of that date. Have they given notice since then? We are ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, meaning Sony-EMI could theoretically withdraw on the very eve of trial. If notice is given between now and trial, it is possible that the length of trial and the amount of time the Court takes to decide Pandora's rate could materially affect the scope of Pandora's license, if Pandora's motion is not granted. That cannot have been contemplated when the rate court provisions of the BMI decree were adopted. And all of this assumes that BMI and Sony-EMI do not simply rewrite or further modify their affiliation agreements between now and the time the Court determines the rate for Pandora's BMI license.

The past year has demonstrated that BMI and its publishers are capable of drastically changing the nature of their affiliation on a whim, and these proceedings must be protected from this unprecedented state of play. Indeed, an article appearing in *The Hollywood Reporter* today described the recent relationships of BMI and its major publishers as a "dance" or game of "footsie," remarking that "[t]o some observers, this smacked of side-stepping the judge's ruling by being 'all in' when convenient and 'all out' when negotiating with Pandora."

---

[1] For the Court's convenience, Pandora will provide a complete set of cited materials to the Court later this week.
[2] *See* Eriq Gardner, *BMI Advises Pandora That Big Publishers Won't Be Withdrawing Licensing Rights*, HOLLYWOOD REPORTER, Nov. 4, 2014, http://www.hollywoodreporter.com/thr-esq/bmi-advises-pandora-big-publishers-745763.

When BMI filed its Petition in June 2013, it put the fate of Pandora's BMI license in the hands of the Court. Accordingly, the Court has authority to grant this relief under the BMI consent decree, particularly those provisions that establish the rate court and charge it with enforcing the decree, and as part of its general power to control its docket and to ensure the fairness of its proceedings. To be clear, Pandora is *not* asking the Court to modify any agreements between BMI and its affiliates or otherwise interfere with their relationships. Those agreements and relationships acknowledge the significance of licenses-in-effect, the pendency of this proceeding, the constraints of the consent decree, and the Court's authority to act. Indeed, Sony's negotiations with BMI acknowledged precisely the Court's ability to grant the relief Pandora seeks here. Like any order of this Court determining rates or terms of a BMI license— and unlike Pandora's November 2013 motion challenging the permissibility of selective digital rights withdrawals under the decree—an order granting Pandora's motion would do nothing to disturb BMI's existing contracts with its affiliates.

### I. BMI'S AGREEMENTS WITH ITS PUBLISHERS CONFIRM THIS COURT'S AUTHORITY TO ISSUE THE REQUESTED RELIEF

Pandora understands that the Court is concerned about whether it has the ability to grant the relief sought by Pandora—in particular, whether granting Pandora's motion would interfere with the rights of the publishers as copyright holders. (See Oct. 22, 2014 Conference Tr. 52:17-23.). There would be no interference. As discussed below, the agreements between the publishers and BMI expressly recognize and endorse the longstanding license-in-effect concept. Moreover, when a publisher chooses to affiliate with BMI, the publisher voluntarily relinquishes some amount of control over its copyrights in exchange for the benefits of collective licensing. The licensing of that publisher's works through BMI becomes subject *both* to the terms of the affiliation agreement between the publisher and BMI and the restrictions that the consent decree imposes on BMI. For example, it is beyond question that this Court (and not the publishers in BMI) will set the rate for Pandora's BMI license, notwithstanding that decision's effect on BMI's affiliates' rights "as a practical matter." Proposed Order Granting Intervention at 1. Here, the Court's authority to order that Pandora has a license-in-effect flows both from the agreements between BMI and its affiliates and the consent decree.

### A. The License-In-Effect Concept Is a BMI and Industry Standard Consistently Embodied in BMI's Affiliation Agreements

The license-in-effect concept is a longstanding BMI and industry standard. Although the consent decree does not speak directly to licenses-in-effect, BMI and its affiliates have consistently operated with the understanding that, once BMI licenses a licensee, that license locks in the current BMI repertory as part of the license (in addition to any compositions added to the BMI repertory during the term of the license).

3

This is an important industry standard for a reason. Without licenses-in-effect, users and affiliates would receive far less value and efficiency from PRO blanket licenses due to the lack of predictability associated with the license. Licensees value PRO blanket licenses due to the stability and predictability such licenses provide them in operating their businesses. Similarly, the stability provided by licenses-in-effect is good for PROs (and by extension their affiliates) because it helps them allocate costs among affiliates while locking in more steady royalty streams. Moreover, the license-in-effect concept is essential to the viability of certain common licensing arrangements (like lump-sum licenses) that otherwise would expose the licensee to tremendous risk. No licensee would ever pay a lump-sum license (*e.g.,* pay a periodic or upfront license fee) to BMI if entire catalogs of publishers' works that were in the BMI repertory on "day one" could simply be removed or divested at the whim of BMI or its affiliates.

Unsurprisingly, then, the license-in-effect concept is embodied in both BMI's form affiliation agreements and the affiliation agreements of the major publishers who are intervening here.

1. BMI Form Affiliation Agreements

The current form affiliation agreement found on BMI's website[3] expressly recognizes (in Section 9.B) the license-in-effect concept:

> The termination of this agreement shall be deemed subject to any rights or obligations existing between BMI and its licensees under licenses then in effect. As a result thereof, notwithstanding such termination, BMI shall have the right to continue to license all of Publisher's Works in all places and in all media with respect to which such licenses exist as of the date of termination, until such licenses expire.

The same language appears in the affiliation agreement ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[4] The most recent form affiliation agreement produced by BMI in this case also contains an identical Section 9.B. BMI's form agreements, which undoubtedly apply to the majority of BMI's affiliates, thus explicitly provide for BMI's issuance of licenses that protect licensees from being subject to diminished BMI repertory access by virtue of publisher resignations/withdrawals occurring after BMI's licenses take effect.

---

[3] http://www.bmi.com/forms/affiliation/bmi_publisher_kit.pdf.
[4] Early in discovery, Pandora requested that BMI produce certain affiliation agreements, including those with withdrawing publishers. (See Pandora's First Requests for Production.) On April 2, 2014, counsel for BMI and counsel for Pandora agreed that, to alleviate BMI's burden of producing "hundreds" of affiliation agreements between BMI and its affiliates, BMI would produce to Pandora a "representative sample" of affiliation agreements entered into by BMI and purportedly withdrawn publishers. BMI produced 11 representative form affiliation agreements spanning 1969-2000. The August 2000 form affiliate agreement was the most recent agreement made available to Pandora.

2. <u>The Digital Rights Withdrawal Addenda</u>

The Digital Rights Withdrawal Addenda that were the focus of Pandora's November 2013 motion for partial summary judgment are to the same effect. They continued the practice of insulating licenses-in-effect from subsequent withdrawals. For example, ███████████████████████████████████████████████████████████████. Similarly, the guidelines for digital rights withdrawals that appeared on BMI's website stated that:

> If an Affiliate elects Digital Rights Withdrawal for a term commencing after BMI has entered into a final license agreement with a customer, the Affiliate's catalog will continue to be covered under BMI's existing license agreement with that customer for the remainder of the term of the license.

Consistent with this policy, each of the Digital Rights Withdrawal Addenda executed by Sony, UMPG, BMG, and Kobalt included the following provision (found at Section 6 in each of the agreements):



3. <u>BMI's Suspension Agreements with Withdrawing Publishers</u>

Despite BMI's protests to the contrary at the October 22 conference, the Suspension Agreements (which suspend the effect of the Digital Rights Withdrawal Addenda) also recognize the license-in-effect concept. Under those agreements, BMI is free to issue licenses-in-effect to the vast majority of applicants. ██████████████████████████████████████████████

5

<sup>5</sup>

### a. UMPG And BMG Suspension Agreements[6]

The UMPG and BMG Suspension Agreements authorize the Court to enter a license that will extend beyond 2014 and bind the publishers through a license-in-effect. For example, Section 2 of the UMPG-BMI suspension agreement provides that



The language of the Suspension Agreement thus plainly contemplates that BMI will continue to have the right to license UMPG content ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

While Section 3 of the BMI-UMPG Suspension Agreement, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ this restriction does not impact the license-in-effect protections afforded to licensees.[7] The rate-setting process by definition is about

---

[5] Section 2(b)(iii) of the UMPG Suspension Agreement ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" which confirms that UMPG recognized that the BMI Rate Court would have the power to bind UMPG's catalog while it remains in BMI.

[6] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Indeed, notwithstanding this provision, BMI unquestionably has the authority -- and cannot deny that it has exercised this authority during the term of the Suspension Agreements -- to issue licenses and/or license extensions with a number of licensees with terms extending beyond 2014 that operate as licenses-in-effect.

*requiring* BMI to agree to a license on terms that BMI otherwise might not accept. So while BMI is contractually prohibited from *voluntarily* agreeing to a license-in-effect with certain licensees, nothing in Section 3 interferes with the Court's authority to *require* BMI to provide a license with the status of a license-in-effect.



### b. Sony Suspension Agreement

Sony's Suspension Agreement also contemplates licenses-in-effect.



(Emphasis added). By its plain language, this provision does *not* extend to Pandora's application, which was made in 2012.[8]

Sony and BMI expressly discussed the possibility of the Court issuing a license-in-effect during its suspension with a term extending beyond 2014. In an earlier draft, BMI proposed including a provision in Section 7(c) that contemplated "[ ]" Brodsky Dep. Tr. 141:12-18. BMI and Sony thus recognized that even for applications in 2014 it was possible that the Court would set a license term extending beyond 2014.

---

[8] Section 7(a) of the Sony Suspension Agreement . But, as discussed above, this does nothing to limit the Court's authority to order that Pandora's BMI license has the status of a license-in-effect that would extend beyond 2014.

7

**B. Thousands of Licensees Hold Licenses-in-Effect Through Beyond 2014**

Past practice confirms that Pandora's license should be treated as a license-in-effect. Virtually the entire radio industry holds licenses-in-effect through 2016. Months after the initial publisher partial withdrawals were announced, BMI entered into an agreement with the thousands of RMLC-represented entities for a seven-year license term through 2016. That agreement contains the following language confirming its status as a license-in-effect:

> BMI represents and warrants to the RMLC that: (i) BMI has the right, power and authority to grant the rights provided for in the 2010 BMI Licenses and in this Agreement; (ii) there has been no material diminution of the BMI Repertoire since January 1, 2010; and (iii) if any BMI affiliate has withdrawn from BMI the right to license the right of public performance of New Media Transmissions, or withdraws such rights during the License Term, such withdrawal of licensing rights from BMI has not precluded, and will not preclude, BMI from granting a through-to-the-audience license to perform any or all of the copyrighted musical works in the BMI Repertoire of that BMI affiliate to the Licensees pursuant to this Agreement for the duration of the License Term."

RMLC License at § 7. Similarly, the 2013 Apple – BMI license (an agreement put forth as a benchmark by BMI's expert) has a ▬▬▬▬▬▬▬▬▬▬▬▬. It contains the following provision:



Apple-BMI License at § 1.8. These are just a few of many examples demonstrating BMI's practice of licensing publishers' catalogs post withdrawal.

These examples also illustrate how BMI has twisted itself into a pretzel. On the one hand, it has made clear—in its agreements with licensees such as the RMLC, in its standard form affiliation agreements with publishers, in the initial Digital Rights Withdrawal Addenda, and

8

even in the Sony and BMG Suspension Agreements—that its practice is to issue licenses-in-effect. Yet, in its Suspension Agreement with Sony/ATV, BMI also appears to have contractually obligated itself to take the position that ███████████████████████████████████████████████████████████████████████████ *Id.* § 7(c). *See also* O'Neill Ex. 35 § 3 (agreement with UMPG); O'Neill Ex. 37 § 3 (agreement with BMG).

But no amount of twisting can change the fact that this Court currently has jurisdiction over BMI and its repertory, inclusive of all the major publishers' works, and that BMI—empowered by its affiliates—historically and uniformly has provided its licensees with licenses having the status of licenses-in-effect not subject to subsequent publisher resignations/withdrawals during the term of said licenses. BMI's recent agreements with its publishers confirm their understanding that BMI is subject to the Court's jurisdiction.

## II. BMI's POSITION THAT PANDORA IS NOT ENTITLED TO A LICENSE-IN-EFFECT IS UNPRECEDENTED AND INEQUITABLE

As explained, BMI's final licenses for decades have been licenses-in-effect. But in its October 21, 2014 letter to the Court, BMI announced—for the first time ever—that Pandora's final license in this proceeding would not have the status of a license-in-effect. That result would be unprecedented and inequitable.

BMI insists that the parties' expert reports assumed a license that would be subject to future withdrawals. That is plainly wrong. Pandora's expert—Dr. Keith Waehrer—expressly reserved the right to modify his opinions in the event of future withdrawals from BMI. In his rebuttal report, he cautioned that "I have been informed by counsel that one or more major publishers have threatened to withdraw from BMI at the end of 2014. In the event that BMI's repertory subject to Pandora's license changes materially before the time of trial, I reserve the right to revisit my analysis and to offer opinions concerning an appropriate royalty rate for any materially diminished BMI repertory." Waehrer Rebuttal Report ¶ 2 n.2. Dr. Waehrer's opening report proposed an adjustment for past periods when BMI was temporarily not able to license works by BMG, UMPG, and Sony, but certainly did not contemplate future withdrawals. Dr. Waehrer confirmed in his deposition that he "assumed . . . that once the court ruled whatever was in the BMI repertory . . . would remain in the BMI repertory and it would be like any other final license . . . ," and that, "[i]f that is not the case, . . . then I would have to think about . . . how does that change the value of the license to Pandora relative to the benchmarks." Waehrer Dep. Tr. at 262-63. That is because "the common belief was that all those benchmarks had the status of a license in effect and weren't subject to withdrawals during their term." *Id.* at 263.

9

Nor do the reports of BMI's expert — Dr. Pierre Cremieux — speak to eliminating Pandora's license-in-effect. Dr. Cremieux's reports make no reference to *future* publisher withdrawals, other than to claim that BMI's proposal would "protect" Pandora against such withdrawals, and otherwise relay BMI's proposal for an adjustable fee blanket license ("AFBL") that is "very similar to other BMI AFBL agreements." Cremieux Rebuttal Report 41-42. As this Court is aware, an AFBL allows a music user to take a deduction for works that the user has directly licensed; an AFBL never has been thought to account for future withdrawals. Indeed, the Second Circuit has explained that "[a]n AFBL is essentially a blanket fee reduced to account for *music directly licensed* from music publishers and owners *that also appear within the PRO's repertoire*." *Broadcast Music, Inc. v. DMX Inc.*, 683 F.3d 32, 39 (2d Cir. 2012). Dr. Cremieux's proposed adjustment mechanism, disclosed for the first time in his rebuttal report, simply adopts a mechanism from the DMX case -- and is hopelessly flawed when applied to anything other than a license-in-effect.

BMI's newly-stated position is a complete surprise. At no time before receiving BMI's letter on October 21 did BMI explicitly articulate an intention that Pandora would *never* have a license-in-effect. Although BMI's petition initiating this proceeding referred to "appropriate adjustments to account for the withdrawal from BMI by certain BMI-affiliated publishers of the right to license their digital public performing rights to Pandora," BMI Pet. ¶ 2, Pandora understood that language to account for past withdrawals (and at most any permitted withdrawals that might occur before Pandora was deemed to have a license-in-effect). Pandora did not understand that language to propose the unprecedented step of eliminating the license–in-effect concept. As discussed below, that result would undermine the rate-setting jurisdiction of this Court.

During the negotiations between BMI and Pandora, moreover, both parties understood that Pandora's final license would be a license-in-effect. The conversations between the parties reflected that assumption. An e-mail from the late Milton Olin (Pandora's lawyer) relayed BMI's concerns about



▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ It would be fundamentally unfair and senseless to allow BMI to change the nature and scope of the license subject to this litigation at such a late stage, after discovery and after the parties made expert disclosures.

The license-in-effect policy also protects BMI affiliates, particularly smaller publishers and writers. Without the license-in-effect protections, the larger publishers could withdraw from BMI if they disapprove of the result reached by the rate court. BMI's affiliates contribute to BMI's expenses, including its legal expenses. So when larger publishers withdraw, the remaining, smaller BMI affiliates are left holding the bag. Imagine, for example, if Sony and UMPG — the driving forces behind BMI's massive legal expenditures in this action — decided to withdraw and leave the trial tab with the smaller publishers and individual songwriters. Sony and UMPG could wait until they know the outcome of trial and withdraw only if the Court's rate determination is unfavorable, leaving the smaller publishers and writers with a disproportionate administrative burden for Pandora's license.

The license-in-effect concept also helps parties accurately assess the value of a BMI blanket license. The value of a BMI blanket license that includes the works of larger publishers versus one that does not is markedly different. A major part of the value of a BMI blanket license lies in the stability of the repertory and the benefits of obtaining the entire BMI catalog without having to negotiate licenses with individual publishers. As BMI's own expert, Dr. Cremieux, testified in a prior case, a PRO blanket license offers "many benefits," including eliminating the need to identify rights holders prior to performing works, reduced risk of inadvertent infringement, and eliminating the transaction costs associated with a large number of negotiations with individual rights holders. Rebuttal Rpt. Of Pierre Cremieux, in the case of *WPIX, Inc., v. BMI*, 09-civ-10366(LLS), at ¶ 9-13. If future withdrawals could diminish the scope of final licenses, these benefits would be severely undermined.

Indeed, if BMI is correct that Pandora's final license will not be a license-in-effect, that license would be far less valuable to Pandora. *See* Waehrer Dep. Tr. at 259 ("I would have to think about the situation. It seems likely that a license-in-effect has some additional value . . . that a license that is subject to withdrawals does not . . . ."). To assess the value of such a depleted license, Pandora and its experts would need to reevaluate every proffered benchmark in this proceeding. That would be particularly difficult because every benchmark the parties have considered acted as a license-in-effect—i.e., was not subject to dramatic reductions in licensed repertory. Those benchmarks thus would require a downward adjustment to account for the removal of such a material term. No side's experts have conducted the economic analysis that would be necessary to make such a downward adjustment. All of the parties' and the Court's efforts in preparing this case for trial (not to mention the Federal Rules of Civil Procedure designed to provide notice and disclosure) will be for naught if the license available from BMI

11

after trial bears no resemblance to the one available now, after fact discovery has closed and expert disclosures have been made.

BMI's new position on licenses-in-effect is puzzling. BMI should embrace the license-in-effect concept, particularly because bending to the will of larger publishers at the expense of its smaller affiliates is arguably a breach of its fiduciary duties. BMI recently commented to the Department of Justice that withdrawal of major publishers "would be potentially catastrophic for smaller publishers and songwriters who depend on BMI for their livelihood." BMI Comments at 12, available at http://www.justice.gov/atr/cases/ascapbmi/comments/ 307859.pdf. Under BMI's own reasoning, then, a decision denying Pandora a license-in-effect would negatively affect BMI's smaller publishers and songwriters.

### III. THE COURT ALSO SHOULD ORDER THAT PANDORA'S BMI LICENSE OPERATES AS A LICENSE-IN-EFFECT AS OF THE CLOSE OF FACT DISCOVERY AND EXPERT DISCLOSURES, AND THAT PANDORA IS LICENSED THROUGH 2017.

In addition to confirming that Pandora's final license will be a license-in-effect, this Court should order that, as of the close of fact discovery and submission of the parties' expert reports, the scope (and term) of Pandora's BMI license is no longer subject to diminution by virtue of ensuing publisher withdrawals. The record on the issue of Pandora's entitlement to a final license is closed, and there is no triable issue of fact that Pandora is entitled to an adjustable fee blanket license granting it the right to perform publicly all of the compositions in BMI's repertory through at least 2016. With respect to that period, there is no "dispute[] over facts" such that "a grant of summary judgment" is precluded. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All that is left for trial is to decide a reasonable rate for that license.

The BMI decree confirms this conclusion. BMI has no discretion as to whether it will grant a license; the BMI Decree simply requires BMI to quote a fee for the license requested by an applicant. Upon receiving a request for a blanket license to all of the compositions in its repertory, BMI must "advise the applicant in writing of the fee which it deems reasonable for the license requested." BMI Decree Art. XIV(A); *United States v. Broad. Music, Inc.*, 275 F.3d 168, 176 (2d Cir. 2001). Similarly, the BMI decree makes clear that the purpose of the rate court is to set a rate. *See, e.g.,* Article XIV(A) ("[T]he applicant may forthwith apply to this Court for the determination of a reasonable fee . . . ."). The relief sought by Pandora thus reserves for trial the only triable issue in this case, as envisioned by the decree.[9]

---

[9] BMI itself agrees that an applicant such as Pandora is entitled to a license automatically upon request. As BMI wrote in 1994 in support of the modification of its consent decree to include a rate court, "[t]he modification contemplates that a would-be licensee would automatically obtain a BMI license by requesting one" under Article XIV. Memo. of Broadcast Music, Inc., 1994 WL 16189513, at *11 (emphasis added). In fact, in its recent filing with the Department of Justice, BMI wrote that, "[u]nder the BMI decree, upon written request for a license, a licensee has an automatic right to a blanket license to use any, some, or all of BMI's music. This allows licensees the

Moreover, the Court should determine that Pandora's license extends through the end of 2017. Pandora filed a written application with BMI for a blanket license to perform all of the compositions in the BMI repertory for the period of January 1, 2013, to December 31, 2017. BMI initially proposed a license that extended only through 2014; but BMI recently disclosed its proposal for an adjustable fee blanket license that extends from January 1, 2013, through December 31, 2016. Despite BMI's failure to propose a fee for the license requested, the express text of the BMI Decree entitles Pandora to the "the license [it] requested"—here, a license for the period January 1, 2013, through December 31, 2017. Art. XIV(A). That legal question of interpretation is appropriate for resolution on summary judgment.[10]

The Court should decide this issue now. Before October 31, 2014, there was a pressing need to resolve this issue before January 1, 2015, when the major publishers appeared scheduled to withdraw. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.[11] Nevertheless, the Court should decide this issue now because the publishers and BMI could change their minds at a moment's notice. The Sony Suspension Agreement requires Sony to give BMI ninety-days' notice before withdrawing, meaning that Sony could time its withdrawal to occur before the trial, during the trial, or even while this Court is writing an opinion. Moreover, BMI and Sony could modify the notice provision at any time to allow an immediate withdrawal. If the Court does not determine that Pandora, at a minimum as of the date of the close of fact discovery and expert disclosures in the case, has the benefit of a BMI license-in-effect, then the door will be left open for the publishers to continue to sidestep the "market discipline" the Court sought to impose last year and to interfere with the rate court proceedings by shifting their catalogs in and out of BMI.

That result would undermine the rate-setting provisions of the decree and interfere with this Court's jurisdiction. As the Supreme Court has explained, a court may "control the disposition of the causes on its own docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North American Co.,* 299 U.S. 248, 254 (1936). Similarly, the All Writs Act broadly empowers courts to act when to do otherwise would "frustrate the implementation of a court order or the proper administration of justice." *United States v. New York Tele. Co.,* 434 U.S. 159, 174 (1977); *see also United States v. Inter. Bhd. of Teamsters,*

---

opportunity to obtain performing rights licenses by simply sending a letter availing themselves of the rate court process—in good faith or otherwise." (emphasis added). An order confirming that Pandora is licensed through 2016 or 2017 thus is in harmony with this aspect of BMI's decree.

[10] BMI's concern with a hypothetical licensee requesting a 50-year license is inapposite. BMI routinely enters agreements with terms of 5 years or more. *See* RMLC – BMI agreement discussed *supra.* Allowing BMI to dictate short license terms would have a chilling effect on the rate court provisions of the consent decree, as no party could justify the costs of litigating the rate for a short-term license.

[11] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ We assume that BMI and Sony were unaware of this agreement during the pre-motion conference that took place on October 22. During that conference, BMI and Sony did nothing to dispel the impression that major publisher withdrawals were scheduled to take effect on January 1.

*Chauffeurs, Warehousemen and Helpers of America, AFL-CIO*, 911 F.Supp. 743, 750 (S.D.N.Y. 1996) ("[T]he All Writs Act empowers a district court to enjoin actions by a nonparty when necessary to protect the court's jurisdiction over a consent decree.") (internal quotation marks omitted).

Determining this issue now is crucial to ensuring "economy of time and effort" for the court, and for preventing the publishers from "frustrat[ing] the implementation of [the consent decree] or the proper administration of justice." The Court has an obligation to enforce the consent decree, which instructs the Court, upon application by either BMI or a music user, to "determine [a] reasonable fee based upon all the evidence." Article XIV(A). Even BMI agrees that the Court has broad authority to set the terms of the license. *See* Arnay Depo. at 82 (testifying that he believed BMI "suggest[ed] that the rate court has the power to set the terms of a license between PROs and the applying licens[ee]"); Arnay Exh. 31 (noting comment from BMI that "Court does have jurisdiction to set all terms") (emphasis in original).

Although no withdrawal is currently scheduled for January 1, 2015, history shows that the publishers and BMI will not hesitate to change the status quo. Despite the Court's December 2013 summary judgment ruling, for example, the publishers and BMI contrived immediately after the ruling to keep the publishers' compositions in the BMI repertory for everyone except Pandora. As the ink was drying on their direct deals with Pandora, the publishers finalized their negotiated "suspension" agreements with BMI that changed the effective date of their withdrawals to January 1, 2015. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████ If there is anything fixed in today's world of music licensing, it is that no one may count on the stability of the publishers' relationship with the performing rights organizations.

Nevertheless, the consent decree's provisions have not changed. The rate court is still supposed to set a reasonable rate for a blanket license. Yet the publishers' and BMI's machinations have created a realistic possibility that Pandora will be left with a BMI blanket license that is a shadow of its former (and current) self should Pandora exercise its right to have the Court set a reasonable fee for its license. If permitted to continue, this threatens to undermine the integrity of this proceeding and of the rate court in general. Unlike anything that has come before, the scope of BMI's catalog has fluctuated dramatically over a short period of time during this proceeding. Millions of works left BMI's repertory in December 2013, only to be replaced (many retroactively) just months later. Issuing an order that Pandora is entitled to a BMI license that is not subject to these post-hoc vicissitudes would head off the next round of BMI's (and the publishers') efforts to game the process.

## IV. CONCLUSION

For these reasons, Pandora requests that the Court issue an order that Pandora's final license in this proceeding has the status of a license-in-effect, the scope of which does not change with any future publisher withdrawals. Pandora also requests that the Court order that the scope and term of Pandora's BMI license to be determined at trial includes the works of all BMI publishers comprising the BMI repertory as of the close of fact discovery and submission of the parties' expert reports, and that Pandora's license operates now as a license-in-effect through 2017 (or, at a minimum, through 2016), with the fee for that license to be set at trial in 2015.

Respectfully submitted,

*/s/Kenneth L. Steinthal*
Kenneth L. Steinthal

cc:     All Counsel