UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BROADCAST MUSIC, INC.,

               Petitioner,

          v.

PANDORA MEDIA, INC.,

               Respondent.

*Related to*

UNITED STATES OF AMERICA,

               Plaintiff,

          v.

BROADCAST MUSIC, INC.

               Defendant.

Civil Action No. 13-4037 (LLS)(KNF)

**ECF CASE**

Civil Action No. 64-3787 (LLS)

**PANDORA'S SUPPLEMENTAL BRIEF
ON REALNETWORKS AND MUSIC CHOICE**

## SUPPLEMENTAL BRIEF

If anything is clear in the rate court world, it is that setting an appropriate license fee is a highly fact-intensive task. "In making a determination of reasonableness (or of a reasonable fee), the court attempts to make a determination of the fair market value — the price that a willing buyer and a willing seller would agree to in an arm's length transaction." *United States v. Broadcast Music, Inc.*, 316 F.3d 189, 194 (2d Cir. 2003) (internal quotation marks omitted). "Fair market value is a *factual matter*," *ASCAP v. Showtime/The Movie Channel, Inc.*, 912 F.2d 563, 569 (2d Cir. 1990) (emphasis added), and neither rate court *ever* has set a license fee without analyzing marketplace circumstances surrounding the litigating parties and hearing substantial testimony about relevant benchmark licenses.

Remarkably, BMI disagrees with this foundational principle. Its *lead argument* is that, strictly speaking, there is no need for this rate court trial at all. *See* Trial Tr. 2:24-25; 3:1-25; 4:1-25; 5:1-25; 6:1 (BMI Opening Statement). BMI insists that the Second Circuit already has held — as a matter of law in two paragraphs "out of the long, long opinion" (Trial Tr. 557:13) — that the 2.5 percent rate applied to Music Choice's *wholesale* revenue base as part of a settlement that expired in 2010 must automatically be applied to the *retail* revenue base for a standalone radio service like Pandora. *See United States v. ASCAP (In re Applications of RealNetworks, Inc., Yahoo!, Inc.)*, 627 F.3d 64, 81 (2d Cir. 2010). If BMI really had the courage of its convictions, it would have moved for summary judgment long ago, sparing the costs of trial. But because BMI is maintaining this position here, PX-1124, 1125, and 1126 should be admitted to show why *RealNetworks* and Music Choice do not dictate the appropriate rate here.

BMI is wrong about *RealNetworks* for a number of reasons. *First*, in remanding a rate court decision for further proceedings (not "affirming" or "endorsing" it, as BMI misstates) it is

inconceivable that the Second Circuit intended to forever cut off rate court proceedings involving customized radio services. The record in *RealNetworks* may have supported a finding that it would not be clear error for the ASCAP rate court to adopt a rate of 2.5 percent in *that* case (for some kinds of services). But as BMI has repeatedly emphasized in an effort to distance itself from Judge Cote's conclusions in the more on-point ASCAP trial, the record here is different and deserves an independent analysis.

Since the *RealNetworks* record closed in 2007, for example, Pandora has continued to pay BMI based on the 1.75 percent rate contained in the form license. That is due in part to a 2009 Second Circuit ruling that services like Pandora are *non*-interactive services rather than interactive ones, which influenced how ASCAP and BMI licensed Pandora. *See Arista Records, LLC v. Launch Media, Inc.*, 578 F.3d 148, 164 (2d Cir. 2009). In addition, in 2012 (well after the Second Circuit decision), the RMLC agreed to deals with both ASCAP and BMI covering personalized radio services at a 1.70 percent rate. More recently, the ASCAP rate court rejected a 2.5 percent or higher rate for Pandora for an overlapping term to the one at issue here. BMI has also continued to license Rhapsody — a customized radio service that was one of the services at issue in *RealNetworks* — through 2013 at the same 1.75 percent rate that applied to Pandora. If BMI had really thought that *RealNetworks required* a 2.5 percent rate for customized radio services distributed on a retail revenue basis, it would have moved Rhapsody to such a rate. And *every* proposed benchmark that the experts have considered in this case post-dates the closing of the *RealNetworks* record and even the Second Circuit's decision in that case. There is no basis to simply cast all of this aside in favor of an old, expired license that BMI itself describes as "this quasi-ancient Music Choice benchmark." Trial Tr. 558:24.

*Second*, the discussion in *RealNetworks* about the proper royalty rate for what it

considered "a more customized station" was *dictum*. The court of appeals found that the district court had applied an unreasonable music use adjustment factor and remanded for further proceedings. In the process, the court offered that the Music Choice agreement "provides a basis for a 2.5% royalty rate, or higher" for certain customized radio services, but that observation was not necessary to the court's decision. *RealNetworks*, 627 F.3d at 81. Although BMI insists that "[s]urely" the district court "would have been bound by" the Second Circuit's remark (Trial Tr. 4:25; 5:1-4), the court of appeals itself said otherwise. Indeed, the Second Circuit expressly *declined* to set "specific royalty rates" on appeal, *RealNetworks*, 627 F.3d at 84, and instead instructed "the district court to consider, in the first instance, what options are available to it in setting a reasonable rate or rates in this case." *Id.*

*Third*, the Music Choice and Pandora business models and revenue bases are fundamentally different. For at least a decade, Music Choice has been primarily a wholesaler (like a cable network without significant advertising revenues), while Pandora is a retailer. Royalty rates applied to a retail revenue base should naturally be lower than those applied to an intermediate revenue base in order for both to yield the same total royalty. The rate applied to Music Choice's wholesale revenues from 2006-2010 was designed to capture the value of the blanket license in the context of delivery of the Music Choice service via cable/satellite TV operators. But *Pandora*'s retail revenue base already includes the total value of its programming, so applying that same rate to Pandora's revenue base would overstate BMI's royalties. In all events, neither expert attempted to reconcile the differences between these business models.

BMI nonetheless insists that "the Second Circuit was presented with that distinction [between wholesale and retail revenues], and it held that the Music Choice rate supports a 2.5 percent rate." Trial Tr. 5:9-11. That is inexplicable. The *RealNetworks* court did not even use the

words "retail" or "wholesale," much less hold that 2.5 percent is an appropriate rate to apply to any specific revenue base. And less than one-half of one percent of the discussion in the briefs in that case mentioned the distinction between wholesale and retail revenues. BMI's claim that "the Second Circuit was presented" with the issue is simply wrong.

*Fourth*, BMI's position that the Music Choice 2.5 percent rate should be applied to Pandora's retail revenues cannot be reconciled with the Second Circuit's later decision in *ASCAP v. MobiTV, Inc.*, 681 F.3d 76 (2d Cir. 2012). There, the ASCAP rate court had held that "a 2.5% rate is an artificially high rate to apply to retail revenue." *In re Application of MobiTV, Inc.*, 712 F. Supp. 2d 206, 242 (S.D.N.Y. 2010). Two years after *RealNetworks*, the Second Circuit affirmed *MobiTV* in an opinion that did not even criticize the district court's conclusion that 2.5 percent (based on the same benchmarks raised in the *RealNetworks* case) is too high for retail revenues. Applying the 2.5 percent Music Choice rate to MobiTV's payments to Music Choice rather than retail revenues is fundamentally incompatible with a conclusion that 2.5 percent applies equally to a retail, primarily advertising business model.

*Finally*, BMI has expressly *disclaimed* the Music Choice license as a benchmark in this very litigation. In his rebuttal report, Dr. Cremieux declared: "I do not consider agreements with services such as . . . Music Choice . . . as benchmarks in my analysis." Cremieux Rebuttal Report at 38 n.197. BMI should not be permitted to introduce the "quasi-ancient" Music Choice license through the back door of the *RealNetworks* case.

Pandora respectfully requests that the Court base its decision on the record developed in this case rather than on *dictum* about a record that closed nearly eight years ago. Pandora also requests that the Court receive into evidence PX-1124, 1125, and 1126 as evidence of BMI's historical licensing of wholesale business models at higher rates than applied to retail services.

DATED:  San Francisco, CA
        February 20, 2015

                              KING & SPALDING LLP


                              *S/ Kenneth L. Steinthal*
                              Kenneth L. Steinthal (KS-7897)
                              *ksteinthal@kslaw.com*
                              Joseph R. Wetzel (JW-0510)
                              *jwetzel@kslaw.com*
                              101 Second Street, Suite 2300
                              San Francisco, CA 94105
                              Telephone:    415.318.1200
                              Facsimile:    415.318.1300

                              *Attorneys for Pandora Media, Inc.*