UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BROADCAST MUSIC, INC., | Civil Action No. 13-4037 (LLS)(KNF) |
| Petitioner, | |
| v. | **ECF CASE** |
| PANDORA MEDIA, INC., | |
| Respondent. | |
| *Related to* | |
| UNITED STATES OF AMERICA, | Civil Action No. 64-3787 (LLS) |
| Plaintiff, | |
| v. | |
| BROADCAST MUSIC, INC. | |
| Defendant. | |

**PANDORA'S POST-TRIAL BRIEF**

## POST-TRIAL BRIEF

Pandora respectfully submits this post-trial brief in response to the Court's invitation on the last day of trial. Pandora is mindful that this Court prefers not to receive a review of all the evidence and submits this supplemental brief to address two legal points that arose during closing arguments that reveal the disparate perspectives of the parties on controlling issues in this case.

## COMPETITION

Closing arguments confirmed that the parties disagree about whether "a freely competitive market," *ASCAP v. Showtime/The Movie Channel, Inc.*, 912 F.2d 563, 569 (2d Cir. 1990), requires *competition* between the performing rights organizations ("PROs") and publishers. BMI believes it does not. During Dr. Keith Waehrer's testimony, BMI objected that "[t]he witness has been testifying that he expects publishers and BMI to be competing. I don't know how that is tethered to the issues in the case." Trial Tr. 2443:10–12. That objection followed Dr. Waehrer's testimony that BMI and the publishers did not consider competing with one another even when the publishers were withdrawing from BMI. *See id.* 2442:20–22 ("The fact that these publishers and BMI were discussing a return to BMI suggests to me that BMI was still thinking of them as customers and not as competitors."). During closing arguments, BMI claimed that the relevant market is one in which there is simply *no* such competition: "[c]ontrary to the way that Dr. Waehrer posited the publishing industry's interaction with PROs and contrary to the way that my counterpart Mr. Steinthal mischaracterized the industry, *PROs just do not compete with publishers*." *Id.* 2691:8–12 (emphasis added). In BMI's view, "[i]t just doesn't make any sense, it's contrary to the way the consent decree is written, and it is a view of the world that doesn't conform to facts." *Id.* 2691:19–21.

1

But it is BMI's view of the world that does not conform to facts or the law, and the conceded lack of competition between BMI and its publishers should doom BMI's proposed benchmarks under Second Circuit law. The law is clear that "[f]undamental to the concept of" a reasonable rate "is a determination of what an applicant would pay in a *competitive market*." *Broad. Music, Inc. v. DMX Inc.*, 683 F.3d 32, 45 (2d Cir. 2012) (emphasis added; internal quotation marks omitted). And, in setting a rate, the Court must consider "the degree to which the assertedly analogous market under examination reflects an adequate degree of *competition* to justify reliance on agreements that it has spawned." *Showtime*, 912 F.2d at 577 (emphasis added). *See also United States v. ASCAP (In re Application of RealNetworks, Inc., Yahoo! Inc.)*, 627 F.3d 64, 76 (2d Cir. 2010) (same).

The "market under examination" is the marketplace for public performance rights in musical compositions. Services like Pandora can obtain public performance rights from the performing rights organizations *or* directly from publishers. By giving ASCAP and BMI the right to license compositions only on a non-exclusive basis, the consent decrees guarantee this right. And Second Circuit precedent confirms that, although the public performance market historically "organized itself largely around the single-fee blanket license" offered by the PROs, *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 20–21 (1979), publishers also participate in the market by offering direct licenses for the right to perform their compositions.[1] The Supreme Court relied on this same competitive alternative of direct licenses from PRO members/affiliates as a key way to mitigate the PROs' market power when it determined that the

---

[1] BMI argued that because its consent decree prohibits BMI from acting as a publisher, BMI and the publishers cannot compete with each other. Trial Tr. 2443:18–21; 2691:22–2692:1. That is not true. BMI and the publishers participate in the same market for the licensing of public performance rights even though they do not carry out identical functions or compete in other markets not at issue here.

PROs' blanket licensing practices, even under the decrees, did not *per se* violate United States antitrust laws. *Id.* at 12.

As such, the availability of direct licensing is a check on the PROs' market power *even when the publishers are full members of the PROs. See id.* ("[T]he decree guarantees the legal availability of direct licensing of performance rights by [PRO] members" and "there are no practical impediments preventing direct dealing by the television networks if they so desire."); *Columbia Broad. Sys., Inc. v. ASCAP*, 620 F.2d 930, 938 (2d Cir. 1980) (noting the availability of direct licenses from competing publishers as a check on ASCAP market power).

More recently, courts that have considered whether publishers and the PROs to which they belong are competitors have concluded that they are. *See, e.g.*, *Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180, 206 (S.D.N.Y. 2014) ("SESAC and its affiliates can also fairly be viewed as potential competitors in the licensing of the rights to the same works."); *In re Petition of Pandora Media, Inc.*, 6 F. Supp. 3d 317, 357–58 (S.D.N.Y. 2014) ("What is important is that ASCAP, Sony, and UMPG did not act as if they were competitors with each other in their negotiations with Pandora."). These cases address members or affiliates who have not expressed an intent to withdraw from a PRO and those who have expressed an intent to withdraw, but have yet to do so.

Importantly, the role of competition between publishers and PROs was no mystery to BMI just a few months ago. In its *amicus* brief filed in the Second Circuit in the *ASCAP* case, BMI recognized that a competitive market in public performance rights effectively *requires* competition between fully or partially withdrawn publishers and PROs. BMI claimed that Judge Cote's decision invalidating the selective withdrawals "restricts competition and is contrary to antitrust goals. It eliminates the *copyright holders' ability to compete directly with PROs*

3

(whether through direct licensing or by employing licensing agents that may be more efficient than the PROs in licensing particular uses)." BMI Amicus Br. at 21–22, *Pandora Media, Inc. v. ASCAP*, Nos. 14-1158 et al., (2d Cir. Aug. 4, 2014) (emphasis added), attached as Exhibit A. BMI also insisted that "[a]rguing that limited grants are anti-competitive . . . is contrary to the decades of jurisprudence holding that the availability of direct licensing is a critical check on PRO power, *i.e.*, pro-competitive." *Id.* at 24 (citing *Broad. Music, Inc.*, 441 U.S. at 11, 23–24). Direct licenses can be a "critical check on PRO power" only if publishers and the PROs compete in the same market.

In comments submitted to the Department of Justice, BMI similarly recognized that publishers and the PROs compete, at least when the publishers have withdrawn from BMI. BMI explained that, "[w]ith respect to digital rights, significant publisher withdrawal is a real possibility. Those publishers will be able to negotiate in free-market rate negotiations with music users, and therefore hold a distinct advantage over BMI. Such a state of affairs would prevent BMI — and critically, by proxy, all the independent and smaller publishers who choose to remain affiliated with BMI — from competing on a level playing field with these withdrawing or terminating publishers." Public Comments of Broadcast Music, Inc. at 24, http://www.bmi.com/pdfs/advocacy/bmi_public_comments_to_doj.pdf (Aug. 6, 2014). It is impossible to reconcile BMI's previous submissions with its claim here that publishers, even withdrawn ones, do not compete with PROs. The truth is that competition between the PROs and the publishers, both when the publishers are withdrawn and when they are not, is a cornerstone of a competitive market in public performance rights.

The parties' divergent perspectives regarding competition in the public performance marketplace is not merely an academic issue. The outcome of this case turns on the disputed

legal question of whether a competitive market requires competition between the publishers and the PROs.[2] The trial record shows that BMI's primary benchmarks arose from a marketplace lacking competition and in which BMI and certain publishers exercised artificial market control. Indeed, in BMI's own witnesses' words, those agreements arose from a volatile marketplace riddled with uncertainty and chaos. *See* Trial Tr. 175:24–176:3 (O'Neill testimony); *id.* 377:20–24 (Conlon testimony); *id.* 640:6-10 (Brodsky testimony); *id.* 1111:19–1112:20 (Kokakis testimony); *id.* 2315:3–8 (Drexler testimony); *id.* 2369:3–6 (Smith testimony).

BMI's and those publishers' conduct after this Court's December 18, 2013 summary-judgment decision are a case in point. Faced with the dilemma about whether to be "all in" BMI, with the benefits and limitations that entails, or "all out" of BMI as a competitor in the public performance licensing marketplace, the publishers looked to BMI for a solution. Within days, and before the end of 2013, BMI offered these publishers the unprecedented opportunity to temporarily withdraw from BMI and to return their catalogs retroactively. *See, e.g.*, Trial Tr. 246:11–247:11. This way they would not risk foregoing any licensing revenues as a consequence of their decision to withdraw. In so doing, BMI offered (and ultimately agreed) *not* to compete with its withdrawing publishers, particularly when it came to licensing new-media services like Pandora.

BMI's lack of interest in competition with withdrawing publishers was evident from the outset. *See* PX-1023 (announcing BMI's plan to rely on agreements with withdrawing publishers as benchmarks to raise prices on BMI's remaining repertory). At trial, Mr. O'Neill maintained

---

[2] The lack of competition is of course only one of many reasons to reject BMI's proposed benchmarks. Additional reasons include, among other things, abnormal information asymmetries between the parties, undue time pressures under which those agreements were negotiated, and the chaotic nature of the marketplace.

this position, glibly rejecting the notion of considering price competition to gain market share and increase revenues for remaining BMI affiliates as becoming the "Wal-Mart of the PRO world." Trial Tr. 229:2.

A competitive analysis of BMI's and its withdrawing publishers' conduct goes to the heart of this Court's charge under Second Circuit law. To paraphrase Dr. Waehrer, BMI treated the withdrawing and withdrawn publishers as preferred customers rather than as potential competitors in the wake of the Court's December 2013 rulings. *See, e.g.*, Trial Tr. 174:10–175:18 (noting that Universal, not BMI, insisted on all of the unprecedented terms in the Suspension Agreements that gave withdrawing publishers additional control over BMI's licensing activity); *id.* 1130:1–18 (stating that Universal required concessions from BMI to suspend its withdrawal because "maintaining the status quo wasn't good enough for [Universal]").

BMI's concession that "PROs just do not compete with publishers" should not write the role of competition out of this Court's decision. Trial Tr. 2691:8–12. BMI's failure to compete with withdrawing and withdrawn publishers alike is why most of BMI's proffered benchmarks do not "reflect an adequate degree of competition," and thus fail the legal standards that bind this Court. *See, e.g.*, *Showtime*, 912 F.2d at 577.[3]

---

[3] BMI's closing focused on so-called "categories of evidence," Trial Tr. 2688:25, involving the deals struck by withdrawing publishers Sony and Universal. Those categories included vigorously disputed factual issues such as the sincerity of Pandora's requests for data that could have improved its prospects of conducting or threatening a takedown of Sony or Universal works, either of which would have given Pandora greater leverage in its negotiations. But even if those factual disputes were resolved in BMI's favor, they do nothing to cure the fact that BMI's proposed benchmarks arose from unprecedented and artificial circumstances where BMI and the publishers failed to compete with each other. By definition, those proposed benchmarks fail the applicable Second Circuit rate-setting standards.

## BENCHMARKS

The parties also disagree about the legal standard that the Court should employ when evaluating whether the various agreements presented at trial are appropriate benchmarks. Although BMI occasionally recites the correct legal standard, BMI in fact advocates for a different rule. Trial revealed BMI's belief that what matters is simply whether the agreement was negotiated "outside the shadow of the rate court" between a willing buyer and a willing seller. Trial Tr. 2690:3–4. BMI employed that formulation again and again throughout trial. *E.g.*, *id.* 16:13 (referring to "the shadow of a rate court"); *id.* 16:14–18 (contending that "the publisher benchmarks are the best evidence of what a willing buyer would pay a willing seller, because they're the only benchmarks that are somewhat outside the rate court environment"); *id.* 17:12–13 ("shadow of the rate court"); *id.* 2524:15–17 (same); *id.* 2553:3–6 (same), *id.* 2553:22–24 (same); *id.* 2690:1–10 (same); *id.* 2700:11–13 (same); *id.* 2710:23–2711:2 (same). But even monopolists can find "willing buyers" at monopoly prices when no competitive alternatives are present.

BMI's view of the legal standard cannot be squared with what the Second Circuit has instructed. In choosing a benchmark and determining how it should be adjusted, a rate court must determine "the degree of comparability of the negotiating parties to the parties contending in the rate proceeding, the comparability of the rights in question, and the similarity of the economic circumstances affecting the earlier negotiators and the current litigants," *United States v. Broad. Music, Inc.*, 426 F.3d 91, 95 (2d Cir. 2005) (internal quotation marks omitted), as well as the "degree to which the assertedly analogous market under examination reflects an adequate degree of competition to justify reliance on agreements that it has spawned." *Showtime*, 912 F.2d at 577. An analysis of a proposed benchmark must therefore take into account the economic

circumstances surrounding the agreement and the degree of competition in the market, not merely the fact that the agreement was negotiated outside the rate court between a willing buyer and a willing seller.[4]

DATED:  San Francisco, CA
        April 3, 2015

                                        Respectfully submitted,

                                        KING & SPALDING LLP

                                        *s/ Kenneth L. Steinthal*
                                        Kenneth L. Steinthal (KS-7897)
                                        *ksteinthal@kslaw.com*
                                        Joseph R. Wetzel (JW-0510)
                                        *jwetzel@kslaw.com*
                                        101 Second Street, Suite 2300
                                        San Francisco, CA 94105
                                        Telephone:     415.318.1200
                                        Facsimile:     415.318.1300

                                        *Attorneys for Pandora Media, Inc.*

---

[4] Pandora respectfully suggests that this Court should await the Second Circuit's decision in the ASCAP appeal before issuing its ruling. Although each rate court case depends on the individual record developed in that case, the Second Circuit's upcoming ruling on the selective withdrawals and the appropriate remedy will likely provide useful guidance to this Court. If the Second Circuit were to rule that selective withdrawals are impermissible, but disagree with this Court that such withdrawals render BMI incapable of licensing withdrawn compositions to anyone, such a ruling would mean that BMI's primary benchmarks should never have existed. The same would be true if the court of appeals were to rule that an application for a license confers a right to use all compositions to which the application pertains during the pendency of rate court proceedings. In addition, if the Second Circuit were to affirm Judge Cote's rate determination, Dr. Cremieux testified that he would consider the Pandora-ASCAP license to be a potential benchmark. Trial Tr. 1707:6–21.