# MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP

**1 CHASE MANHATTAN PLAZA**

**NEW YORK, NY 10005**

212-530-5000

FAX: 212-530-5219

Scott A. Edelman
Chairman
DIRECT DIAL NUMBER
212-530-5149
E-MAIL: sedelman@milbank.com

| | |
|---|---|
| **LOS ANGELES** 213-892-4000 FAX: 213-629-5063 | **BEIJING** 8610-5969-2700 FAX: 8610-5969-2707 |
| **WASHINGTON, D.C.** 202-835-7500 FAX: 202-835-7586 | **HONG KONG** 852-2971-4888 FAX: 852-2840-0792 |
| **LONDON** 44-20-7615-3000 FAX: 44-20-7615-3100 | **SINGAPORE** 65-6428-2400 FAX: 65-6428-2500 |
| **FRANKFURT** 49-(0)69-71914-3400 FAX: 49-(0)69-71914-3500 | **TOKYO** 813-5410-2801 FAX: 813-5410-2891 |
| **MUNICH** 49-89-25559-3600 FAX: 49-89-25559-3700 | **SÃO PAULO** 55-11-3927-7700 FAX: 55-11-3927-7777 |

April 3, 2015

**VIA ECF**

Honorable Louis L. Stanton
United States Courthouse
500 Pearl Street, Courtroom 21C
New York, NY 10007

    Re:    *Broadcast Music, Inc. v. Pandora Media, Inc.*, 13 Civ. 4037 (LLS)

Dear Judge Stanton:

    We represent Petitioner Broadcast Music, Inc. ("BMI") in the above-captioned matter. We write to address two discrete issues: (i) the areas of disagreement between BMI and Pandora Media, Inc. ("Pandora") regarding the terms of an adjustable fee blanket license (the "AFBL") and how to adjust such license to account for publisher withdrawals; and (ii) the cumulative effect of an adjustment to the Radio Music License Committee (the "RMLC") license rate for *both* monetization and music density.

## I.    BMI and Pandora agree on all but three components of the AFBL.

    BMI and Pandora generally agree[1] on the structure of the AFBL and BMI's proposed formula.[2] The parties disagree, however, on three important components of the AFBL:

---

[1]    Trial Tr. 2477:19-2478:17, 2480:5-7, Mar. 10, 2015 (Waehrer) (describing his proposed adjustment mechanism as "very much like Dr. Cremieux's proposal, with two or three differences."); *see also* Trial Tr. 1670:17-1671:7, Mar. 2, 2015 (Cremieux).

[2]    The components and reasonableness of BMI's proposed AFBL are discussed in greater detail in: (i) the Trial Brief of Petitioner Broadcast Music, Inc., dated January 26, 2015, at pages 43-46, 58 through 60; (ii)

Milbank, Tweed, Hadley & McCloy LLP

Hon. Louis L. Stanton
April 3, 2015
Page 2

(i) whether BMI should be compensated for the value of its license that is "independent of the value of the music performing rights," as reflected by the costs to BMI of "assembling its repertoire and making it available to [the licensee]" including "the convenience of gaining access to the entire BMI repertoire in one license, the immediate right of access to new BMI works, and protection against copyright infringement"[3]; (ii) whether BMI should be compensated for the additional costs associated with administering an AFBL, as opposed to a traditional blanket license; and (iii) whether the fee payable by Pandora should be adjusted to account for withdrawn works that are not being performed and have not been directly licensed.

BMI's AFBL proposal is reasonable, consistent with case law, and fair to Pandora. In contrast, as demonstrated at trial, Pandora's proposal is unreasonable as it gives *zero* credit to the non-music components of the BMI license and *zero* compensation to BMI for administering the AFBL. Pandora also proposes an adjustment mechanism that would result in Pandora receiving a *smaller* credit than BMI proposes in certain circumstances for works that are withdrawn but not directly licensed.

### A. BMI should be compensated for the value of its license that is independent of music performing rights.

In *DMX*, this Court recognized—and the Second Circuit affirmed—that a blanket license from BMI offers benefits beyond just the value of the music included in BMI's catalog.[4] In spite of this controlling authority, Pandora posits that BMI should not be compensated *at all* for this value based on Dr. Waehrer's testimony that, because of publisher withdrawals, the value of the non-music benefits of the traditional blanket license are diminished.[5] On cross-examination, however, Dr. Waehrer conceded that publisher withdrawals did not reduce the benefits of the blanket license to zero, and that BMI will "still have costs that it needs to recover."[6] Moreover, as Dr. Cremieux explained, BMI's proposed 10% floor fee—which is significantly lower than BMI's actual domestic overhead rate of 17-18% that was used as the

---

the testimony of BMI's economic expert, Dr. Pierre Cremieux, at pages 1659 through 1674 of the Trial Transcript, dated March 2, 2015, as well as slides 3, 42-51, and 62 of the PowerPoint presentation handed out prior to, and referenced during, the direct testimony of Dr. Cremieux; and (iii) slides 54 through 58 of the PowerPoint presentation handed out prior to, and referenced during, BMI's closing argument on March 13, 2015 (the "Closing Slide Deck").

[3] *Broad. Music, Inc. v. DMX, Inc.*, 726 F. Supp. 2d 355, 361-63 (S.D.N.Y. 2010); *see also* Closing Slide Deck at 55.

[4] *DMX*, 726 F. Supp. at 361-63; *Broad. Music, Inc. v. DMX, Inc.*, 683 F.3d 32, 48 (2d Cir. 2012) ("Inclusion of the floor fee into the fee structure also ensured that ASCAP and BMI would be compensated for the value of their services regardless of the extent to which DMX played ASCAP or BMI works that were also directly licensed.").

[5] Trial Tr. 2480:5-25, Mar. 10, 2015 (Waehrer); Trial Tr. 2575:9-11, Mar. 11, 2015 (Waehrer).

[6] Trial Tr. 2576:10-22, Mar. 11, 2015 (Waehrer).

Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP

Hon. Louis L. Stanton
April 3, 2015
Page 3

floor fee in *DMX*—accounts for any decrease in the value of the non-music components of the blanket license that may result from publisher withdrawals.[7]

### B. BMI should be compensated for the incremental cost of administering the AFBL.

Pandora argues that BMI should not be paid the incremental administrative fee, proposed as 3% of the traditional blanket license fee.[8] This fee, which Pandora would pay regardless of the extent of its direct licensing, reimburses BMI for the additional cost to BMI of administering the AFBL[9] and is consistent with this Court's decision in *DMX*, and the negotiated AFBL approved by the Court in *WPIX*.[10] Furthermore, as Dr. Cremieux testified, it is economically reasonable to allocate these costs to Pandora.[11]

### C. BMI's proposed adjustment mechanism is reasonable.

#### i. BMI's proposed adjustment mechanism credits Pandora appropriately for all withdrawn and/or directly licensed works it continues to perform.

BMI and Pandora agree that Pandora should receive a pro rata, performance-based credit to account for any BMI-affiliated composition that is either directly licensed by Pandora or withdrawn from BMI's repertoire.[12] BMI's proposal does not adjust for terminations of affiliation agreements, as distinct from publisher withdrawals. Pandora disagrees with BMI's proposed crediting mechanism only in the limited circumstance where a publisher withdraws its catalog from BMI *and* Pandora does not enter into a direct license with that publisher.[13] In that instance, under BMI's proposed adjustment mechanism, Pandora would receive a partial share credit for all split works (works co-owned by a BMI-affiliated publisher and a withdrawn

---

[7] Trial Tr. 1668:21-1669:4, Mar. 2, 2015 (Cremieux); Trial Tr. 155:7-156:3, Feb. 11, 2015 (O'Neill); Trial Tr. 406:25-207:21, Feb. 17, 2015 (Steinberg); *DMX*, 726 F. Supp. 2d at 362.

[8] Trial Tr. 2480:5-25, Mar. 10, 2015 (Waehrer); Trial Tr. 406:25-407:21, Feb. 17, 2015 (Steinberg).

[9] Trial Tr. 1661:16-1663:19, Mar. 2, 2015 (Cremieux); Trial Tr. 406:25-407:21, Feb. 17, 2015 (Steinberg).

[10] *DMX*, 726 F. Supp. 2d at 362; Final Order at Ex. 3, *WPIX, Inc. v. Broad. Music, Inc.*, 09 Civ. 10366 (LLS).

[11] Trial Tr. 1662:10-1663:19, Mar. 2, 2015 (Cremieux).

[12] Trial Tr. 2477:19- 2478:10, Mar. 10, 2015 (Waehrer); *see also* Trial Tr. 1670:17-20, Mar. 2, 2015 (Cremieux).

[13] Trial Tr. 2478:11-17, Mar. 10, 2015 (Waehrer); *see also* Trial Tr. 1670:21-1671:7, Mar. 2, 2015 (Cremieux). An example of such circumstance would be an instance where Pandora chooses to remove the publisher's works from its service, not enter into a direct license with Pandora, and the publisher chooses to stay withdrawn from BMI for a substantial period of time.

Milbank, Tweed, Hadley & McCloy LLP

Hon. Louis L. Stanton
April 3, 2015
Page 4

publisher) that Pandora continued to perform, but Pandora would not receive credit for works it removed from its service.[14]

First, a performance-based credit—that is, a crediting system based on works Pandora actually performs—is consistent with Pandora's approach.[15] Indeed, even in the narrow area of disagreement, Pandora proposes a performance-based credit but argues that it should be based on historical, rather than current, performances.[16] In other words, Pandora seeks credit under a BMI license for works that Pandora is not currently playing, based on how much it performed those works in the past. This approach is unfair to those BMI affiliates whose works Pandora currently performs. For example, if 20% of works performed by Pandora were withdrawn, and Pandora replaced them with other BMI works, Pandora would have used the same amount of BMI music as it had historically, yet it would have paid lower fees, thus harming songwriters whose works continued to be performed by Pandora.

Second, the reasonableness of BMI's crediting proposal for withdrawn, but not licensed, works was illustrated at trial by reference to BMG, a catalog Pandora *did* remove from its service. The evidence showed that prior to Pandora's removal of BMG from its service, BMG represented a share-adjusted 5-6% of performances on Pandora.[17] When, however, Pandora removed BMG, it removed only BMG's *wholly-owned* works, which accounted for approximately 1% of total performances.[18] Under BMI's performance-based crediting formula, Pandora's fee would be reduced to account for all performances of BMG works that were co-published with another publisher and continued to be performed by Pandora (*i.e.*, BMG split works). The only works Pandora would not receive a credit for would be those works Pandora determined not to perform and chose not to license directly, *i.e.* the 1% of total performances.

Dr. Waehrer disagreed with this approach at trial. He argued that BMI should not reduce the fee payable by Pandora for split works licensed through BMI (*i.e.*, the share-adjusted 4-5% of performances), but that BMI should reduce the fee for works taken down by Pandora to reflect the purported reduced value of the repertoire.[19] As the BMG example demonstrates, under BMI's proposed crediting mechanism, Pandora could receive a larger credit than its own expert, Dr. Waehrer, thinks is reasonable. BMI is prepared to provide a potentially larger credit based on current performances in part for administrative simplicity, as it eliminates the need for BMI to track and monitor whether Pandora has entered into direct licenses with publishers that have withdrawn their works from BMI.

---

[14]   *See* Trial Tr. 1669:9-19, 1670:17-1671:7, Mar. 2, 2015 (Cremieux).

[15]   Trial Tr. 2477:24-2478:10, Mar. 11, 2015 (Waehrer).

[16]   *Id.*; *see also id.* at 2479:21-2480:4.

[17]   BX 300.

[18]   *Id.*

[19]   Trial Tr. 2478:11-2480:4, 2573:21-2575:8, Mar. 11, 2015 (Waehrer).

**Milbank, Tweed, Hadley & McCloy LLP**

Hon. Louis L. Stanton
April 3, 2015
Page 5

Dr. Waehrer also ignores the fact that Pandora will replace the 1% removed works with performances of other works, a significant portion of which presumably would be BMI works.[20] Under this scenario, Pandora could perform an identical number of works from the BMI repertoire after a publisher's withdrawal (albeit by using different works in the repertoire) yet reduce the fee payable to BMI.

> ii. **BMI's proposed adjustment mechanism accounts appropriately for any purported diminution in BMI's repertoire as a result of publisher withdrawals.**

Pandora's contention that the music component of BMI's license is not as valuable as it once was in light of the publisher withdrawals is greatly overstated, not to mention unsupported.[21] Pandora's references to a small group of songwriters who have terminated their affiliation with BMI and affiliated with Global Music Rights ("GMR") are misleading and incomplete.[22] The movement of *songwriters* from BMI to GMR is not the same as the new phenomenon of *publisher* withdrawal. Rather, it represents the standard ebb and flow in the BMI repertoire that has always existed as composers move among BMI, ASCAP and SESAC. Now they can also elect to move to GMR.[23] The blanket license accommodates these movements. Just as the blanket license fee does not adjust upward to account for the tens of thousands of new songwriters who affiliate with BMI each year or the new songs that come into the BMI repertoire,[24] it does not adjust downward when BMI's affiliates leave BMI in the ordinary course.

II. **Appropriately adjusted, the RMLC rate confirms the reasonableness of BMI's proposed 2.5% rate for Pandora.**

As demonstrated at trial, Pandora is different from terrestrial radio in a number of ways.[25] Among the differences are Pandora's greater music intensity and terrestrial radio's ability to better monetize its music use.[26] Thus, to the extent the rate paid by RMLC stations is relevant to evaluating the reasonableness of the rate proposed by BMI to Pandora, the RMLC

---

[20]   Trial Tr. 1671:8-1672:6, Mar. 2, 2015 (Cremieux).

[21]   *See, e.g.*, Tr. 2624:2-24, Mar. 13, 2015 (Pandora's closing argument).

[22]   *See, e.g.*, Trial Brief of Respondent Pandora Media, Inc. at 74, n.379. Notably, these songwriters left BMI precisely because they believed they can achieve higher rates from online music services outside of the PRO ecosystem. (*See* Trial Tr. 191:10-192:13, Feb. 11 (O'Neill).)

[23]   Trial Tr. 191:2-9, Feb. 11, 2015 (O'Neill).

[24]   *Id.* at 192:16-193:2, 193:21-194:21.

[25]   *See, e.g.*, Trial Tr. 1366:5-1367:4, Feb. 25, 2015 (Milkman).

[26]   *See, e.g.*, BX 147; Trial Tr. 2006:3-10, Mar. 4, 2015 (stipulated facts); Trial Tr. 1367:5-1368:6, Feb. 25, 2015 (Milkman); Trial Tr. 1622:25-1624:15, 1625:24-2634:5, Mar. 2, 2015 (Cremieux).

Milbank, Tweed, Hadley & McCloy LLP

Hon. Louis L. Stanton
April 3, 2015
Page 6

rate must be adjusted to account for these differences.[27]  As Dr. Cremieux testified, adjusting the RMLC rate for music density alone yields a rate of 2.15% to 2.34%.[28]  As Dr. Cremieux further testified, because of Pandora's lesser ability to monetize its music use as compared to RMLC stations, Pandora's per-performance rate is between one-half and one-third the per-listener performance rate paid by the average terrestrial radio station.[29]

       Although BMI does not believe that it is necessary to perfectly align Pandora's and the RMLC's monetization levels through an adjustment to the percentage-of-revenue rate, it is instructive to consider the cumulative effect of the music density and monetization adjustments.  As detailed in the chart below, and based on the testimony at trial, adjusting the RMLC rate to account for differences in *both* monetization and music density, the RMLC rate implies a percentage-of-revenue rate for Pandora of between 3.3% and 4.7%.

**RMLC Density and Monetization Benchmark Adjustment**

|  |  | Option 1 | Option 2 | Option3 | Option 4 |
|---|---|---|---|---|---|
| Radio Songs per hour[30] | [A] | 11 | 11 | 12 | 12 |
| Pandora Songs per hour[31] | [B] | 15.18 | 15.18 | 15.18 | 15.18 |
| Density Factor | [C] = [B] / [A] | 1.38 | 1.38 | 1.265 | 1.265 |
| Pandora RPM[32] | [D] | 35 | 46 | 35 | 46 |
| Radio RPM[33] | [E] | 70 | 70 | 70 | 70 |
| Monetization Factor | [F] = [E] / [D] | 2 | 1.52 | 2 | 1.52 |
| Adjusted Benchmark Rate | [G] = [C] * [F] * 1.7% | **4.7%** | **3.6%** | **4.3%** | **3.3%** |

---

[27]    Trial Tr. 1620:21-1621:24, Mar. 2, 2015 (Cremieux).

[28]    *Id.* at 1622:25-1623:21; Closing Deck at 44.

[29]    Trial Tr. 1625:24-1630:18, Mar. 2, 2015 (Cremieux); Closing Deck at 46-48.  Revenue per thousand listener hours, or "RPMs," is the "key indicator of [Pandora's] ability to monetize [its] listener hours."  (BX 155 at 46.)

[30]    Trial Tr. 2106:4-8, 2107:11-19, Mar. 5, 2015 (Rosenblatt); Trial Tr. 1367:5-21, Feb. 25, 2015 (Milkman); *see also* BX 147 at BMI_P00160230.

[31]    BX 470 at BMI_P00215822; Trial Tr. 1368:2-6, Feb. 25, 2015 (Milkman).

[32]    BX 147 (email from Joseph Kennedy stating "[t]errestrial radio monetizes an hour of listening at just about twice the rate we do (~$70 RPM vs. ~$35 RPM)."); BX 2441 at 46 (Pandora Form 10-K for the fiscal year ended December 31, 2014).

[33]    The $70 RPM figure is the lower bound of the stipulated terrestrial radio RPM.  (Trial Tr. 2006:3-4, Mar. 4, 2015 (stipulated fact).)

**Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP**

Hon. Louis L. Stanton
April 3, 2015
Page 7

### III. Conclusion.

For all of the foregoing reasons, BMI respectfully submits that the Court should conclude that BMI's proposed floor fee, incremental administrative fee, and adjustment factor are reasonable and therefore endorse as reasonable the AFBL and 2.5% rate proposed by BMI.

Respectfully submitted,

/s/ Scott A. Edelman
Scott A. Edelman

cc:   All Counsel