KING & SPALDING

King & Spalding LLP
101 Second Street
Suite 2300
San Francisco, CA 94105
Tel: +1 415 318 1200
Fax: +1 415 318 1300
www.kslaw.com

May 7, 2015

**VIA ECF**

Kenneth Steinthal
Partner
Direct Dial: +1 415 318 1211
Direct Fax: +1 415 318 1300
ksteinthal@kslaw.com

Hon. Louis L. Stanton, United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:    *Broadcast Music, Inc. v. Pandora Media, Inc.*, No. 1:13-cv-04037-LLS

Dear Judge Stanton:

      I write on behalf of Pandora Media Inc., to notify the Court of two major developments since the close of evidence. First, in an opinion issued yesterday, the Second Circuit affirmed Judge Cote's decisions invalidating selective withdrawals from ASCAP and setting a 1.85 percent-of-revenue rate for Pandora's 2011-2015 ASCAP license. *See* Opinion, attached as Exhibit A. As explained in more detail below, the Second Circuit's published, precedential decision changes this case dramatically. It clarifies that the "Round Two" Sony-Pandora and Universal-Pandora agreements should never have existed, confirms that the ASCAP-Pandora license is a compelling benchmark, all but eliminates the contingent and supracompetitive rate in the 2013 Universal-Pandora direct license, and endorses Judge Cote's legal determinations. Second, the Federal Communications Commission approved Pandora's bid to acquire the KXMZ commercial radio station, and the Pandora-KXMZ transaction is now scheduled to close in a matter of weeks. *See* FCC Ruling, attached as Exhibit B. As explained below, Pandora will be licensed under the terms of the BMI-RMLC license for at least part of the term of that license.

**The Second Circuit's Decision**

      Yesterday, the Second Circuit affirmed Judge Cote's decisions. That ruling affects this case in four principal ways.

      *First*, and most critically, the Second Circuit held that the "[t]he partially withdrawn works at issue *remain in the ASCAP repertory* pursuant to the plain language of the consent decree." Op. 13 (emphasis added), and that "the partial withdrawals do not affect the scope of Pandora's license." *Id.* at 14. That holding squarely overrides this Court's determination that selectively withdrawn compositions "cannot be held in BMI's repertory" and that "BMI cannot deal in or license those compositions to anyone." Opinion & Order at 10 (Dec. 18, 2013).[1] *See*

---

[1] ASCAP's, Pandora's, and BMI's appellate briefs to the Second Circuit presented the question of the appropriate remedy for the decree violation. *See* ASCAP Opening Br. 20; Pandora Br. 31-32 n.2; BMI *Amicus* Br. 4-5, 12, 22.

*United States v. Broad. Music, Inc.*, 316 F.3d 189, 194 (2d Cir. 2003) (recognizing that the ASCAP and BMI consent decrees should be interpreted consistently). Notably, the court of appeals also concluded that "[t]his outcome does not conflict with publishers' exclusive rights under the Copyright Act," as the publishers "remain free to choose whether to license their works through ASCAP" (Op. 13) – an observation that applies equally to BMI.

It is thus inappropriate as a matter of law to consider the "Round Two" Sony and Universal direct agreements with Pandora as benchmarks here because they arose from a set of circumstances that the Second Circuit confirmed should never have existed. Pandora argued as much during trial when it urged in its oral motion for judgment as a matter of law that, had this Court followed the path chosen by Judge Cote for implementing rulings that partial withdrawals are impermissible, "the Sony and Universal benchmarks at the end of 2013 would not even exist." Trial Tr. 2031:13-14. The Second Circuit has now confirmed Judge Cote's reasoning and Pandora therefore renews its motion on this point.

*Second*, the Second Circuit's opinion renders the Pandora-ASCAP license the best and most comparable benchmark for Pandora's BMI license. It involves the same licensee and indisputably similarly situated licensors. *See United States v. Broad. Music, Inc.*, 426 F.3d 91, 95 (2d Cir. 2005) (noting that "the degree of comparability of the negotiating parties to the parties contending in the rate proceeding" is relevant to selecting a benchmark) (internal quotation marks omitted). BMI's own expert agrees. Dr. Cremieux testified at his deposition and at trial that the pending appeal was the *only* reason he did not rely on the Pandora-ASCAP license. During that testimony, he acknowledged that the license "has other characteristics . . . such that if it was complete and if we knew what the terms of the licenses were, then it's a license that I would consider." Trial Tr. 1707:6-10, 18-21. That day has come and the Pandora-ASCAP license is now complete.

Relatedly, BMI argued at trial that "the Court should not lose sight of the fact that the Second Circuit has already held [in the *ASCAP/RealNetworks* case] that a 2.5 percent rate is reasonable for a service *just like Pandora*." Trial Tr. 5:23-25; 6:1 (emphasis added). But the Second Circuit much more recently has held that a 1.85 percent rate is reasonable *for Pandora*.

*Third*, the Second Circuit's affirmance all but eliminates the contingent supracompetitive rate in the Round One Universal-Pandora direct license, thus draining that license of any value to BMI as a benchmark. Indeed, it becomes a benchmark in Pandora's favor. That license contains the following provision:

> [I]n the event that a final decision not subject to any further appeal is rendered in the pending ASCAP Rate Court proceeding between ASCAP and Pandora . . . [such that UMPG's partial withdrawal] is not effective vis-à-vis Pandora . . . this letter agreement shall prospectively be of no further force or effect . . . UMPG shall refund to Pandora any and all amounts previously paid to UMPG under this letter agreement . . . . Pandora shall instead make payments for the applicable UMPG-owned and/or UMPG-controlled compositions to ASCAP pursuant [to Pandora's license from ASCAP].

May 7, 2015
Page 3

JX-816. Although the mandate has not yet issued, the Second Circuit has rendered such a decision. A soon-to-be-vacated direct license is plainly not an appropriate benchmark.

*Fourth*, the Second Circuit expressly held "that the district court's legal determinations underlying [its] ultimate conclusion – including its rejection of various alternative benchmarks proffered by ASCAP – were sound." Op. 15. Judge Cote's holdings in the "Conclusions of Law" section of her opinion are thus entitled to respect. *See generally In re Petition of Pandora Media, Inc.*, 6 F. Supp. 3d 317, 353-72 (S.D.N.Y. 2014). Among those conclusions of law is Judge Cote's holding that "the historical division between interactive and non-interactive internet music services requires that Pandora be licensed well below the" rate at which interactive services are licensed. *Id.* at 355. Another: "it is not clear, in all events, that any rate differential is justified on the basis of music use." *Id.* at 368. *Cf. In re Wright*, Bankr. No. 09-3224, 2011 WL 3298914, at *6 (9th Cir. BAP Mar. 14, 2011) ("The Court of Appeals' adoption in a published order of [another decision] renders that decision the law of the circuit."). BMI's positions on these issues cannot be squared with Judge Cote's affirmed legal conclusions.

### The Federal Communications Commission's Decision

Pandora also wishes to apprise this Court of the FCC's May 4, 2015 decision approving Pandora's acquisition of the KXMZ radio station in Rapid City, South Dakota. For nearly two years, ASCAP vigorously and successfully held up Pandora's efforts to acquire KXMZ, arguing that Pandora could not satisfy the FCC's foreign ownership rules. ASCAP claimed standing based on the possibility that it could be harmed by Pandora's ability to argue its entitlement to RMLC rates upon acquiring KXMZ. On Monday, however, the FCC rejected ASCAP's efforts, with one concurring Commissioner saying that the debate over "whether Pandora should be able to own a single FM radio station in a small South Dakota town" was "absurd." *See* Ex. B at 11 (Pai, concurring). The FCC thus cleared the way for Pandora and KXMZ to close the transaction, which will happen in a matter of weeks.

When it does, Pandora will be entitled to the terms of the BMI-RMLC license. This includes the 1.70 percent rate contained in that license for at least part of the term of that license. Pandora will be entitled to the terms of the Station License because it will become the assignee of KXMZ's license with BMI, which expressly provides that "[t]his Agreement shall inure to the benefit of and shall be binding upon the parties and their respective successors and assigns." BMI-KXMZ License § 10. *See Citibank, N.A. v. Tele/Resources, Inc.*, 724 F.2d 266, 269 (2d Cir. 1983) (noting that "the assignee . . . moves into the shoes of the assignor"). Even if Pandora were not entitled to the Station License, Pandora would be entitled to the terms of the BMI Radio Group Transmissions License by virtue of its ownership of a commercial radio station. *See* Radio Group Transmissions License § 2.B.[2]

After the Pandora-KXMZ transaction closes, Pandora intends to seek this Court's leave to move for partial summary judgment on the grounds described above. To avoid the need to

---

[2] That result is consistent with Judge Cote's conclusion that "Pandora . . . is radio and competes with programmed radio, including terrestrial radio, for listeners and advertising dollars." *In re Pandora Media, Inc.*, 6 F. Supp. 3d at 370.

May 7, 2015
Page 4

reopen a final judgment, Pandora thus respectfully suggests that the most appropriate course would be to await the closing of the transaction and the disposition of Pandora's anticipated motion before issuing an opinion.

Respectfully submitted,

*/s/ Kenneth L. Steinthal*
Kenneth L. Steinthal

cc: All Counsel