# MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP

**1 CHASE MANHATTAN PLAZA**

**NEW YORK, NY 10005**

212-530-5000

FAX: 212-530-5219

Scott A. Edelman
Chairman
DIRECT DIAL NUMBER
212-530-5149
E-MAIL: sedelman@milbank.com

| | |
|---|---|
| **LOS ANGELES** 213-892-4000 FAX: 213-629-5063 | **BEIJING** 8610-5969-2700 FAX: 8610-5969-2707 |
| **WASHINGTON, D.C.** 202-835-7500 FAX: 202-835-7586 | **HONG KONG** 852-2971-4888 FAX: 852-2840-0792 |
| **LONDON** 44-20-7615-3000 FAX: 44-20-7615-3100 | **SINGAPORE** 65-6428-2400 FAX: 65-6428-2500 |
| **FRANKFURT** 49-(0)69-71914-3400 FAX: 49-(0)69-71914-3500 | **TOKYO** 813-5410-2801 FAX: 813-5410-2891 |
| **MUNICH** 49-89-25559-3600 FAX: 49-89-25559-3700 | **SÃO PAULO** 55-11-3927-7700 FAX: 55-11-3927-7777 |

May 12, 2015

**VIA ECF**

Honorable Louis L. Stanton
United States Courthouse
500 Pearl Street, Courtroom 21C
New York, NY 10007

      Re:   *Broadcast Music, Inc. v. Pandora Media, Inc.*, 13 Civ. 4037 (LLS)

Dear Judge Stanton:

      On behalf of Petitioner Broadcast Music, Inc. ("BMI"), we write in response to the letter, dated May 7, 2015 (the "Letter"), submitted by Pandora Media, Inc. ("Pandora") regarding (i) the decision by the Court of Appeals for the Second Circuit in the ASCAP-Pandora matter (the "Opinion" or "Op.");[1] and (ii) the FCC's recent ruling regarding Pandora's purchase of South Dakota radio station KXMZ (the "FCC Ruling").

      On May 6, 2015, the Second Circuit, *per curiam*, affirmed Judge Cote's summary judgment and post-trial decisions in the ASCAP-Pandora matter. Consistent with the applicable standard of review, the Second Circuit considered only whether Judge Cote's conclusion that 1.85% was a reasonable rate for an ASCAP-Pandora license was clear error, giving full deference to Judge Cote's findings of fact and credibility determinations. The Second Circuit was not tasked with and specifically:

---

[1] *Pandora Media, Inc. v. Am. Soc. of Composers, Authors & Publishers*, Nos. 14-1158-cv(L), 14-1161-cv(Con), 14-1246-cv(Con) (2d Cir. May 6, 2015).

Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP

Hon. Louis L. Stanton
May 12, 2015
Page 2

1. Did not find that Judge Cote's evaluation of the evidence was correct, but found only that Judge Cote had not committed clear error.

2. Did not find that Judge Cote's determination of a 1.85% rate for the duration of the Pandora-ASCAP license was the only reasonable rate for such license.

3. Did not determine how Judge Cote's opinion might have been affected had she considered evidence available to Your Honor (but not to Judge Cote) regarding Pandora's entry into music licenses with Sony and Universal, and Pandora's ability to take down the works of BMG, in December 2013; the Second Circuit found only that the District Court had not abused its discretion by refusing ASCAP's request for additional discovery regarding the Sony and Universal licenses. (Op. 16-17.)

4. Did not adopt wholesale the "Conclusions of Law" section of Judge Cote's opinion; the Court merely upheld as "sound" those legal determinations—premised on her factual findings—underlying the ultimate conclusion that a 1.85% rate was reasonable. (Op. 15.)

Despite Pandora's assertion to the contrary, nothing in the Second Circuit's opinion binds this Court in determining whether BMI's proposed 2.5% blanket license rate is reasonable for the 2013-2016 time period. Having heard five weeks of trial testimony, including live testimony of 15 witnesses, it would be inappropriate for this Court to defer to Judge Cote's determinations, based (as they were) on an entirely different evidentiary record.

Even Mr. Steinthal was sensitive to the fact that some of the witnesses, upon whose testimony Judge Cote relied, raised significant credibility issues through their testimony in our trial. To that end, Mr. Steinthal urged in closing argument that such credibility issues "should not affect the issues presented that are most pertinent to that benchmark analysis." (Trial Tr. 2684:15-17, Mar. 13, 2015 (Pandora closing argument).)[2] But evaluation of evidence requires evaluation of credibility. BMI respectfully submits that this Court should make its own fact and credibility determinations and assess the reasonableness of BMI's proposal in light of the evidence at our trial.

---

[2] For example, this Court had evidence, not available to Judge Cote or the Second Circuit, that through the use of various information, including LyricFind, Pandora had effectuated a takedown of BMG, notwithstanding that Pandora (through Mr. Kennedy) testified before Judge Cote that a takedown of a music publisher would be impossible. (Trial Tr. 902:4-911:6, Feb. 20, 2015 (Kennedy).) Incredibly, Kennedy gave that testimony after Pandora had successfully taken down BMG. Kennedy was able to offer that testimony because ASCAP (unlike BMG) was denied access to discovery about the BMG takedown. And despite the fact that Pandora knew it had been able to take down BMG at the end of 2013, neither Pandora nor Kennedy took any steps to correct the record that it had created before Judge Cote about Pandora's supposed inability to take down a publisher. (Trial Tr. 902:4-911:6, Feb. 20, 2015 (Kennedy)).

Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP

Hon. Louis L. Stanton
May 12, 2015
Page 3

   As BMI explained in its closing arguments, the evidence at trial overwhelmingly supports the reasonableness of a 2.5% rate for Pandora in this case:

1.  The fact of publisher withdrawals indicated that the rate of 1.75% and 1.85%, paid under Pandora's former licenses with BMI and ASCAP, respectively, were too low (*See, e.g.,* BX 548 at 2; BX 740 at 2);

2.  Pandora's extensive efforts to avoid free market deals (including its contrived purchase of KXMZ) demonstrated that Pandora knew 1.75% and 1.85% were below market rates (*See, e.g.,* BX 124 at 58);

3.  BMI independently concluded that a 2.5% rate was reasonable for digital music services based on internal analyses in 2010-2012 unrelated to publisher withdrawals and direct licenses. (BX 718 at 10; Trial Tr. 278:18-25, 286:20-23, 296:8-297:21, Feb. 13, 2015 (Conlon));

4.  BMI's primary benchmarks (taken together)—the Sony, Universal, and EMI agreements—supported a 2.5% rate (Trial Tr. 1592:3-1602:24, Mar. 2, 2015 (Cremieux));

5.  BMI's confirmatory benchmarks—BMI's license agreements with Spotify, Rhapsody, Rdio, and Apple—supported a 2.5% rate (*id*. 1606:12-1613:17); and

6.  Once appropriately adjusted, the RMLC license supported a 2.5% rate (*id*. 1621:6-1635:8).

The Second Circuit's affirmance of Judge Cote's decision does not alter this factual record.

   As to Pandora's second point relating to its still-pending acquisition of KXMZ, BMI respectfully submits that the FCC's action in the proposed acquisition should not delay a decision on the reasonableness of BMI's proposed license. Whether or not Pandora ultimately qualifies in the future for the RMLC license (something that BMI will vigorously oppose), Pandora must concede that its purchase of KXMZ will have no impact on the first two and a half years of the license at issue in this case. It would be highly improper, prejudicial to BMI, and a waste of this Court's time and resources to allow Pandora to delay a decision so that it may file for summary judgment or re-open the trial record at some undetermined date.

Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP

Hon. Louis L. Stanton
May 12, 2015
Page 4

**I.     The Second Circuit's affirmance of the ASCAP decision does not impact the reasonableness of a 2.5% rate for the BMI-Pandora License.**

As the Second Circuit stated, an assessment of the substantive reasonableness of the rate determination is based on a deferential review of the factual determinations. (Op. 14.) Different factual records could support different rate conclusions. Indeed, in the *DMX* appeal, the Second Circuit affirmed as reasonable different fees to be paid to ASCAP and BMI by background music provider DMX, based on different factual records regarding the appropriate floor fee. *Broad. Music, Inc. v. DMX Inc.*, 683 F.3d 32, 41-43, 48-49 (2d Cir. 2012). Similarly, the Second Circuit affirmed as reasonable in the ASCAP case and in the *RealNetworks* case different rates for very similar licensees—based on different factual records presented to the district courts.[3]

The Second Circuit in the Opinion did not independently conclude that 1.85% is the only reasonable rate for Pandora in all circumstances or for all time periods. It concluded only that, based on the record and evidence before Judge Cote, the District Court "did not commit clear error" in concluding that 1.85% was reasonable for the period 2012-2015. (Op. 15.) It similarly affirmed Judge Cote's determination that ASCAP failed to carry its burden of proving that its proposed rate was reasonable." (Op. 16.) This Court should independently consider the very different factual evidence presented at the trial before Your Honor and determine whether BMI has carried its burden of proving that its 2.5% rate proposal for the years 2013-2016 is reasonable.

**A.     The Second Circuit's Opinion does not alter the significance of the benchmarks presented at trial.**

In determining whether a proposal is reasonable, rate courts generally focus on "agreements reached either by these parties or by others for the purchase of comparable rights." *Am. Soc'y of Authors & Publishers, v. Showtime/The Movie Channel*, 912 F.2d 563, 577 (2d Cir. 1990).[4] This emphasis on marketplace agreements makes sense. Whether affirmed or reversed by the Second Circuit, a district court opinion is the judiciary's prediction as to the rate that a willing buyer would pay a willing seller. By contrast, a transaction in the marketplace is evidence of what a willing buyer actually agrees to pay a willing seller.

---

[3]     *United States v. ASCAP (In re Application of RealNetworks, Inc., Yahoo! Inc.)*, 627 F.3d 64, 81 (2d Cir. 2010).

[4]     *See United States v. Am. Soc'y of Composers & Publishers*, Civ. No. 13-95,1993 WL 60687 at *18 (S.D.N.Y. 1993) ("Both in prior cases and in this proceeding, the parties and the court have focused principally on agreements ***voluntarily arrived at*** by the same or comparably situated parties contracting for the same or comparable rights.") (emphasis added); *United States v. Am. Soc'y of Composers, Authors & Publishers (In re America Online)*, 559 F. Supp. 2d 332, 395 (S.D.N.Y. 2008) (same).

Milbank, Tweed, Hadley & M<u>c</u>Cloy LLP

Hon. Louis L. Stanton
May 12, 2015
Page 5

   In our trial, the Court had available to it the 2014 Sony and Universal licenses, which were not before Judge Cote or the Second Circuit. Recognizing the significance of these transactions to the setting of a rate, Pandora argues that they should be disregarded entirely. Its argument is based on the Second Circuit's affirmance of Judge Cote's decision that the compositions of publishers who attempted to partially withdraw remained *in* the ASCAP repertoire. According to Pandora, the 2014 licenses with Sony and Universal—which followed this Court's "all *out*" ruling[5]—"should never have existed." (Letter at 1-2.)

   Pandora's argument misses the point. Whether the Sony and Universal licenses *should* exist is irrelevant. The fact is that they do exist, and they were voluntarily entered into between the parties. The Sony and Universal licenses reflect fully and fairly negotiated marketplace deals between a willing buyer and willing seller. (*See* Trial Tr. 1582:17-1583:23, 1592:3-1602:24, Mar. 2, 2015 (Cremieux).)

   In any event, Pandora does not argue that the Opinion retroactively voided the licenses. Indeed, it could not. Pandora explicitly agreed in the Universal license that any appellate decisions would have no effect on the license.[6] Similarly, the Sony license provided for rolling quarterly terms terminable at either party's option, precisely to allow for changed circumstances such as a Sony re-affiliation with BMI or the Second Circuit affirming Judge Cote's "all in" order. (BX 324 ¶ 3.) After the first quarter of 2014, Pandora terminated the Sony license.

   Pandora's argument also cannot be reconciled with its position that the EMI license—which under Pandora's theory also "never should have existed"—is a valid benchmark. (Trial Tr. 2675:15-2677:3, Mar. 13, 2015 (Pandora closing argument).) Instead of arguing that the EMI agreement was tainted by Judge Cote's "all in" ruling which obviated the need for any direct deals, Pandora advanced the EMI agreement as a valid benchmark in both the ASCAP and Pandora trials. In fact, both ASCAP and Pandora advanced EMI as a benchmark in the ASCAP-Pandora case for the years 2011-2012. Judge Cote used the parties' agreement regarding the relevance of the 1.85% rate in the EMI agreement, as the foundation for the remainder of the period. *In re Petition of Pandora Media, Inc.*, 6 F. Supp. 3d 317, 355-56 (S.D.N.Y. 2014).

---

[5]  As this Court knows, both Your Honor and Judge Cote held that publisher withdrawals were impermissible under BMI's and ASCAP's consent decrees, respectively. Opinion & Order, 9-13, Dec. 19, 2013, ECF No. 74; *In re Pandora Media, Inc.*, No. 12 CIV. 8035 (DLC), 2013 WL 5211927 at *7 (S.D.N.Y. Sept. 17, 2013). This Court held that publisher withdrawal of works precluded BMI from licensing those works to any users (*i.e.,* they were "all out"). By contrast, Judge Cote held that ASCAP publishers' works could not be withdrawn and therefore they were "all in." *Pandora Media,* 2013 WL 5211927 at *7. The Second Circuit's decision interpreting ASCAP's consent decree is not technically binding as to BMI, which has a different consent decree with different language.

[6]  JX 817 ¶ 6(a) ("In the event that any decision is rendered in . . . any appellate court proceeding concerning the BMI Rate Court proceeding between BMI and Pandora . . . or in any other legal . . . proceeding concerning . . . Pandora . . . that may conflict in any manner with the terms of this agreement . . . this agreement shall nevertheless remain in full force and effect . . . .")

Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP

Hon. Louis L. Stanton
May 12, 2015
Page 6

As to Pandora's claim that the Pandora-ASCAP license is now the best benchmark, Pandora's reliance on Dr. Cremieux's testimony that he would "consider" the Pandora-ASCAP license, if it were finalized (Letter at 2), misrepresents the record and should not be considered at this stage in the proceedings. Pandora intentionally omits from its letter Dr. Cremieux's testimony that although he would consider the ASCAP license, "it doesn't rise to the level of the free market agreements that I observe, which I think are a better reflection of what I would expect an arm's length transaction to result in." (Trial Tr. 1707:11-17, March 2, 2015 (Cremieux).)[7]

Pandora's speculation as to how Dr. Cremieux's analysis would change, if at all, if he had considered a final Pandora-ASCAP license is irrelevant now that the record is closed. To adequately consider the ASCAP-Pandora license, the parties would need to reopen expert discovery and redo expert reports and analyses. Pandora has presented no justification for doing so here. As Pandora argued, and Judge Cote confirmed in the ASCAP case, "[a]t some point, discovery must end so that the parties can determine the total universe of facts and evidence relevant to a case in order to prepare for trial." Letter, at 1, *In re Pandora Media*, No. 12-8035, (S.D.N.Y. Jan. 6, 2014), ECF No. 144 (internal quotation and citation omitted); *see also Muhammad v. Coughlin*, No. 91 CIV. 6333 (LAP), 1995 WL 242119, at *1 (S.D.N.Y. Apr. 26, 1995) (denying a motion to reopen the record after trial, but before a decision, because, *inter alia*, doing so "at this late date would permit this trial to continue *ad infinitum*.").

**B.    The 2013 Universal License remains a benchmark in BMI's favor.**

The Opinion does not change the relevance of the 2013 Universal license. The 2013 Universal agreement was always contingent—throughout discovery, trial, and today. The trigger of the contingency now does not change the rationale underlying Dr. Cremieux's opinion that the 2013 Universal agreement is relevant because it reflects the rate that the parties agreed would be paid unless certain subsequent events occurred. (Trial Tr. 1709:1-11, Mar. 2, 2015 (Cremieux).) The agreement continues to reflect the fees that would have been paid in a market that was not constrained by the rate court. Although Pandora challenged Dr. Cremieux's reliance on the agreement because of the contingency, Pandora did not present any evidence as to the value of the license at the time the parties entered the agreement, and is precluded from doing so now. *Stuhlmuller v. Delta Air Lines, Inc.*, No. 93 CIV. 8982 (JSM), 1995 WL 479472, at *4 (S.D.N.Y. Aug. 11, 1995) (failure to advance arguments in pleadings before or during trial considered waiver); *see also Masella v. Blue Cross & Blue Shield of Conn., Inc.*, 936 F.2d 98, 107-108 (2d Cir. 1991) (district court did not err in holding that a contractual limitations claim was waived when the first time the issue was raised "with any clarity was in its reply to

---

[7]    For this reason, to the extent any license may be considered "the best" benchmark, the Pandora-publisher deals, and not the Pandora-ASCAP license, are the best, as they were negotiated in a truly free marketplace, outside the shadow of the rate court. (*See* Trial Brief of Petitioner Broadcast Music, Inc. at 40-43.) In contrast, the Pandora-ASCAP license was a court-ordered decision that was never agreed to by ASCAP.

[plaintiff's] post-trial submission"); *Lyons v. Jefferson Bank & Trust*, 994 F.2d 716, 722-23 (10th Cir. 1993) (arguments raised for the first time in post-trial motion are not preserved for appeal).[8]

### C. The Second Circuit's affirmance of Judge Cote's legal conclusions does not transform every statement under the heading, "Conclusions of Law," into a legal holding of the Second Circuit.

Pandora extrapolates from one sentence in the Opinion that any statement in the 48-page long "Conclusions of Law" section in Judge Cote's decision is "entitled to respect." (Letter at 3.) That is not the case. The Second Circuit held that the 1.85% rate was a factual determination subject to review for clear error. The Court then held that the legal conclusions "underlying the ultimate conclusion" were correct, but did not identify which legal findings supported the ultimate conclusion. Many of the statements labeled "legal conclusions" were not even the subject of briefing or argument before the Second Circuit. It would make no sense to treat the district court's entire "Conclusion of Law" section as Second Circuit law based on one summary statement in the Opinion. *Getty Petroleum Corp. v. Bartco Petroleum Corp.,* 858 F.2d 103, 113 (2d Cir. 1988) ("Inasmuch as the . . . . issue was not briefed, argued or addressed by the [Second Circuit panel], we are not constrained by it to affirm the instant award."); *cf. Anderson v. Celebrezze*, 460 U.S. 780, 784 n.5 (1983) ("We have often recognized that the precedential effect of a summary affirmance extends no further than 'the precise issues presented and necessarily decided by those actions.' A summary disposition affirms only the judgment of the court below, and no more may be read into our action than was essential to sustain that judgment.") (citation omitted).

Moreover, many statements within Judge Cote's "Conclusions of Law" section are factual determinations, not legal conclusions. Their placement in the conclusions of law section does not magically convert them into them binding legal conclusions. *See Hale v. Ward*, No. 98-35645, 1999 WL 462352, at *1 (9th Cir. 1999) ("Although the district court labeled its interference finding as a conclusion of law, we are not bound by such a label.") (citation omitted); *Benrose Fabrics Corp. v. Rosenstein*, 183 F.2d 355, 357 (7th Cir. 1950) ("It is immaterial that some of these findings [of fact] appear in the conclusions of law, for their true nature is not determined by their labels.") (citation omitted).

Pandora points to two purported "Conclusions of Law" in Judge Cote's decision that it claims "cannot be squared" with BMI's position in this case. (Letter at 3.) Both of those supposed "conclusions" of law are factual determinations dependent on the particular record before Judge Cote and her appraisal of the evidence.

---

[8] In addition, Pandora's argument that the Opinion—one of the contingent events—transforms the agreement into "a benchmark in Pandora's favor" cannot be squared with its arguments throughout the case and in closing argument that "the contingent aspects on top of the bargaining leverage issues rendered the 2013 Universal license not a good agreement, not a good benchmark under the competitive market framework." (Trial Tr. 2662:1-14, Mar. 13, 2015 (Pandora closing argument).) If the contingency rendered it a poor benchmark—a fact which BMI disputes—it is a poor benchmark regardless of whether or not the contingency has been triggered.

Hon. Louis L. Stanton
May 12, 2015
Page 8

First, Pandora argues that Judge Cote made a legal conclusion—affirmed by the Second Circuit—that Pandora should pay a lower rate than interactive services. Judge Cote, however, actually wrote that Pandora should be licensed "well below the 3% rate at which ASCAP licenses interactive music services." *In re Petition of Pandora Media, Inc.*, 6 F. Supp. 3d at 355. Pandora omitted from its Letter the reference to 3%, a rate that on its face is well above the 2.5% requested by BMI.

Moreover, as Dr. Cremieux testified, Spotify would continue to pay substantially more in fees per performance than Pandora, even if Spotify paid the same percentage of revenue rate. (Trial Tr. 1608:11-1609:10, 1635:23-1636:20, Mar. 2, 2015 (Cremieux).) The ASCAP court was not presented with any evidence of relative monetization between Pandora and Spotify, or the impact that their monetization differentials have on actual dollars paid for performing rights.

In any event, regardless of how her opinion characterized this statement, her finding about relative pricing of interactive and non-interactive services was a factual determination; the issue of whether a reasonable rate for one type of music service is higher, the same, or lower than the rate for another type of music service is not a question of law. Indeed, precisely that issue was the subject of expert testimony at trial.

Second, Pandora argues that differences in music use are irrelevant to the Court's determination of a reasonable royalty rate because Judge Cote stated that "it is not clear, in all events, that any rate differential is justified on the basis of music use." (Letter at 3.) On this point, Judge Cote did not make a conclusion at all. Rather, she noted that she was ***not*** concluding whether a rate differential was justified based on music use.

Moreover, Judge Cote's determination of the relevance of "music use" was dependent on her factual determinations as to the differences in music use between broadcast radio and Pandora. *See In re Petition of Pandora Media, Inc.*, 6 F. Supp. 3d at 368. Again, the records in the two trials were very different. At least one of the factual findings relied upon by Judge Cote for her conclusion was Pandora's claim in the ASCAP trial that the "habits of terrestrial radio listeners . . . may make any differential largely illusory." (*Id.*) In our case, the uncontroverted testimony was just the opposite. BMI's industry expert Sam Milkman testified that terrestrial listeners do not change stations frequently and thus hear many more commercials—and thus less music—than Pandora listeners. (Trial Tr. 1368:7-1369:17, Feb. 25, 2015 (Milkman).) Pandora did not offer any evidence to the contrary.

In any event, the Second Circuit's cursory affirmance of Judge Cote's decision cannot reasonably be read to overturn Second Circuit precedent that music intensity is a relevant factor in adjusting benchmarks.[9] *Orange Cnty. Water Dist. v. Unocal Corp.,* 584 F.3d 43, 51 (2d

---

[9] *United States v. BMI*, 426 F.3d 91, 98 n.8 (S.D.N.Y 2005) (*Music Choice IV*) ("[T[he District Court is free to look to the Internet licensees and make explicit its findings concerning the role that the 'intensity of use,' by those licensees and by Music Choice, plays in its rate setting."); *see also Capital Cities/ABC*, 831 F. Supp. at 162 ("Thus,

Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP

Hon. Louis L. Stanton
May 12, 2015
Page 9

Cir. 2009) (Second Circuit decision did not decide legal issue that was not directly analyzed because a "*sub silentio* holding is not binding precedent."); *see also Shalala v. Ill. Council on Long Term Care*, 529 U.S. 1, 18 (U.S. 2000) ("This Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*.").

## II. The FCC's declaratory ruling with respect to Pandora's purchase of KXMZ should not delay the issuance of a ruling on the merits of a BMI-Pandora license.

This Court should not delay a decision on the reasonableness of BMI's 2.5% proposal for the BMI-Pandora license based on Pandora's notice to the Court that the FCC recently issued a declaratory ruling permitting Pandora to exceed the statutory foreign ownership limitation set for broadcasters in its proposed purchase of KXMZ. (Letter at 3.) First, as Pandora concedes, any future purchase of KXMZ will not impact the fees payable to BMI from the period from January 1, 2013 through an as yet undetermined date when its acquisition of KXMZ closes. (Letter at 1.) That is, even if Pandora were entitled to the RMLC license for its digital music service, which it plainly is not, Pandora would not be so entitled on a retroactive basis. There is no justification for delaying a final adjudication of the fees payable for that period of more than two and a half years.[10]

Second, notwithstanding Pandora's claim that it is now merely "weeks away" from closing its purchase—a claim that is purposefully vague and likely overly optimistic—the facts remain the same: Pandora continues to await final FCC approval. In fact, the FCC has imposed specific conditions that Pandora must meet,[11] some of which may require a shareholder vote, and we do not know if or when such a vote will occur, much less whether it would be successful. Further, Pandora has 90 days to "submit a list of steps it has taken or intends to take to ensure compliance" with these conditions. (Letter Ex. B (FCC Ruling) at 10.) Only once that submission is received, reviewed, and determined to be "satisfactory" will the FCC resume its

---

for the purposes of a rate-setting inquiry, we think it appropriate to assume that the value of the blanket license to a network will vary in direct proportion to the amounts of music used by that network, all other factors remaining equal."); *United States v. Am. Soc'y of Composers, Authors & Publishers (In re Capital Cities/ABC, Inc. CBS Inc.)*, 157 F.R.D. 173, 179 (S.D.N.Y. 1994) ("[A] license fee formula that relies *exclusively* on a percentage of gross revenue for the fee calculation is not a reasonable measure of the value of a music performance license because it does not account for changes in the value of the license by considering changes in the level of music use.").

[10] To now delay final judgment also will unduly prejudice BMI. Pandora has been licensed on an interim basis since January 1, 2013. Since that time, Pandora has paid BMI interim fees at a rate below that set by Judge Cote, and affirmed by the Second Circuit, and that the evidence at trial in this case demonstrated is unreasonably low.

[11] The FCC's declaratory ruling subjects Pandora to more than two pages of conditions that Pandora may need many months to complete, if it is able to meet the conditions at all. Such conditions include that Pandora must modify its certificate of incorporation, bylaws, or other organizational documents to make clear that Pandora has "(1) the right to restrict the transfer of shares to aliens; (2) the right to require disclosure when an alien acquires beneficial ownership of, or voting interest in, shares; and (3) the right to compel the redemption of shares held by aliens." (Letter Ex. B (FCC Ruling) at 8.)

**Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP**

Hon. Louis L. Stanton
May 12, 2015
Page 10

consideration of Pandora's application to assume KXMZ's broadcast license. (*Id*. at 9-10.) Any action relating to the purchase of KXMZ should await the closing of the purchase of KXMZ, as opposed to Pandora's prediction as to when such a closing will occur. In any event, Pandora's proposal to delay this Court's decision so that it may file for summary judgment should not be countenanced where any such motion would be both procedurally improper and meritless.

Third, any summary judgment motion by Pandora would be untimely. "It is axiomatic that the purpose of summary judgment is to prevent trials that are unnecessary[.]" *Pahuta v. Massey-Ferguson, Inc.*, 170 F.3d 125, 130 (2d Cir. 1999). The parties agreed—and this Court so ordered—that the last date for filing motions for summary judgment would be October 24, 2014. (Second Am. Scheduling Order, July 22, 2014, ECF No. 109.) That deadline has long since passed. Nor can Pandora use other means to re-open the trial record. "Very little purpose would be served by requiring adequate and timely trial preparations and Pre-Trial Orders if a party could be afforded such relief absent a showing of due diligence." *Bradford Trust Co. of Boston v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 622 F. Supp. 208, 214 (S.D.N.Y. 1985) (rejecting a request to reopen the record after trial but before a decision where plaintiff was aware that the issue in question was a "vital question" in the case and "never sought an adjournment to submit proof on that issue.") Pandora can hardly disagree, having argued successfully for the exclusion of the just-executed 2014 Universal and Sony licenses from being introduced at trial.[12] The Second Circuit expressly affirmed Judge Cote's exclusion of these agreements. (Op. 16-17.)

The parties spent two years litigating this case, engaged in extensive fact and expert discovery, and submitted voluminous pretrial submissions. This Court then presided over a five week trial after which the parties submitted post-trial briefs. It would be an enormous waste of judicial resources to permit Pandora to request one license, proceed with costly discovery and a trial on that request, only to claim—nearly two months *after* trial—that it no longer wants the license it requested, but instead wants a different one. Pandora should not be permitted to reject the Court-ordered rate in this case by simply buying its way into another deal in a separate industry. Pandora requested a license—longer than the one proposed by BMI—and should be bound by the determination of that license.

---

[12] Judge Cote denied ASCAP's request that Pandora produce the license agreements on grounds that "it would not be fair to either ASCAP or Pandora . . . to reopen discovery or to consider the document without discovery" which, on the eve of trial, was not appropriate. (Tr. at 4, *In re Pandora Media*, No. 12-8035, (S.D.N.Y Jan. 16, 2014) (ECF No. 158).

Milbank, Tweed, Hadley & McCloy LLP

Hon. Louis L. Stanton
May 12, 2015
Page 11

### III.     Conclusion

For all of the foregoing reasons, this Court should conclude that the Second Circuit's Opinion does not affect the validity of the benchmarks proposed by BMI and even if it did, BMI established many other bases upon which this Court may affirm the reasonableness of BMI's proposal.  This Court should also deny Pandora's request to delay its final decision pending Pandora's possible acquisition of KXMZ.

Respectfully submitted,

/s/ Scott A. Edelman
Scott A. Edelman

cc:     All Counsel