ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - -X
BROADCAST MUSIC, INC.,

Petitioner,

- against -

PANDORA MEDIA, INC.,

Respondent,
- - - - - - - - - - - - - - - -X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/28/15

13 Civ. 4037 (LLS)

Related to 64 Civ. 3787 (LLS)

OPINION & ORDER

## TABLE OF CONTENTS

BACKGROUND............................................................................................................3

    A. BMI Consent Decree...................................................................................6

    B. The Online Music Industry......................................................................7

    C. Pandora......................................................................................................9

        1. The Music Genome Project.............................................................10

        2. Pandora's Business and Revenue..................................................11

    D. BMI's Licensing History of Pandora....................................................13

    E. Publisher Withdrawals............................................................................15

    F. Pandora-Publisher Direct Licenses......................................................19

        1. "Round One" Agreements.............................................................19

            a. Pandora-EMI License.............................................................19

            b. Pandora-Sony and EMI Licenses........................................20

            c. Pandora-UMPG License..........................................................23

        2. "Round Two" Agreements.............................................................25

       a. Pandora-Sony and EMI Licenses.............................26

       b. Pandora-UMPG License.....................................29

       c. Pandora-BMG License......................................32

  G. Suspension Agreements.........................................35

  H. BMI's Licenses with Pandora's Competitors.................36

DISCUSSION.........................................................37

  A. Recent Understanding in the Music Industry...............37

  B. RMLC Radio Broadcasting Stations' Rate as Benchmark......45

  C. BMI's Primary Benchmarks Support a 2.5% Rate.............48

  D. Pandora's Proposed Benchmarks...........................52

    1. BMI Form License Agreement.............................53

    2. 2012 Pandora-EMI License..............................53

    3. RMLC License..........................................54

    4. ASCAP-Pandora License.................................54

    5. Pandora-BMG License...................................54

  E. BMI's AFBL Framework Is Adopted..........................55

  F. BMI's Advertising Deduction Proposal is Appropriate......58

  G. Term of License..........................................59

CONCLUSION.........................................................60

Broadcast Music, Inc. ("BMI") has petitioned pursuant to article XIV of the BMI Consent Decree for a determination of reasonable fees and terms for an adjustable-fee blanket license ("AFBL") to Pandora Media, Inc., a streaming internet radio

service, for the time period January 1, 2013 through December 31, 2016.

After a five week non-jury trial and post-trial submissions, the following constitutes the findings, Opinion and Order of the Court, holding that the 2.5% percentage of revenue rate and other terms offered to Pandora by BMI are reasonable.

## BACKGROUND

BMI is a non-profit performing rights organization ("PRO") that licenses non-exclusive rights of public performance to a variety of music users on behalf of affiliates who are the music compositions' copyright holders.    BMI's affiliates comprise approximately 600,000 composers, songwriters and music publishers, and BMI's repertory consists of approximately 8.5 million musical compositions.

Pandora is a streaming customized internet radio service that plays musical compositions under licenses which it has obtained directly from their copyright holders, or through BMI and other PROs such as ASCAP (American Society of Composers, Authors and Publishers).

BMI offers a blanket license fee of 2.5% of Pandora's gross revenue, subject to adjustments to accommodate performances of works it has licensed directly from their authors or another PRO.    The adjustment formula includes: (i) a floor fee equal to 10% of the traditional blanket license fee; (ii) an incremental

- 3 -

administrative fee, equal to 3% of the remaining 90% of the
traditional blanket license fee, that Pandora would be required
to pay regardless of the extent of direct licensing; and (iii)
credits for performances of BMI works directly licensed or
withdrawn.  BMI also proposes that in calculating gross revenue,
Pandora may deduct up to 15% of commissions paid to third-party
advertising agencies.

The prevailing method followed in setting a reasonable fee is
by reference to "benchmarks": the rates set in (or adjusted from)
contemporaneous similar transactions.   As the Second Circuit
explained in United States v. Broadcast Music, Inc. (In re Music
Choice), 316 F.3d 189, 194 (2d Cir. 2003):

> In making a determination of reasonableness (or of a
> reasonable fee), the court attempts to make a determination
> of the fair market value – "the price that a willing buyer
> and a willing seller would agree to in an arm's length
> transaction." Showtime, 912 F.2d at 569.  This determination
> is often facilitated by the use of a benchmark – that is,
> reasoning by analogy to an agreement reached after arms'
> length negotiation between similarly situated parties.
> Indeed, the benchmark methodology is suggested by the BMI
> consent decree itself, of which article VIII(A) enjoins
> disparate treatment of similarly situated licensees.

The Second Circuit later amplified (id., 426 F.3d 91, 95 (2d
Cir. 2005)):

> In choosing a benchmark and determining how it should be
> adjusted, a rate court must determine "the degree of
> comparability of the negotiating parties to the parties
> contending in the rate proceeding, the comparability of the
> rights in question, and the similarity of the economic
> circumstances affecting the earlier negotiators and the
> current litigants," United States v. ASCAP (Application of

- 4 -

Buffalo Broad. Co., Inc.), No. 13-95 (WCC), 1993 WL 60687 at [*] 18, 1993 U.S. Dist. LEXIS 2566, at *61 (S.D.N.Y. Mar. 1, 1993), as well as the "degree to which the assertedly analogous market under examination reflects an adequate degree of competition to justify reliance on agreements that it has spawned." Showtime, 912 F.2d at 577.

BMI bears "the burden of proof to establish the reasonableness of the fee requested by it." BMI Consent Decree Art. XIV(A). Should it not do so, "then the Court shall determine a reasonable fee based upon all of the evidence." Id.

BMI offers as its primary benchmarks five direct licensing agreements between Pandora and major music publishers Sony, EMI, and UMPG. Those agreements were entered into between March 2012 and December 2013. Their agreed rates range from 2.25 to 5.85% of Pandora's revenue. BMI proposes as confirmatory benchmarks BMI's licenses with Pandora's competitors, entered into between 2010 and 2013, which have a range of effective rates from 2.5 to 4.6% of revenue.

Pandora argues that the 2.5% rate proposed by BMI is unreasonable because the publisher agreements were the result of a non-competitive market situation in which it was constrained to agree to rates higher than those paid by its similarly-situated competitors, who it claims are thousands of commercial radio broadcasters. Pandora contends that the long-standing BMI-Pandora license, which has stipulated a 1.75% rate for the past seven years, is the best and most comparable benchmark for

- 5 -

establishing a reasonable fee.  Pandora also relies on its direct licenses with publishers EMI and BMG, its license with ASCAP, and BMI's agreement with the Radio Music License Committee ("RMLC"), which represents the commercial radio ("terrestrial") broadcasting stations, as benchmarks establishing a reasonable rate between 1.7 and 1.85% of Pandora's revenue.

Pandora proposes a similar adjustment formula with credits for performances of directly licensed or withdrawn BMI works as well as an advertising deduction between 9.5% and 12% on a flat deduction basis or an actual deduction of 15% inclusive of internal costs.

### A. BMI Consent Decree

BMI's business of licensing the public performance rights of its musical repertory is governed by the Consent Decree settling this antitrust suit brought by the United States.  United States v. BMI, 1996 Trade Cas. (CCH) ¶ 71,941 (S.D.N.Y. 1966), amended No. 64-cv-3787, 1994 WL 901652, 1996-1 Trade Cas. (CCH) ¶ 71,378 (S.D.N.Y. Nov. 18, 1994).  The 1994 amendment to the BMI Consent Decree establishes this Court as a "rate court," which sets fees for licenses when BMI and applicants cannot agree on a reasonable fee.  BMI Consent Decree Art. XIII.

Section VII(B) of the BMI Consent Decree requires that BMI "upon the request of any unlicensed broadcaster, license the rights

- 6 -

publicly to perform its repertory by broadcasting on either a per program or programming period basis, at defendant's option."

Section VIII(A) provides:

Defendant shall not enter into, recognize as valid or perform any performing rights license agreement which shall result in discriminating in rates or terms between licensees similarly situated; provided, however, that differentials based upon applicable business factors which justify different rates or terms shall not be considered discrimination within the meaning of this section; and provided further that nothing contained in this section shall prevent changes in rates or terms from time to time by reason of changing conditions affecting the market for or marketability of performing rights.

If, as in this case, BMI and an applicant cannot agree on a license fee, Section XIV(A) provides that either party may apply to this Court for the determination of a reasonable license fee, which BMI has done.

## B. The Online Music Industry

An over-arching question is how Pandora's product is properly classified. A brief overview of the main sources of online music – programmed radio, customized radio, and on-demand services – is helpful in understanding Pandora's place within the music business and the licensees to whom it is most "similarly situated."

Radio is a form of broadcast media by which a provider transmits audio programming to a listener. Historically, a listener had the ability to tune in to a particular radio

station, but could hear only the programming provided by that station.

Over the past century, new radio delivery systems have been developed, and radio programming can now be transmitted by broadcast signal, cable, satellite, or over the internet.  The advent of the internet as a radio delivery platform has allowed many broadcast or "terrestrial" radio providers such as iHeartMedia (a conglomerate which owns hundreds of AM and FM stations) to broadcast their conventional radio programming simultaneously to listeners' computers or mobile devices.  It has also allowed radio providers to create an unprecedented level of listener interaction with the broadcaster through customizable radio services.

In contrast to the broadcasting of a common signal throughout a geographic area for terrestrial radio, with the internet each listener's device can now receive its own individualized data stream.  The traditional model can be referred to as the "one-to-many," as compared to the "one-to-one" current model.  Because they now operate on a one-to-one model, customizable internet radio services are able to offer music programming that is adjustable by the individual user's feedback.  Present customizable radio services include Pandora, iHeartMedia's "Create Station" within its iHeart Radio platform, and Spotify Radio.

"On-demand" streaming services using a one-to-one model offer an even more personalized means of delivery of music through the internet.  On-demand services provide users with individual access to large libraries of songs, from which each listener can select exactly which song she wishes to play at any time.  Most offer both advertising and subscription-based services, which control the number of advertisements to which a listener is exposed: fewer for a subscription-fee paying customer, more for one whose compensation to the service provider comes from payments by advertisers.  Spotify is the leading on-demand service; other popular services include Rhapsody and Rdio.  Pandora does not offer an on-demand service.

There is overlap between programmed radio, customizable radio, and on-demand services.  For example, some programmed radio providers also offer customizable radio products, such as iHeartMedia's "Create Station" in its iHeartMedia product.  Many on-demand services also offer customizable radio products, such as Spotify Radio.

### C. Pandora

Pandora is the largest internet radio service now operating in the United States.  Launched in 2005, today it has approximately 200 million registered users worldwide and supplies approximately 70% of the streaming music market in the United States.  It is the largest single licensee of BMI music.

- 9 -

### 1. **The Music Genome Project**

Pandora has built its business on its proprietary Music Genome Project ("MGP"), which analyzes and records the characteristics of each song in its database. Trained music analysts, most with degrees in music composition or music theory, listen to the compositions selected for inclusion in the database and classify the composition according to as many as 450 characteristics. For example, pop and rock songs typically have between 150 and 200 musical traits according to MGP analysis, whereas classical songs have between 300 and 400 characteristics. Pandora keeps track of which songs share similar traits, and its algorithms use those characteristics to join similar songs in a program for its radio stations that the particular listener is predicted to be likely to enjoy.

Pandora has a catalog of approximately 2,000,000 songs, which is considerably less than those of on-demand services, who must be able to play virtually any composition a customer may select. For example, Spotify has a catalog of about twenty million songs.

A Pandora user can create her personalized station by selecting a song, artist, genre or composer, which serves as that station's "seed." The station then plays music tailored to that seed. Users can continuously add variety to their stations by inputting additional "seed" songs or artists.

Each Pandora user can create up to 100 personalized stations, and can also listen to 690 pre-programmed "genre stations" such as "Today's Country" and "Today's Hip Hop and Pop Hits."

Once a Pandora listener has created a station, the listener can influence its content by rating "thumbs up" or "thumbs down" on its songs.  If a listener gives a song a thumbs-up, it will be played with greater frequency, and if a listener gives a song a thumbs-down, it will not be played again on that station.  Pandora will also customize the next song heard based on thumbs-up and thumbs-down feedback – if a listener gives a song a thumbs-up, the MGP will locate other compositions that the listener is likely to enjoy, and if a listener gives a song a thumbs-down, songs sharing its characteristics will be played less frequently on that station.

Clicking "thumbs down," "skip," or "I'm tired of this track" will cause a song to be skipped.  This means that the song will immediately stop playing and the station will start a new one.  Users may skip a certain number of songs per day and can also pause a song at any time.

## 2. Pandora's Business and Revenue

Pandora delivers music content to its audience in two ways: (i) a free service which derives its revenue from the sale of display, audio and visual advertising; and (ii) Pandora One, a subscription service which charges a fee for users' access to Pandora's music without advertising.  Pandora's free service

accounts for approximately 80% of its revenue, while the remaining 20% is derived from Pandora One.

Pandora's revenue has grown exponentially since its inception a decade ago.  For fiscal year 2009, Pandora reported revenue of approximately $19 million; by fiscal year 2014, its revenue had risen to over $600 million.  Nevertheless, at present, Pandora has not demonstrated sustained profitability.

Pandora's payments of licensing fees for the use of music consume a large portion of its revenue.  For the 2013 fiscal year, Pandora's music acquisition cost it over 60% of its revenue.  A substantial portion of those expenses were payments for licenses of sound recordings (discussed below).

Pandora identifies terrestrial radio broadcasting stations as its chief competitors for listeners and advertising dollars. In its 2014 10-K, Pandora identified as its direct competitors both terrestrial broadcast stations and internet radio providers, including iHeartRadio, LastFM, and Songza.  In its 10-K and in internal company documents, Pandora also identified on-demand services such as Spotify and Slacker as direct competitors.

While Pandora considers terrestrial radio to be its principal competitor, it has struggled to monetize its product as effectively as terrestrial broadcasters do.  At present, Pandora is able to sell only 60% of its advertising inventory,

and it is working for improvement. Pandora has hired a large
in-house advertising sales team to compete for the local
advertising dollars that are responsible for most broadcast
radio advertising revenue. Pandora has also invested heavily in
becoming as ubiquitous as terrestrial radio by expanding its
availability on mobile devices, appliances, automobiles and
other consumer products.

Pandora's struggle with monetization means that broadcast
radio stations pay BMI in fees per listener performance
approximately twice what Pandora does, and that Spotify pays BMI
in fees per listener performance approximately eight times as
much as Pandora.

### D. BMI's Licensing History of Pandora

In 1995 BMI first introduced the BMI Web Site Music
Performance Agreement (the "Form Website License"), a generic
license to cover public performances of BMI-affiliated musical
compositions on websites. At that time, website music
performances were not a major portion of those licensees'
businesses.

Under the Form Website License, a website paid either: 1)
1.75% of its gross revenues; or 2) the greater of a) 2.5% of the
website's music-related revenues, or b) the number of music-
related page impressions divided by 1,000, then multiplied by
$0.12.

Pandora first entered into the Form Website License on June 30, 2005, choosing to pay a fee based on 1.75% of its total gross revenue.  From 2005 to 2012, BMI continued to license Pandora under that Form Website License, which renewed itself automatically on a calendar year-to-year basis.

By 2011, BMI had concluded that the 1.75% rate had become inappropriate for the emerging music-intensive streaming services.  BMI created and began offering the Music Service Web Site Music Performance Agreement ("Music Service Website License").  The Music Service Website License was offered to any music service which predominantly derived its revenue from the use of music, and stipulated a rate of 2.5% of gross revenue.

In 2012, BMI replaced the Music Service Website License with the BMI Digital Music Service Music Performance License Agreement (the "Digitial Music Service License").  The Digitial Music Service License also includes a license fee of 2.5% of gross revenue, but added a definition of "Music Service," which includes "transmissions delivered over the Internet [and] mobile and/or wireless networks."  This license became BMI's operative license for online streaming music services, while the Form Website License was offered only to websites whose use of music was only incidental.

On October 24, 2012, after BMI's and Pandora's negotiations on a new type of license failed, Pandora formally notified BMI

- 14 -

of its intention to terminate the Form Website License.   On
December 5, 2012, Pandora applied for a license under the BMI
Consent Decree commencing January 1, 2013.

        In response, by letter dated March 4, 2013 BMI offered
Pandora a license covering the two year period from 2013 through
2014 at a higher rate than what had been paid by Pandora under
its previous license.   After negotiations failed again, on June
13 2013 BMI filed this petition with the Court for the
determination of reasonable license fees.   It seeks the
determination that 2.5% of gross revenues is a reasonable rate.

## E. Publisher Withdrawals

        During BMI's negotiations with Pandora, the music licensing
industry was undergoing an unprecedented transformation.

        BMI and its chief competitor ASCAP have historically
licensed the public performance right on a non-exclusive basis
on behalf of music publishers who own or administer the
copyright in a musical composition.   While the publishers
retained the right to engage in direct licensing of the
performers, they exercised this right infrequently.

        In recent years, many major publishers have expressed
dissatisfaction with the PRO fee system, asserting particularly
that the performing rights fees that Pandora paid to BMI and
ASCAP did not reflect the fair-market value of their copyrights.
That perception has been reinforced by the disparity between the

high fees digital performing services pay to record companies
for sound recording rights, and the significantly lower fees
they pay to the PROs (and hence to the copyright holder, authors
and composers) for public performance rights.

While the right of public performance in a composition is
the right to use the underlying musical composition itself, the
right to the public performance of a sound recording is the
right to play one recording of a performance of a song.

In 1995, Congress passed the Digital Performance in Sound
Recordings Act ("DPSRA"), which for the first time provided a
public performance copyright in sound recordings.  See 17 U.S.C.
§§ 106, 114 ("Section 114").  Under that Act, the Copyright
Royalty Board designates SoundExchange as a non-profit
organization to collect and distribute royalties for the
performance of sound recordings to the copyright holders.  Only
digital services are required to pay royalties for performances
of sound recordings.  17 U.S.C. § 106(6); United States v. Am.
Soc'y of Composers, Authors & Publishers (In re Petition of
Pandora Media, Inc.), 6 F. Supp. 3d 317, 345 (S.D.N.Y. 2014),
aff'd, May 6, 2015 (2d Cir. 2015).

In brief, sound recording fees are calculated using a penny
per-performance rate rather than a percentage-of-revenue fee,
and it yields a fee that is twelve to thirteen times higher than
the percentage-of-revenue fee Pandora pays to the PROs.

Consequently, while Pandora pays approximately 60% of its revenue to record companies, it pays only approximately 4% to the PROs for the public performance rights to their songs.

Motivated by a desire to license their works at higher rates to digital media entities, between 2011 and 2013 four large music publishers – Sony/ATV Music Publishing ("Sony"), EMI Music Publishing ("EMI")[1], Universal Music Publishing Group ("UMPG"), and BMG Rights Management (US) LLC ("BMG") – took the unprecedented step withdrawing from ASCAP and BMI the right to license their compositions to so-called "New Media Services" such as Pandora.

Sony CEO Marty Bandier stated of the withdrawals:

> By withdrawing certain limited categories of digital performance rights from the societies, we believe that Sony/ATV and EMI will be on a level playing field with prospective licensees.  This will allow both parties to engage in free market negotiations, while taking into account the value of the songs to be licensed.

Exh. BX 740.

UMPG CEO Zach Horowitz echoed:

> With the consent decree constraints that apply to both ASCAP and BMI, in our view it's especially challenging for either society to achieve market rates in negotiations with digital services . . .  In order to ensure that our songwriters are fairly compensated, we believe the best approach is for us to negotiate directly with these services.

Exh. BX 548.

---

[1]"Sony/EMI" refers to the combined catalogs of Sony and EMI; Sony/ATV became the administrator of EMI's catalog in July 2012.

Effective May 1, 2011, EMI became the first publisher to withdraw from ASCAP the right to license certain digital audio transmissions performed by digital music services.  In September 2011, Sony formally notified ASCAP of its intent to withdraw Sony's grant to license digital performances effective April 1, 2012, subsequently extended to December 31, 2012, which led to the Pandora-ASCAP rate litigation.  United States v. Am. Soc'y of Composers, Authors & Publishers (In re Petition of Pandora Media, Inc.), 6 F. Supp. 3d 317, 345 (S.D.N.Y. 2014), aff'd, May 6, 2015 (2d Cir. 2015).

In October 2012, Sony (which had then recently acquired EMI's catalog) became the first publisher to notify BMI of its intent to withdraw BMI's right to license digital ("New Media Services") performances of Sony and EMI works, effective January 1, 2013.

Under this pressure, BMI acquiesced in its affiliate publisher copyright-holders' withdrawals of the rights to digital performance of their musical compositions effective January 1, 2013, and modifications of their affiliation agreements to exclude BMI's right to license those rights to new media services.

As the predominant internet digital performer of their compositions, Pandora was the primary target of those

- 18 -

withdrawals.   While they were in effect, Pandora could no longer
enjoy the right to perform those publishers' compositions at the
1.75% rate afforded by its blanket license with BMI.   To retain
the right to perform them, it had to negotiate directly with the
publishers.

### F. Pandora-Publisher Direct Licenses

Between March 2012 and July 2014, Pandora entered into
seven direct licenses with publishers for the internet digital
performances of musical compositions they had withdrawn from the
ASCAP and BMI repertories.

### 1. "Round One" Agreements

### a. Pandora-EMI License

Soon after learning in May 2011 that EMI had withdrawn its
"new media licensing rights" from ASCAP, Pandora began
negotiating a direct license with EMI.   The key terms of the
license fee were discussed and agreed upon as early as July
2011, although the licensing agreement itself was not executed
until March 2012.   At no point during the negotiations did
Pandora ask EMI for a list of EMI-published works that had been
withdrawn from ASCAP; i.e. the works Pandora would be unable to
perform if it could not agree with EMI.

On March 16, 2012, Pandora entered into a license agreement
with EMI at a rate of 1.85% of Pandora's prorated gross revenue

for its performance of EMI's withdrawn ASCAP works, effective
January 1, 2012.

### b. Pandora-Sony and EMI Licenses

In October 2012, after Sony notified BMI that effective
January 1, 2013 it planned to withdraw the Sony/ATV catalog and
recently acquired EMI catalog, Sony and Pandora immediately
began negotiating a direct license.  Because Pandora had already
negotiated a license for EMI's ASCAP works in March 2012, the
Pandora-EMI license was for its BMI works, while the Pandora-
Sony license was for Sony's ASCAP and BMI works.

The license was negotiated by Peter Brodsky, Sony's
Executive Vice President of Business and Legal Affairs, and
Robert Rosenbloum, Pandora's outside counsel.  They have known
each other for years, have done about fifteen deals together,
and have never started negotiating a deal that they did not
accomplish.  Brodsky 581.

On November 1, 2012 Rosenbloum sought to define the loss of
repertory Pandora would face if unable to agree on rates with
Sony.  He sent an email to Brodsky stating that "given the
uncertainties around Sony/ATV's and EMI's position with respect
to webcasting rates, Pandora has decided that it needs to be
prepared to take down all Sony/ATV and EMI content in the event
we are unable to agree on rates by the end of the year."  Exh.

BX 2389.  He asked for an electronic listing of the Sony/ATV and
EMI catalogs, and a rate proposal from Sony.

Brodsky testified that he believed Sony made an oral
license proposal before a breakfast meeting between Sony and
Pandora on November 30, 2012, at a 5% rate of revenue.  On
December 6, 2012, Brodsky sent Rosenbloum an email asking, "Any
feedback on our proposal," Exh. BX 2394, and followed up with
Rosenbloum on December 13, 2012, writing "It's been awhile.  Do
you have anything to report on this?"  Exh. BX 2395.  Brodsky
testified that he thought he reached a deal with Rosenbloum at
some point in the next few days.  During this time the request
for a list was effectively shelved.  It was "less than a minor
point" in their negotiation.  Brodsky 583.

On the evening of December 17, 2012, Pandora's then-general
counsel, Delida Costin, intervened.  She sent an email to
Brodsky clearly reiterating Pandora's request for a list of
withdrawn works.  Brodsky testified:

> I was pretty surprised that she was writing this note after
> we were on the eve of closing the deal, and at least in my
> mind we had an agreement on a deal for quite some time
> before that.
>
> And so the next morning, the first thing I did was call
> Bobby and I said, Bobby, what's going on with this email.
> This doesn't make any sense to me.  And he said, don't
> worry, you know, we don't need the list, she's just
> covering her ass.

Brodsky 599.

Rosenbloum testified that he did not say or imply to Brodsky that Costin's email was merely precautionary or that Pandora did not need a list; he said he had already requested the list from Sony.  Rosenbloum 2206.

In any event, Sony did not provide a list to Pandora.  On December 18, 2012, Brodsky sent Rosenbloum a draft term sheet for the agreement, and they then exchanged revised term sheets. On December 21, 2012, Pandora and Sony entered into a binding term sheet deal, at 5% of Pandora's gross revenue.  Effective January 1, 2013, Pandora entered into formal license agreements with Sony covering both the Sony/ATV and EMI catalogs, at industry-wide rates of 5% of gross revenue (2.25% of revenue adjusted for BMI's market share for EMI (a "BMI-adjusted rate" for BMI works only) and for Sony (BMI and ASCAP works)).

In her ASCAP-Pandora rate court opinion, Judge Cote questioned Brodsky's credibility about those negotiations:

> Brodsky testified that Sony did not provide Pandora with a list of works because, when he contacted Rosenbloum regarding Ms. Costin's request, Rosenbloum replied that "there was no need for Sony/ATV to provide such a list of works because we were very close to finalizing a deal." Rosenbloum denies ever telling Brodsky any such thing. Brodsky also testified that Rosenbloum did not make oral requests for the list of works in between the November 1 written request and the request during the breakfast meeting on November 30.  While Rosenbloum was entirely credible in his testimony on these issues, Brodsky was not.

United States v. Am. Soc'y of Composers, Authors & Publishers (In re Petition of Pandora Media, Inc.), 6 F. Supp. 3d 317, 345 (S.D.N.Y. 2014), aff'd, May 6, 2015 (2d Cir. 2015).

On his and Mr. Rosenbloum's testimony and the record before me, I do not find Brodsky's credibility impaired.  The two men had a long experience of negotiating with each other, had a good personal relationship, and neither one anticipated (nor was there) any squabble on the subject of the rate.  They were in fact very close to finalizing a deal, although a binding term sheet was not executed until December 21.  I find Brodsky's testimony persuasive.  There is no question he called Rosenbloum the morning after Ms. Costin's email and complained about it.  That would have been inconsistent, disingenuous and inexplicable if the list was an open point of concern between the two, and out of character with their relationship.

### c. Pandora-UMPG License

In February 2013, Pandora learned that UMPG was withdrawing its new media licensing rights from ASCAP effective July 1, 2013.

On March 22, 2013, Pandora's then-CEO, Joseph Kennedy, met with Zach Horowitz, then-chairman and CEO of UMPG, to discuss a direct license between Pandora and UMPG for the withdrawn ASCAP works.  In the ensuing negotiations, UMPG proposed an industry-

wide rate of 8%, which would be pro-rated to reflect UMPG's
share of performances on Pandora.

Pandora requested a list of works affected by withdrawal,
which UMPG provided, subject to a Non-Disclosure Agreement
("NDA"). The NDA stated that UMPG's catalog information could
not be used "for any purpose except to evaluate and engage in
discussions concerning a potential business relationship between
the parties." The parties disagree as to whether the NDA
permitted Pandora to use it to effectuate a take-down.

UMPG and Pandora held another in-person meeting on May 21,
2013. Pandora then placed the negotiations on hold.

On June 11, 2013, Pandora announced its purchase of KXMZ-
FM, a terrestrial radio station in Rapid City, South Dakota. On
the same day, Pandora moved for partial summary judgment in its
rate case against ASCAP, arguing that any purported new media
withdrawals following the ASCAP rules' modification did not
alter the scope of ASCAP's repertory available to Pandora under
its application for an ASCAP license.

In a June 13, 2013 email to UMPG, Chris Harrison, Pandora's
assistant general counsel, apologized for the delay in the
negotiations. Harrison explained that "we expect the ASCAP rate
court to rule on our motion promptly, and we hope, before July
1. We also expect confirmation of our entitlement to the RMLC-

ASCAP license [because of its purchase of KXMZ-FM] before July

1." He continued:

> In the unlikely event we don't have a decision on either of
> these points by July 1, it is our preference to continue to
> perform works in the UMPG catalog.  To help facilitate
> that, we propose accepting UMPG's 7.5% of revenue offer on
> a provisional basis starting July 1, 2013, pending the
> Court's rulings, with the understanding that if the ASCAP
> rate court subsequently rules in Pandora's favor that
> Pandora will immediately thereafter – and on a retroactive
> basis back to July 1, 2013 – license the right to works in
> the UMPG repertory through ASCAP at whatever rate the rate
> court decides.

Exh. BX 283.

On June 19, 2013, Horowitz responded, writing that UMPG was

willing to accept Pandora's approach for a six-month period.

Pandora and UMPG entered into a license effective July 1, 2013

at an industry-wide rate of 7.5% of gross revenue, or 3.38% at a

BMI-adjusted rate, for a term of six months.

### 2. "Round Two" Agreements

On September 17, 2013 Judge Cote in the Pandora v. ASCAP

case granted Pandora's motion for partial summary judgment,

holding that the publishers' partial withdrawals were not

permitted under the ASCAP consent decree.

In my December 18, 2013 Opinion and Order I reached a

similar conclusion in this case, holding that the BMI Consent

Decree requires BMI to offer all applicants a license to perform

all of the compositions in its repertory.  When music publisher

copyright holders exercise their right to withdraw their digital

rights and revoke BMI's authority to license those compositions to Pandora and other new media services, those compositions no longer qualify for inclusion in BMI's repertory and BMI can no longer license them to Pandora or any other applicant.  Thus, the publisher loses the whole list of BMI licensees for that composition.

On November 5, 2013, Pandora's outside counsel Steinthal emailed substantially identical communications to the outside counsel of Sony/EMI and UMPG (the "Steinthal Nov. 5 email"). The one to Sony/EMI stated:

> . . . Pandora requests that EMI and SATV, as soon as possible, provide information to Pandora identifying the Works that EMI and SATV have withdrawn from BMI's licensing authority, including the identity of any co-owners of said works and the percentage shares of ownership of said co-owners, so that Pandora can consider removing such works from its service if the parties are unable to agree on direct license terms (should direct licensing be required as discussed above).

Exh. BX 262.

Pandora's assistant counsel Harrison sent an email with identical language to BMG management on November 4, 2013 (the "Harrison Nov. 4 email").

### a. Pandora-Sony and EMI Licenses

The Sony and EMI licenses with Pandora were set to expire on December 31, 2013.

On November 8, 2013, Zakarin, Sony's outside counsel, responded to Steinthal, proposing two options to Pandora: (i)

negotiate and enter into another one year direct license; or (ii) negotiate and enter into a direct license or "or other arrangement" commencing on January 1, 2014 and expiring upon final determination of the question whether the publishers could exclude Pandora and new media from works available through BMI.

Pandora's assistant general counsel Harrison emailed Sony's executive vice-president Brodsky on November 11, 2013, asking to discuss these two proposals.  On November 19, 2013, Harrison emailed Brodsky and asked him to provide a "list of withdrawn works as soon as possible[.]"  Exh. PX 913.  On November 22, 2013, Brodsky replied to Harrison and assured him that Sony was working on the lists, stating, "[W]e will provide you with the lists in more than enough time for Pandora to remove the SATV and EMI compositions from the Pandora service when our license expires on December 31st."  Id.

On November 26, 2013, Brodsky sent Harrison a link to a web site containing two lists of Sony/ATV and EMI withdrawn works. Harrison was unable to access the site, and so Sony sent Pandora the lists on December 2, 2013.  In a December 4, 2013 email to Brodsky, Harrison confirmed that Pandora had received the repertory information.

On December 9, 2013, Pandora offered Sony a quarterly, flat fee of $500,000 for the right to perform Sony/ATV and EMI music on Pandora.  Sony rejected Pandora's offer on December 12, 2013

- 27 -

and counter-offered a "Covenant Not to Sue Agreement" with the following terms: (i) the agreement would cover four consecutive quarterly periods, commencing on January 1, 2014; (ii) the agreement would call for the payment by Pandora of $2.25 million to Sony for the first and second quarters of 2014; and (iii) the fees for the third and fourth quarters of 2014 would be adjusted, on a pro rata basis, to reflect increases in Pandora's revenue for the most recent quarter, with a floor fee of $2.25 million each quarter. The agreement was terminable at Pandora's option before each of the last three quarters of the agreement.

On December 19, 2013, Brodsky sent Harrison a draft agreement (styled as a "Covenant Not to Sue") reflecting the terms of this counter-proposal. Brodsky confirmed that as of January 1, 2014, Sony and EMI's catalogs would be withdrawn from BMI's repertory.

On December 24, 2013, Steinthal emailed BMI and its outside counsel a request that "BMI immediately provide Pandora with the electronic Repertoire File for each of the withdrawing publishers." Exh. BX 303. BMI's outside counsel Atara Miller responded on December 26, 2013, writing that BMI believed Pandora's request was most appropriately directed to the publishers. On December 27, 2013, Steinthal asked Sony to provide the information requested in his December 24 email or to direct BMI to furnish that information.

Harrison sent an internal email with the subject line "Publisher Update" to Pandora management on December 26, 2013. In this email, Harrison stated that he, Costin, and Pandora's Chief Financial Officer Mike Herring recommended that Pandora accept Sony's proposal and execute an agreement for the first quarter at $2.25 million.

On December 30, 2013, Harrison sent Brodsky an executed copy of the agreement, with no changes from Brodsky's December 19 proposal except the addition of Pandora's address for notice. The figures in the agreement for the Sony and EMI catalogs amount to a BMI-adjusted rate of 5.85% for the 2014 calendar year.

### b. Pandora-UMPG License

UMPG's license with Pandora was scheduled to expire, and UMPG was set to withdraw from BMI, effective January 1, 2013.

Glenn Pomerantz, UMPG's outside counsel, responded promptly to the Steinthal Nov. 5 email, saying that UMPG was willing to negotiate a direct license and was willing to provide a list of its BMI compositions if Pandora would sign a Non-Disclosure Agreement.  Pomerantz assured Steinthal that the NDA expressly allowed Pandora to use the list to take down UMPG's BMI works in the event the parties failed to reach an agreement.  David Kokakis, UMPG Senior Vice President, Head of Business & Legal

Affairs/Business Development, sent Steinthal the NDA on November
12, 2013.

On November 20, 2013, Kokakis emailed Harrison and proposed
a UMPG-Pandora license with the following rates and terms: (i)
7.5% of Pandora's UMPG-Adjusted Revenue base for 2015; (ii) 8.5%
of UMPG's Adjusted Revenue base for 2015; (iii) a Most Favored
Nation clause that could increase to 15% the rate of UMPG's
Adjusted Revenue base if specified thresholds related to sound
recording fees were met or exceeded; and (iv) that the license
would not be contingent on the outcome of any rate court
proceeding.

On November 22, 2013, Harrison emailed Kokakis to say that
Pandora would review and respond to UMPG's proposal, and asked
when UMPG could provide a list of the catalog information for
its BMI repertory. Kokakis responded later that afternoon. He
informed Harrison that UMPG had a "catalog list ready to go,"
but had been waiting for Pandora to sign the NDA. Exh. BX 263.
Pandora returned the signed NDA to UMPG on November 25, 2013.
On November 27, 2013, Kokakis sent Harrison a list of UMPG
works.

On December 4, 2013, Harrison wrote to Kokakis that Pandora
was still evaluating the "repertoire information provided and
the economics" of UMPG's November 20, 2013 license proposal.
Exh. BX 294. Five days later, on December 9, 2013, Pandora

rejected UMPG's proposal.  Harrison stated in an email to
Kokakis that "we intend to use the repertoire information UMPG
provided to take down the relevant songs by the end of the
calendar year."  Id.  Harrison proposed that UMPG and Pandora
enter into a 90 day agreement whereby if UMPG agreed not to
bring an infringement action Pandora would pay UMPG $200,000,
reasoning that this would provide Pandora time to identify and
remove the relevant songs.

Kokakis responded on December 18, 2013 and rejected this
request, writing, "We are disappointed that Pandora has chosen
not to engage in any negotiations with respect to our license
proposal and instead has decided to shut down all discussions
rather than seek an amicable solution."  Exh. BX 266.

Steinthal asked BMI to provide a "repertoire file" of UMPG's
withdrawn works in an email dated December 24, 2013.  When BMI
rejected this request, Steinthal forwarded it to UMPG on
December 27, 2013.  UMPG declined to provide a "repertoire
file," stating that it had already provided Pandora with a
catalog list.

On December 26, 2013, Harrison wrote to Kokakis to revive
UMPG's licensing proposal.  According to Harrison, the revised
proposal included the following provisions: (i) a one year term,
with a second year at UMPG's option; (ii) a $5 million
guaranteed minimum fee in years one and two, with "true ups" in

both years if Pandora's 2014 and 2015 gross revenue exceeded specific parameters; and (iii) a Most Favored Nation clause in respect of both PROs and publishers. Kokakis agreed with the general terms outlined, but clarified that the revenue true-ups were based on actual gross revenue for 2014 and the MFN provision accounted for the value of all consideration in a relevant PRO or publisher deal.

Later that day, Harrison sent the internal "Publisher Update" to Pandora senior executives. Harrison wrote that he, Costin, and Herring recommended executing a "Headline rate of 8.5% (industry-wide) with an effective rate of 4.25% for just UMPG's BMI repertoire." In a subsequent email dated December 27, 2013, Harrison elaborated:

> I don't see 8.5% as setting the rate Pandora is willing to pay to any publisher. Rather, it is a rate we are willing to pay for a major publisher. We would not be willing to pay 8.5% for smaller publishers (as evidenced by our refusal to do a deal with the smaller BMG for 10%).

Exh. BX 256.

On December 29, 2013, Harrison informed Kokakis that he had "a green light from Exec Mgt to move forward." Exh. PX 987. On December 30, 2013, Pandora entered into a license agreement with UMPG for the 2014 calendar year, at an industry-wide rate of 8.5% of gross revenue for withdrawn BMI music, at a BMI-adjusted rate of 3.83%.

- 32 -

### c. Pandora-BMG License

While negotiating with Sony and UMPG, Pandora was also exchanging licensing proposals with BMG.

Keith Hauprich, BMG's Vice President of Business and Legal Affairs, responded to the Harrison Nov. 4 email, stating that BMG was interested in securing a direct license at a 10% of revenue rate, and if BMG and Pandora were unable to come to terms, Pandora should remove BMG content from its service. BMG sent its complete repertory information to Pandora on December 12, 2013.

In his December 26, 2013 "Publisher Update" internal email, Harrison recommended to Pandora executives that Pandora "reject BMG's proposal of 10% of revenue and take down BMG content." Harrison stated, "At this stage I don't think BMG is 'worth' anything more than what we are currently paying BMI, so I wouldn't want to offer them more than 1.75%." Exh. BX 256.

Pandora's executives debated whether they should make a counter-offer at a lower percentage, but Pandora ultimately rejected BMG's offer. Pandora decided to remove BMI works wholly controlled by BMG (i.e., not also licensed to BMI by others) from its service.

On December 27, 2013, Eric Bieschke, Pandora's Chief Scientist, replied to the "Publisher Update" email and stated that spins solely by BMG were responsible for only 1% of all

spins on Pandora (and thus dispensable) while a loss of both BMG

and UMPG would be substantial.  Bieschke wrote:

> Removing BMG only spins will have a small impact on
> listening.  Unless they own the entire catalog by a well
> known artist on just the BMI half, which we have not seen
> so far, the impact on listening will be negligible.

> If however we remove both UMPG and BMG we're looking at an
> identified 12% of listening and another unidentified 6%.
> That's 18% of listening, half of which is BMI, or 9% of
> current listening.  I'd expect to see a 1% to 3% drop in
> total listening hours within 28 days if we go that route.

Exh. BX 300.

In order to effectuate the BMG take-down, Pandora used the

catalog list provided by BMG to a limited extent, and also

relied on third party services such as LyricFind and the ASCAP

and BMI online repertory databases.  The take-down was begun on

December 30, 2013 and completed later that day.

BMG withdrew from BMI on January 1, 2014.  Three months

later, on March 31, 2014, BMG and BMI entered into an agreement

effective January 1, 2014 suspending BMG's withdrawal from BMI

until December 31, 2014.

On March 20, 2014, Pandora and BMG held an in-person

meeting at BMG's offices to initiate discussions for a new

license.  The parties continued negotiations following BMG's re-

affiliation with BMI.

On July 16, 2014, Laurent Hubert, President of BMG North

America, sent an email summary of a Pandora and BMG call to Mike

Herring, Pandora's CFO, Simon Fleming-Wood, Chief Marketing
Officer, Harrison, and copied Steinthal.  Hubert suggested a
list of action points, including

- Pandora and BMG to discuss ways to increase spins on
  BMG artists

Exh. BX 359.

Two weeks later, on July 28, 2014, Pandora entered into a
two-year flat fee agreement with BMG, which set fees at: (i)
$1.15 million, payable on or before July 2014; (ii) $1.15
million, payable on or before January 5, 2015; (iii) $1.9
million, payable on or before July 15, 2015; and (iv) $1.9
million, payable on or before January 15, 2016.  These amount to
an implied equivalent headline rate of 1.81% of Pandora's gross
revenue.

## G. Suspension Agreements

In early 2014, Sony, EMI, UMPG, and BMG entered into
"suspension agreements" with BMI which suspended the withdrawal
of their new media licensing rights for a finite amount of time.

On January 31, 2014, UMPG and BMI suspended UMPG's
withdrawal from BMI until December 31, 2014, later extended
through December 31, 2015.

On February 7, 2014, Sony and BMI suspended Sony and EMI's
withdrawal from BMI until December 31, 2014, effective February
7, 2014.

As discussed above, on March 31, 2014, BMG and BMI suspended BMG's withdrawal from BMI until December 31, 2014, effective January 1, 2014.

### H. BMI's Licenses with Pandora's Competitors

Between 2010 and 2013, BMI entered into licenses with Spotify, Rdio, Rhapsody, and Apple iTunes Radio, at rates ranging from 2.5% to 4.6%.

The BMI-Apple iTunes Radio license was signed in 2013 and is set at 2.53% of revenue through 2014 and 2.76% of revenue through 2015. The license includes a Most Favored Nation clause which was triggered when Apple and the publishers entered into direct licensing agreements at an industry-wide rate of 10% of revenue. Apple agreed to pay BMI the same rate, which is equivalent to a BMI-adjusted rate of 4.6% of revenue. The BMI-Spotify license was signed in 2011 with a fee equal to the greater of either 2.5% of revenue or 6.25% of label costs. The BMI-Rdio license was entered into in 2010 and has a stipulated rate of 2.5% of revenue. The Rhapsody-BMI license was entered into in November 2012 and reflects an early approach that differentiates rates based on user interactivity, which Dr. Pierre Cremieux, BMI's economic expert, calculated yielded a net blended rate based on Rhapsody's on-demand and non-interactive services of 2.48%.

These four services compete with Pandora but do not have identical business models, as will be discussed further below.

## DISCUSSION

The evidence presented at trial shows that BMI's proposed license fee of 2.5% of Pandora's gross revenue is reasonable, and indeed at the low end of the range of fees of recent licenses.  The direct licenses between Pandora and Sony and UMPG for the 2014 calendar year are the best benchmarks because they are the most recent indices of competitive market rates.

### A. Recent Understanding in the Music Industry

While it is the analysis of benchmarks and their application which is decisive, one must also be aware of conditions in the music industry at the time of the particular transactions.

There is an unambiguous body of evidence that the prevailing BMI and ASCAP rates were believed to be too low.  The publishers made their unprecedented withdrawals from the PROs because of their convictions that what those PROs were obtaining was well below what could be obtained through free market negotiations.

Pandora obviously shared that belief, for it went to substantial expense and resource in its attempts to remain under the old established BMI rate rather than face the copyright-holding publishers (with their statutory monopolies) in direct

- 37 -

negotiations.  In June 2013, Pandora purchased a radio station
in hopes of becoming a terrestrial broadcaster entitled to the
1.7% RMLC rate.  After the Court's December 18, 2013 Opinion
described above, Pandora sought a holding that the Opinion did
not affect presently-existing interim licenses, for which
Pandora claimed its application for a license qualified it.  See
its applications to the Court dated December 19, 2013 (Dkt. No.
75) and December 20, 2013 (Dkt. No. 81).

An internal Pandora "Publisher Update" email chain in late
December 2013 regarding new UMPG and BMG licenses is so
revelatory of its executives' contemporary appreciation of free-
market rates that it merits complete quotation (in chronological
order, for ease of reading, rather than the original inverted
"email chain" form).

        --------------------------------------------------------
        **From:** Chris Harrison
        **Sent:** Thursday, December 26, 2013 8:50 PM
        **To:** Brian McAndrews; Mike Herring; Delida Costin; Simon
        Fleming-Wood; Tom Conrad; Tim Westergren; Joe Kennedy; Eric
        Bieschke; Will Valentine
        **Subject:** Publisher Update

        All,

        Based on some additional data points unearthed today, Mike,
        Delida, and I are comfortable with the following strategy.

        BMI indicated today that SATV/EMI, UMPG and BMG are all
        withdrawn effective 1/1/14.  I take this list with a rather
        large grain of salt, but it is the best information we
        have.  Based on 3 publishers withdrawing (rather than the 2
        we were discussing this morning), our recommendation is as
        follows:

                              - 38 -

1. Execute the 90-day agreement with SATV/EMI at
   $2.25mm.
2. Execute an agreement with UMPG with the following
   terms:
   a. 1 year term, with 1 year extension at UMPG's
      option; I ASSUME THEY ARE INSISTING ON THIS?
   b. Headline rate of 8.5% (industry-wide), with an
      effective rate of 4.25% for just UMPG's BMI
      repertoire;
   c. $5mm floor in Year 1, with a 'true up' if
      Pandora does more than $950mm in revenue next
      year
   d. $5mm floor in Year 2, with a 'true up' to bring
      that number to represent 15% (UMPG spins) of
      50% (BMI catalog) of 4.25% (half of 8.5); and
   e. MFN against other publishers, based on UMPG's
      share of Pandora's spins (e.g., adjust the 8.5%
      headline to reflect it covers 15% of Pandora
      spins, so a headline rate of 15% would not
      trigger the MFN if it was for 30% of Pandora
      spins).  I WANT TO UNDERSTAND THIS BETTER.
3. Reject BMG's proposal of 10% of revenue and take
   down BMG content.

Our rationale is (a) the incremental royalty spend for UMPG
would be approximately $3.375mm for next year, which is
less than the legal expenses would be from the inevitable
law suit, and (b) taking down BMG (i) will have less impact
on the service while (ii) still demonstrating our ability
to take down the catalog of a significant publisher with a
seat on the ASCAP board.

UMPG Deal Points
I had several conversations with UMPG today.  UMPG is not
interested in a covenant not to sue.  UMPG is also not
moving off the $5mm guarantee.  Zach thinks (a) we will do
more than $900mm in revenue next year (fyi – Zach claims
some analysts have us doing $1.5b next year) and (b) UMPG
is more than 15% of our spins (fyi – Zach thinks UMPG's
market share is closer to 22%).  The upshot is that Zach
sees the $5mm floor as a significant 'give.'  That said,
Zach did drop his idea that we tie our rates to our sound
recording royalties, which was a key component of his
initial offer.

BMG Info

BMG started in 2008 as a joint venture between Bertelsmann
and KKR.  It is now the 5th largest publisher in the world,
behind EMI, SATV, UMPG and Warner Chappell.  BMG has grown
through acquisition, having acquired well-known independent
publishers such as Cherry Lane, Stage Three, Evergreen,
Chrysalis, and Bug.  Laurent Hubert, Pres. BMG North
America, sits on the ASCAP board.

I'm happy to jump on a call tomorrow and discuss.
Otherwise, I'd suggest Eric and his team focus on BMG,
which is a much smaller catalog than UMPG, and be prepared
to take down BMG content on 1/1.

Thanks,

csh

------------------------------------------------------------
**From:** Brian McAndrews
**Sent:** Friday, December 27, 2013 5:04 AM
**To:** Chris Harrison; Mike Herring; Delida Costin; Joe
Kennedy
**Subject:** RE: Publisher Update

Chris and Mike,

A few questions please.

Basically I'm a bit confused on the rate we're paying.  Are
we saying that we are paying a rate assuming that we are
paying a rate assuming that we are spinning UMPG 15% of our
spins and then that half of those are BMI and – without our
knowing what is actually BMI – we then are saying that
translates to an effective 8.5% rate on everything or 4.25%
on BMI?

If I have this right, how can we know that 50% of the UMPG
spins are BMI (which seems to be implied by the math)?  And
if we can't know that, how can we be sure we aren't paying
significantly more than we think?
Does this mean we can actually play them far more than 15%
if we want?

And Mike, you are implicitly saying there that you think
that 8.5% is effectively a rate that we should feel
comfortable jumping up to at this point in time?  Or is
that not the way to think about this?  Yesterday we were

talking about 5% or 6%.  Would like to understand your
thinking here.

And with BMI, I assume we countered their offer of 10%.
What was our counter?

Thanks,

Brian

----------------------------------------------------------
**From:** Chris Harrison
**Sent:** Friday, December 27, 2013 6:57 AM
**To:** Brian McAndrews; Mike Herring; Delida Costin; Joe
Kennedy
**Subject:** RE: Publisher Update

Brian,

You are correct, we are assuming that UMPG's entire catalog
is split evenly between ASCAP and BMI and that the 8.5%
'industry-wide' rate translates to an effective rate of
4.25% for UMPG's BMI-only catalog.  This is, in my
experience, a reasonable assumption.  ASCAP and BMI have
roughly the same overall market share.  Also, while some
small publishers (like ABKCO) do skew towards 1 PRO, I've
never seen a publisher of UMPG's size that skews materially
towards 1 PRO.

We are assuming that UMPG is actually more than 15% of our
spins, which again is a reasonably assumption since we know
UMPG is closer to 18% of our ASCAP spins.  By setting the
'floor' as if UMPG is only 15%, it will allow us to reduce
our spins of UMPG down towards the floor and reduce our
exposure to the higher royalty rate.  We spin UMPG right up
to $5mm in royalty payments and then stop playing UMPG
altogether.  Said another way, but for the higher royalty
rate UMPG is charging, we would have played much more UMPG
content.  In response to the higher rate, we choose to play
less UMPG.

I don't see 8.5% as setting the rate Pandora is willing to
pay to any publisher.  Rather it is a rate we are willing
to pay for a major publisher.  We would not be willing to
pay 8.5% for smaller publishers (as evidenced by our
refusal to do a deal with the smaller BMG for 10%).  During
the upcoming year, we approach smaller publishers and

indicate we will only play their repertoire if they agree
to a lower rate.  This was my experience at DMX, where BMI
was seeking to charge a royalty of $36 and I executed
direct licenses with 850+ publishers at an effective rate
of $12.50, ultimately getting Judge Stanton to set the BMI
blanket license rate at $19.

BMG initially sought the greater of 10.5% of revenue or 22%
of what we pay for sound recordings.  We rejected that
offer.  BMG then sought 10% of revenue (effectively 5% for
BMI).  We countered with the BMI rate (1.75%).  Based on
the size of BMG, we didn't feel it necessary to go above
the rate we were currently paying BMI.

Thanks,

csh

------------------------------------------------------------
**From:** Mike Herring
**Sent:** Friday, December 27, 2013 10:53 AM
**To:** Chris Harrison; Brian McAndrews; Delida Costin; Joe
Kennedy
**Subject:** RE: Publisher Update

Chris-

What is the deal we have offered to BMG?  Before we walk
away let's make sure we put a deal on the table - 6% with a
floor, one year, with 2 renewals at our option.  I want to
make sure we can say to the songwriters:

"We put an offer on the table to increase our royalty
voluntarily 300% and guarantee a minimum royalty rate
higher than what we will pay in 2013 and BMG chose to
withdraw their works from Pandora."

Mike

------------------------------------------------------------
On Dec 27, 2013, at 12:28 PM, "Delida Costin"
<dcostin@pandora.com> wrote:

Mike - just to play this out.

If they accept those terms, do we propose that we accept
that deal?

- 42 -

Delida

------------------------------------------------------------
**From:** Mike Herring
**Sent:** Friday, December 27, 2013 11:44 AM
**To:** Delida Costin
**Cc:** Mike Herring; Chris Harrison; Brian McAndrews; Joe Kennedy
**Subject:** Re: Publisher Update

I would vote yes.  We could go lower [to] 4 or 5%, but I would vote yes on 6.

------------------------------------------------------------
On Dec 27, 2013, at 12:47 PM, "Brian McAndrews" <bmcandrews@pandora.com> wrote:

That deal makes me a little nervous to do now when we don't have to.  My sense - Chris? - is the BMG is being pretty unreasonable.  Given that, do we go back at a lower percentage (4%) - something that is clearly better than today, something we could live with and feel pretty good about and make it either a two year deal or a one year deal with a second year at OUR option?

Downside risk to offering something is they accept and then they don't withdraw and we are paying them more when we didn't have to (vs. UMPG where we are a lot more comfortable taking that risk) AND we don't get a chance to learn anything from actually taking someone down.

My gut is we should play out Joe's strategy more with BMG unless they make us an offer we can't refuse?

Best,

Brian

------------------------------------------------------------
**From:** Mike Herring
**Sent:** Friday, December 27, 2013 11:52 AM
**To:** Brian McAndrews
**Cc:** Mike Herring; Delida Costin; Chris Harrison; Joe Kennedy
**Subject:** Re: Publisher Update

I think that is a good strategy.  4% is still 2x the
current rate and they are likely to decline it.

---------------------------------------------------------
On Dec 27, 2013, at 12:53 PM, "Chris Harrison,"
<charrison@pandora.com> wrote:

I agree.  BMG is asking for a 500% increase.  We should be
comfortable speaking publicly about refusing to pay 5x
more.

---------------------------------------------------------
**From:** Mike Herring
**Sent:** Friday, December 27, 2013 12:00 PM
**To:** Chris Harrison
**Cc:** Mike Herring; Brian McAndrews; Delida Costin; Joe
Kennedy
**Subject:** Re: Publisher Update

Yes, but I also want to say they walked away from a
generous and realistic offer.

---------------------------------------------------------
**From:** Chris Harrison
**Sent:** Friday, December 27, 2013 12:04 PM
**To:** Mike Herring
**Cc:** Brian McAndrews; Delida Costin; Joe Kennedy
**Subject:** RE: Publisher Update

I hear what you're saying.  At this stage I don't think BMG
is "worth" anything more than what we are currently paying
BMI, so I wouldn't want to offer them more than 1.75%.

csh

---------------------------------------------------------
**From:** Brian McAndrews
**Sent:** Friday, December 27, 2013 2:36 PM
**To:** Chris Harrison; Mike Herring
**Cc:** Delida Costin
**Subject:** RE: Publisher Update

I guess given our lack of consensus on this one, Mike, if
okay with you, I would suggest we punt it until after
1/1/14.  We can always make a better offer at that point if
we choose to.  It leaves open the possibility that they
will not withdraw and we'll stay at 1.75%.  And, if not, I

    don't think it's unreasonable to think we will have more
    leverage then than we do now to actually get something
    done.

    Best,

    Brian.
    -----------------------------------------------------------

Exh. BX 256.

    Once the rate negotiations were freed from the overhanging

control of the rate courts, the free-market licenses reflect

sharply increased rates.  The Sony and EMI licenses with Pandora

executed in December 2012 were at a BMI-adjusted rate of 2.25%,

while those licenses were up to 5.85% in December 2013.  The

UMPG license were executed at a 3.38% rate in June 2013 and at a

3.83% rate in December 2013.

### B. RMLC Radio Broadcasting Stations' Rate as Benchmark

    A fundamental assertion by Pandora is that it is comparable,

and should receive treatment similar to, that afforded thousands

of broadcast radio stations who are represented by the Radio Music

License Committee and pay a rate of 1.7 percent.  Kennedy testified

at trial that a 2.5% rate is unreasonable because "our competitors

are paying a lower rate . . . All of the RMLC.  And of the other

internet radio companies that agree to be publicly tracked . . .

16 of the other 19 players fall under the RMLC agreement.  And so

it seems unfair or unreasonable for us to pay a higher rate."

Kennedy 1076.

- 45 -

Pandora asserts that it directly competes with radio broadcasting stations for listeners and advertising revenue. Its listeners cannot choose to listen to individual songs, unlike an on-demand service, but get what is playing on the broadcast or Pandora station they select.

Nevertheless, Pandora differs from broadcast radio in significant ways. Unlike a traditional AM/FM radio station, Pandora offers users the ability to offer detailed responsive feedback and customize the music they hear. Unlike a broadcast radio station's bundled product, which includes weather and traffic reports, advertisements and local and world news as well as music (including disc jockey chatter), Pandora offers virtually uninterrupted music streaming. While the average terrestrial radio station plays approximately eleven songs per hour, Pandora plays approximately fifteen songs per hour.

Nor is Pandora directly comparable to "on-demand" services such as Spotify, because Pandora listeners cannot select specific songs. Pandora's catalog (about 2 million compositions) is considerably smaller than an on-demand service, whose repertory (Spotify's is 20 million) must offer the listener the ability to hear the music that she wants at that time.

On the spectrum extending from terrestrial broadcast radio to streaming on-demand music services, Pandora evades neat categorization. It has aspects of both traditional radio and on-

demand services, but differs in its ability for users to create
and modify individualized stations but not to select the playing
of exact songs.  As Pandora stated in its 2014 10-K report:

> We compete with many forms of media for the time and attention
> of our listeners, such as Facebook, Twitter, Netflix,
> Pinterest and Instagram.  Our direct competitors, however,
> include iHeartRadio, iTunes Radio, LastFM, Google, Songza and
> other companies in the traditional broadcast and internet
> radio market.  We also compete directly with the non-
> interactive, Internet radio offerings such as Spotify and
> Slacker.

Exh. BX 2441.

The fact (not unusual when traditional business models are
evolving and shifting) is that Pandora cannot be accurately
characterized as in any specific category for which rates have
been established.  It has aspects of several, but is not confined
to any one in particular.  As its then-CEO Kennedy stated in an
internal email on December 16, 2011, expressing his doubt that
consumers would say Pandora was radio, "we're just Pandora."  Exh.
BX 115.

The terms of the RMLC licenses cover the over-the-air
broadcasts, digital simultaneous broadcasts, and customized
radio products of over 10,000 terrestrial broadcast radio
stations.  As described above, with the advent of the internet,
many of the RMLC members now simultaneously broadcast on the
internet their programming for their terrestrial stations, but
their fare is diversified, not streaming music.  Pandora

specifically points to the customized radio feature of
iHeartRadio, an online music streaming service operated by one
RMLC member, iHeartMedia, which is included in the RMLC rate, as
evidence that its license is a benchmark for Pandora.  But the
analogy fails: iHeartMedia is the licensee, and operates
hundreds of terrestrial radio stations in addition to its
iHeartRadio service.  Further, when the RMLC license agreement
was negotiated in 2012, the internet portion of iHeartRadio
represented a miniscule part of iHeartMedia's overall music use.

Pandora is not similarly situated to any RMLC licensee,
including iHeartMedia.  The rate for the ten thousand
terrestrial broadcasting members of the RMLC is not a useful
benchmark for Pandora.

### C. BMI's Primary Benchmarks Support a 2.5% Rate

Pandora made much of the absence of the list of Sony and
EMI works to be withdrawn in December 2012 and the list provided
by Universal in June 2013 that was subject to an NDA, arguing
that it faced crippling copyright infringement liability because
it did not know what works to remove.  Pandora contends that it
had no alternative but to enter into direct licenses with Sony
and UMPG, and the rates reached in those agreements should be
disqualified as benchmarks.

That argument caught the attention of Judge Cote, who used
it to conclude that the 2012 Pandora-Sony and 2013 Pandora-UMPG

agreements were not useful benchmarks.  However, the record in

this case is far more extensive than what Judge Cote had before

her.  Pandora entered into subsequent agreements with Sony and

UMPG, and a considerable portion of this trial was devoted to

testimony regarding the significance of the lists.  The record

in this case includes transactions in later years than those in

the ASCAP case, and allows the argument that BMI's benchmarks

were distorted by the specter of massive copyright infringement

(due to ignorance of which works to take down) to be appraised

over a longer time period with more transactions.  In light of

the full record in this case, it appears that the list argument

was primarily generated by lawyers, beginning with Delida

Costin's email in the December 2012 Sony negotiations, and was

repeatedly articulated by Pandora's lawyers rather than by its

businessmen.  In the "Publisher Update" internal email chain in

late December 2013, Pandora's executives never mentioned

avoidance of copyright liability as a motive, or fears about

potential copyright infringement.  Their concerns were directed

to the relative sizes of the catalogs, and the combinations

whose loss could not be tolerated although they could be

foregone individually.

On the credible evidence as a whole, I conclude that the

predominant motive of Pandora's management in the publisher

negotiations was to retain the publishers' works in its

inventory of songs because of those songs' importance to its business. In the second quarter of 2014, Sony and EMI's combined repertory comprised 32.2% of the top 100 songs played on U.S. radio, while UMPG's catalog accounted for 15.2%, and BMG's accounted for 6.5%: a total of 53.9% of performances of those songs. Joint PTO Ex. A ¶¶ 47, 49-50.

In Kennedy's declaration urging the Federal Trade Commission to deny Sony's application to acquire EMI, he wrote:

> As described above, if Sony alone tried to increase the price of its performance licenses, Pandora could survive without Sony's catalogue, though losing Sony's songs would be less than ideal for Pandora and its listeners. I am certain, however, that Pandora could not survive without access to the combined Sony and EMI catalogues, because the combined catalogues account for many of the most popular songs on Pandora and together control a very large percentage of all music publishing rights in the United States. Thus, if Sony acquires EMI and the combined Sony/EMI music catalogues are withdrawn from the PROs, Pandora would have no choice but to enter into a direct license to obtain that content – even at significantly higher rates.

Exh. BX 771.

The evidence that the motivation for agreement and the evaluation of license cost were commercial and not legal comports with the conclusion of BMI's expert Dr. Cremieux:

> If that list had been key, and if the acquisition of such a list or the development of such a list of works had been key to its negotiation, then from an economic standpoint what I would expect to observe is that in the early agreements or presumably there was less time for, and we'll talk specifically about what I mean by less time, but where there was less time for Pandora to put together the material it needed, I would expect the rates to be higher.

Because if Pandora's theory is true, absent the list it's
at the mercy of the publishers and it can't resist an
unreasonable rate.

However, a year later, a year and a half later when a new
negotiation that has been anticipated for at least 12
months is coming up, well, then you would expect that
Pandora would have had more time and would've used this
time to acquire the information it needs to acquire and,
therefore, you would expect those rates to be lower.

In fact, you don't observe that.  There's no relationship
between the amount of time that Pandora was on notice for
and the rate that was ultimately agreed upon.  So it's hard
for me to see the economic kind of tell tale sign of those
lists as being key elements of a negotiation.  There's just
no such evidence.

Cremieux 1597-98.

The reality is that those transactions were driven by
business considerations rather than the collateral prospect of
copyright infringement.  There was at that time a window of free
market negotiations (i.e., outside the framework of rate court
litigation under a consent decree) giving recognition to real
world evaluations.  See, e.g., the discussion among the Pandora
executives set out in full at pp. 37-44, supra.  Accordingly,
the Sony and UMPG agreements negotiated in December 2013 are
valid benchmarks.  And if they were entitled to any discount
because of a legal risk Pandora faced, they could be discounted
substantially and still place 2.5% within a reasonable range.

Dr. Keith Waehrer, Pandora's expert, who has some antitrust
experience, conceived that BMI did not compete, but conspired,
with the publishers when it discussed their potential return to

BMI (thus assuring them of a market) before December 31, 2013, and later signing suspension agreements that allowed the publishers to reenter BMI.  Whatever its merits from a doctrinal point of view, that concept has no factual application to this situation.  BMI was not a competitor to the publishers.  It is the agency through which they market their music.  What Pandora wanted to acquire before December 31 was a license to Sony and UMPG's catalogs, which constituted a major portion of Pandora's musical offerings to the public.  The only possible sellers of those catalogs at this time were Sony and UMPG.  BMI had no competitive product to offer Pandora, because it could no longer offer Sony and UMPG's catalogs.  Pandora already had the right to play all of the other works in BMI's repertory under its blanket license, and BMI had nothing further to offer.  The notion that it could compete with the publishers on any ground has no factual basis.

BMI's licenses with Apple's iTunes Radio, Spotify, Rdio and Rhapsody, which are Pandora competitors (although they have slightly different business models) are confirmatory of the fact that contemporaneous market rates are in the range of 2.5% under free market conditions.

### D. Pandora's Proposed Benchmarks

Pandora proposes a "reasonable" rate between 1.7% and 1.85%, based primarily on the existing Pandora-BMI license rate,

but also on Pandora's direct licenses with EMI and BMG, the
ASCAP-Pandora license, and the 2012 RMLC license.

### 1. BMI Form License Agreement

The Form License Agreement that BMI entered into with
Pandora in 2005 is outdated, was a substantial factor in causing
the publishers' withdrawals of their catalogs from BMI's
repertory, and its 1.75% rate is too low under current market
circumstances, as shown by contemporaneous transactions.

BMI's decision not to terminate its license between 2005
and 2011 was not an admission that the 1.75% rate was
appropriate; it represented a business decision not to expend
the effort of terminating Pandora's license when Pandora's fees
represented a minimal amount of BMI's licensing revenue in 2011,
the cost of the change would be more than the extra revenue it
would yield, and BMI was already engaged in expensive rate court
litigation with the RMLC and the Television Music Licensing
Committee.

### 2. 2012 Pandora-EMI License

The 2012 EMI-Pandora deal for ASCAP works is of secondary
importance because it has been superseded by Sony and EMI's two
subsequent direct licenses with BMI.  By December 2012, EMI was
no longer willing to do a deal with Pandora for 1.85%.  Sony
negotiated a Round One direct license with Pandora for the EMI-
BMI compositions at a rate of 2.25% for BMI's adjusted market

share, and a Round Two license at a share-adjusted rate of 5.85%.  In light of those subsequent agreements, the earlier EMI-ASCAP 2012 license is not much use as a benchmark.

### 3. RMLC License

As previously discussed, the RMLC license is not an appropriate benchmark because Pandora is not radio and is not similarly situated to the other RMLC licensees.

### 4. ASCAP-Pandora License

The ASCAP-Pandora license is not a relevant benchmark because it is based on a different record and does not reflect the most recent market.  Discovery in the ASCAP-Pandora litigation closed on November 4, 2013.  United States v. Am. Soc'y of Composers, Authors & Publishers (In re Petition of Pandora Media, Inc.), 6 F. Supp. 3d 317, 345 (S.D.N.Y. 2014), aff'd, May 6, 2015 (2d Cir. 2015).  Thus, the ASCAP-Pandora license does not reflect the significant free-market Sony or UMPG direct licenses entered into thereafter.

### 5. Pandora-BMG License

The Pandora-BMG July 2014 agreement is not an appropriate benchmark.  It has unquantifiable ancillary benefits to BMG, not apparently reflected in its fixed-dollar fee structure.

For the same dollar amount, the BMG agreement encourages additional spins of BMG music on Pandora, which increase sound recording fees paid to BMG and promote BMG artists and writers,

which was clear to the parties during the negotiations.  It also released Pandora "from any and all claims that BMG may have had or could have asserted against Pandora accruing prior to July 1, 2014, including for copyright infringement of any BMG works during the period prior to July 1, 2014."  There is no evidence of the value of any such claims.  Exh. BX 319.  At the time BMG negotiated the agreement it was a BMI affiliate, and Pandora could perform its catalog through BMI at the rate court rate. Its unusual flat-fee structure was negotiated by lawyers, with the transaction's potential use as a benchmark in this litigation in mind.

### E. BMI's AFBL Framework Is Adopted

BMI's AFBL formula is structured as follows:

*AFBL Fee = BMI Floor Fee + Incremental Administrative Fee + {Fee Subject to Credit x Adjustment Factor}*

*Adjustment Factor = {1 − {Directly Licensed Performances + Withdrawn Performances / Total BMI Performances + Withdrawn Performances}*

BMI and Pandora generally agree on the structure of the AFBL and BMI's proposed formula.  The parties disagree, however, on three of the AFBL's components: (i) whether the AFBL should

include a floor fee; (ii) whether the AFBL should include an
administrative fee; and (iii) how the AFBL should be adjusted to
account for withdrawn works that are not being performed and
have not been directly licensed.

As this Court held in BMI, Inc. v. DMX, Inc., 726 F. Supp.
2d 355, 361-62 (S.D.N.Y. 2010), aff'd, 683 F.3d 32 (2d Cir.
2012), a floor fee:

> represents the value to DMX of the portion of the AFBL that
> is independent of the value of the music performing rights.
> Thus it remains constant regardless of the extent of the
> licensee's direct licensing.  This value is provided by BMI
> assembling its repertoire and making it available to DMX,
> and includes the convenience of gaining access to the
> entire BMI repertoire in one license, the immediate right
> to access new BMI works, and protection against copyright
> infringement.

Pandora's economic expert, Dr. Waehrer, conceded at trial
that the publisher withdrawals did not eliminate the value of
the non-music benefits of the traditional blanket license.
BMI's proposed floor fee of 10% of the blanket license fee
(i.e., 10% of 2.5% of Pandora's gross revenues for that year)
accounts for any decrease in the value of those components that
may have resulted from publisher withdrawals, and is lower than
the 17% floor fee affirmed in DMX.

Conceptually, a floor fee may set an artificially high base
if a publisher withdraws all of its works, for BMI's repertory
can be reduced by the withdrawal to a substantially smaller
inventory, of less value to its blanket licensees.

- 56 -

At present, there is no showing of a pending prospect of such massive publisher withdrawals. The current situation makes it more likely that the publishers looked at the practicalities of BMI being unable to offer a work as part of its repertory if it could not offer it to all applicants, and they sensibly decided that it was unworkable for their businesses, even if BMI was legally allowed to handle all the needed administrative services.

Until so extreme a concrete case is presented, the question is sufficiently handled by present crediting mechanisms.

BMI should also be paid an incremental administrative fee equal to 3% of the traditional blanket fee. This Court upheld an administrative fee in DMX because an AFBL is "more expensive for BMI to administer than its traditional blanket license." DMX, 726 F. Supp. 2d at 362. The administrative fee covers the additional costs of BMI to administer the AFBL because BMI must track direct licenses to ensure that all performed works are licensed through BMI or a direct license and then calculate and process credits to Pandora for performances of directly licensed works. It is reasonable to allocate these costs to Pandora.

Finally, BMI's proposed adjustment mechanism is reasonable. BMI and Pandora agree that Pandora should receive a pro rata, performance-based credit to account for any BMI-affiliated composition that is either directly licensed by Pandora or

withdrawn from BMI's repertory.  Pandora disagrees with BMI's proposed crediting mechanism only in the limited circumstance where Pandora removes a publisher's works from its service and does not enter into a direct license with the publisher, who continues to stay withdrawn from BMI.

Under BMI's proposed crediting mechanism, Pandora would receive a partial share credit for all works co-owned by a BMI-affiliated publisher and a withdrawn publisher that Pandora continued to perform.  For example, if Pandora and a publisher no longer have a license, but Pandora has a license from another publisher who co-owns the work and continues playing it, BMI will give Pandora a credit against the portion of the blanket fee that represents the value of this music.  This is appropriate because that music is no longer part of what BMI is licensing to Pandora, and BMI has no claim to a fee for that performance.  The performance-based credits should be based on current performances, not past performances as Pandora suggests, for accuracy and ease of calculation.

### F. BMI's Advertising Deduction Proposal is Appropriate

BMI's offer of an advertising discount is a consistent feature of its blanket licenses, proffered because of its history rather than any particular economic justification.

In this case it takes the form of a discount of 100% of advertising costs paid to others by the licensee, up to 15% of their total.

Pandora seeks to include in the amount of discounted advertising costs its own internal costs incurred in that connection.  BMI would have no objective control over such internal costs of Pandora.  Its proposal would involve extra layers of accounting complications, it has no independent economic justification, and is simply an attempt to reduce an overall offer which (as noted elsewhere in this Opinion) is already at the lower end of reasonableness.

### G. Term of License

BMI proposes a four year license term; Pandora contends that it should be five.  It is clear that Pandora seeks a longer term because it endeavors to remain under a rate court rate which is considerably lower than direct license rates.

A shorter license term will allow the parties to re-evaluate their licensing relationship sooner, which is critical given the rapidly changing nature of the online music industry.  The Department of Justice is conducting an ongoing review of the withdrawals under the ASCAP and BMI Consent Decrees and Pandora is lobbying the CRB to lower its royalty rates.  BMI's proposed four-year license term is also longer than any other license

that BMI has with new media providers.  BMI's proposed four-year term is reasonable.

### Conclusion

The petition is granted and the rate for the BMI-Pandora license is set at 2.5% of revenue for the years 2013 through 2016. BMI's AFBL formula is adopted and Pandora is entitled to an advertising agency commission deduction of up to 15% of third-party costs.

So ordered.


Dated:  New York, New York
        May 27, 2015

                                    *Louis L. Stanton*
                                 _____
                                    LOUIS L. STANTON
                                    U.S.D.J.